IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENTUCKY SPEEDWAY, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Misc. No._____ |
| | : | |
| NATIONAL ASSOCIATION FOR STOCK | : | **REDACTED VERSION** |
| CAR AUTO RACING, INC., *et al*. | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFF'S MOTION TO COMPEL
## AGAINST THIRD PARTY DOVER MOTORSPORTS, INC.

Kentucky Speedway, LLC ("Kentucky Speedway"), plaintiff in an antitrust action

in the Eastern District of Kentucky (case no. 2-05-CV-138) (Bertelsman, J.), brings this

motion to compel against third party Dover Motorsports, Inc. ("Dover") in order to obtain

documents necessary to the prosecution of the case. From the limited production of the

defendants National Association for Stock Car Auto Racing, Inc. ("NASCAR") and

International Speedway Corp ("ISC"), it appears that Dover possesses relevant and

responsive documents that Kentucky Speedway cannot obtain from any other source.

1.    Kentucky Speedway and Dover have engaged in extended negotiations

about the production of documents for a period of months. So far, Dover has produced

nothing. After first serving subpoenas to Dover in the Eastern District of Kentucky and

the Southern District of Ohio to which Dover objected on the basis of service, Kentucky

Speedway served Dover a subpoena from the District of Delaware on May 30, 2006.

That subpoena is attached as Exhibit 1. Dover objected to the subpoena, claiming an

undue burden, irrelevant requests, and that the requests were too broad. *See* Exhibit 2.

1

Kentucky Speedway and Dover then attempted to narrow the categories even more, but Dover still objected. After viewing ISC's production, Kentucky Speedway requested a set of documents narrower than the original subpoena but broader than the July 7 compromise because after viewing the defendants' production, Kentucky Speedway realized that there were certain categories of documents necessary to its case and that only Dover was likely to have them. Kentucky Speedway has narrowed its original subpoena to 22 categories that are highly relevant to the plaintiff's case. *See* Exhibit 3. Kentucky Speedway has now noticed the deposition of the Chairman of Dover's Board in mid-December, and faces a discovery cut-off of January 12, 2007.

## I.    Kentucky Speedway's Allegations and Relevant Legal Standard.

2.    Kentucky Speedway has brought an antitrust claim under the Sherman Act, Sections 1 and 2, alleging that the defendants NASCAR and ISC have monopolized, attempted to monopolize, and conspired to monopolize the markets for premier stock car racing and premier stock car racetracks over a prolonged period of time. NASCAR is the body in charge of sanctioning Nextel Cup races, which currently is the only type of premier stock car race. NASCAR also decides who will host these races. Kentucky Speedway's First Amended Complaint is attached as Exhibit 4.

3.    Kentucky Speedway's allegations, in part, are that NASCAR and ISC have conspired to award ISC the majority of Nextel Cup races (Compl. ¶ 3(a)), schedule, and realign when necessary, Nextel Cup races in order to maximize revenue to ISC (*id.* ¶ 3(c)), award Nextel Cup races to ISC tracks substantially in advance of awards to competing tracks (*id.* ¶ 3(d)), and award Nextel Cup races to racetracks ISC is purchasing, building, or considering purchasing. (*Id.* ¶ 3(e)). After three years of

2

planning, Kentucky Speedway opened its race track in 2000. (*Id.* ¶¶ 20, 23). Kentucky Speedway does not host a Nextel Cup race.

4.    Kentucky Speedway also has alleged a violation of Section 1 of the Sherman Act because NASCAR and ISC "have engaged in a continuing contract, combination and conspiracy, among themselves and with other companies that control tracks," to unreasonably restrain trade. (*Id.* ¶ 42). These other tracks potentially include Dover. Dover hosts two Nextel Cup races at its track in Dover, Delaware.

5.    Kentucky Speedway has subpoenaed Dover in order to ascertain any contacts between NASCAR or ISC on the one hand and Dover on the other regarding Kentucky Speedway's allegations. As explained more fully in the sealed section below, Kentucky Speedway also has subpoenaed Dover to determine whether anyone has attempted to buy Dover, and if so, the reasons why Dover rejected such a bid. These activities go to the heart of Kentucky Speedway's conspiracy claim against ISC and NASCAR and of Kentucky Speedway's attempted monopolization claim against ISC.

6.    The parties in this case have conducted discovery under a protective order entered by the Eastern District of Kentucky that limits access to trade secrets or other confidential information. The protective order allows third parties such as Dover to designate any materials as either confidential or highly confidential. For highly confidential material, only attorneys and outside experts can see the document. No person working in the racecar business, including inside counsel at the companies or the parties themselves, can see this material. A full copy of the protective order is attached as Exhibit 5.

3

## II.    The Relevant Legal Standard and the Subpoena.

7.      "Federal Rule of Civil Procedure 45 authorizes the issuance of a subpoena commanding a person to whom it is directed to attend and give testimony, or to produce and permit the inspection of designated documents." *Highland Tank & Mfg. Co. v. PS Intern., Inc.*, 227 F.R.D. 374, 379 (W.D. Pa. 2005). A court may quash or modify a non-party subpoena if the subpoena is overly broad or if it seeks confidential material. Fed. R. Civ. P. 45(c)(3)(B). Even if the subpoena requires the disclosure of confidential information, a court can still order the production of documents where, as here, the party issuing the subpoena can show a "substantial need" for the material "that cannot otherwise be met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated." *Id.* A party attempting to quash or modify the subpoena like Dover here has a "heavy burden of establishing that compliance with the subpoena would be 'unreasonable or oppressive.'" *Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enter., Inc.*, 160 F.R.D. 70, 72 (E.D. Pa. 1995) (quoting *Heat & Control, Inc. v. Hester Indus.*, 785 F.2d 1017, 1023 (Fed. Cir. 1986)).

8.      Here, the subpoena is not overly broad and the protective order in the case protects any confidential material of Dover. The protective order allows Dover to produce documents under a highly confidential designation that prevents the public and even the parties themselves from viewing this material. Moreover, Kentucky Speedway has a substantial need for the documents and has offered to pay Dover's reasonable expenses in complying with the subpoena.

4

9.    The subpoena issued to Dover as narrowed to the 22 categories is not overly broad. It is targeted to obtain documents necessary to Kentucky Speedway's case. Kentucky Speedway does not desire documents in the public domain such as track schedules or newspaper articles or documents that are otherwise publicly available. Instead, it seeks only those documents that directly relate to evidence of NASCAR or ISC's anticompetitive behavior and that only Dover has.

10.    Over the summer, counsel for Kentucky Speedway and counsel for Dover engaged in extended negotiations to try to narrow the subpoena, with counsel for Dover maintaining that Kentucky Speedway should wait until the ISC production is complete due to concerns about undue burden. *See* Exhibit 6 (email exchange between Richard Placey and Justin Nelson). Counsel for the parties attempted to narrow the categories to a small subset of categories of documents, but could not reach a resolution on this issue because Dover wanted an assurance that Kentucky Speedway would not seek any more documents from Dover. *See id.* This attempt to reach an agreement was specifically not in prejudice of Kentucky Speedway's right to request more documents after viewing the defendants' production. *See id.*; *see also* Exhibit 7.

11.    After seeing ISC's production, Kentucky Speedway requested 22 categories of documents based upon the scope and nature of ISC's production. ISC's production, for example, did not include e-mails between Dover and ISC, nor did it include many documents exchanged between the parties. Part III explains this point more fully. These 22 categories of documents are narrower than the original subpoena while also permitting Kentucky Speedway to view documents necessary to the prosecution of the case. These categories are attached as Exhibit 5.

5

12.     These categories seek documents related to the discrete issues that are central to Kentucky Speedway's case, the denial of which would cause undue hardship to the plaintiff.   These categories relate to NASCAR and ISC's market power and the alleged conspiracy between the defendants and potentially Dover, including documents reflecting negotiations for a Nextel Cup race, negotiations over the terms of the sanctioning agreement, documents showing the defendants' market share or market power, communications between Dover and the defendants regarding the scheduling of a Nextel Cup race, any attempts by others to buy the racetrack, and any other documents reflecting whether Dover is a participant in the conspiracy such as communications to the defendants about other racetracks.   Kentucky Speedway also asked for demographic studies of the fan base and the gross profits of a Nextel Cup race – information important to Kentucky Speedway's product market and damages analysis, respectively.

13.     Consequently, Kentucky Speedway's subpoena seeks highly relevant information in a manner that does not impose an undue hardship on Dover.   Indeed, if Dover believes that a particular category is too broad, Kentucky Speedway remains open to working with Dover to narrow the wording of the categories to a mutually-agreeable resolution.   Kentucky Speedway also is willing to limit its request to current and former officers and directors of the company, and is willing to exclude any document that relates solely to the logistics of staging the race itself except to the extent it relates to moving the date for the race.   It is in nobody's interest to have an overbroad production, but Kentucky Speedway needs these categories of documents to help prove its case. *See In re Currency Conversion Fee Antitrust Litig.*, 2004 U.S. Dist. LEXIS 8108 (S.D.N.Y. Apr. 21, 2004) (granting motion to compel discovery of non-party's foreign currency

6

conversion pricing and practices); *see also generally United States v. Dentsply Int'l, Inc.*, 2000 U.S. Dist. LEXIS 6925, *17 (D. Del. May 10, 2000) ("general policy of allowing liberal discovery in antitrust cases" has been observed by this Court because "broad discovery may be needed to uncover evidence of invidious design, pattern, or intent.") (citing *Kellam Energy, Inc. v. Duncan*, 616 F. Supp. 215, 217 (D. Del. 1985).

14.     This Court should order Dover to comply with the subpoena as modified to the 22 narrower categories attached as Exhibit 5. The subpoena does not impose the "heavy burden" that Dover must establish in order to quash or modify the subpoena.

**III.    Highly Confidential Documents Further Show The Substantial Need For This Subpoena – THIS SECTION IS FILED UNDER SEAL**

15.     ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████.

16.     ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████.

17.     ████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

7



## IV. In the Alternative, this Court Should Remit or Transfer this Issue to the Eastern District of Kentucky – Where the Underlying Action Is Pending

18.    Rule 26(c) of the Federal Rules allows "the court in which the action is pending" to rule on a protective order.  Courts have interpreted this provision to allow for either the transfer or the remittal of the discovery dispute to the underlying court.  *See, e.g., U.S. v. Star Scientific, Inc.*, 205 F. Supp. 2d 482, 484-88 (D. Md. 2002) (transfer); *Central States, Southeast And Southwest Areas Pension Fund v. Quickie Transport Co.*, 174 F.R.D. 50, 51 (E.D. Pa. 1997) (remittal).  "[I]t is within the discretion of the court that issued the subpoena to transfer motions involving the subpoena to the district in which the action is pending."  Charles Alan Wright & Arthur R. Miller, 9A Federal Practice & Procedure § 2463 (2d ed. 1995).  "'The court in the district where the deposition is to be taken has the power to grant or deny the protective order, but also possesses discretion to defer to the judge handling the case on the merits.'"  *Central States,* 174 F.R.D. at 51 (quoting 6 James Wm. Moore et al., Moore's Practice, §

8

26.102[3] (3d ed.1997) (footnote omitted)).  In *Central States*, the court remitted the action to the underlying court to resolve a Rule 45 document dispute.  *Id.* at 51-52.  This Court retains this option here, as the Eastern District of Kentucky is very familiar with this case.  Magistrate Judge Wehrman of the Eastern District is ruling on all discovery disputes between the parties, and has already made rulings.

       19.    This Court, therefore, should either enforce Kentucky Speedway's subpoena or transfer or remit this action to the Eastern District of Kentucky.

Respectfully submitted,

BOUCHARD MARGULES & FRIEDLANDER, P.A.

By _____

Joel Friedlander (I.D. No. 3163)
John M. Seaman (I.D. No. 3863)
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
Telephone: 302.573.3500
jfriedlander@bmf-law.com
jseaman@bmf-law.com

Of counsel:

Stephen D. Susman
Vineet Bhatia
Susman Godfrey, L.L.P.
1000 Louisiana St., #5100
Houston, TX 77002
(713) 651-9366
(713) 654-6666 (facsimile)
ssusman@susmangodfrey.com
vbhatia@susmangodfrey.com

Justin A. Nelson
Susman Godfrey, L.L.P.
1201 Third Avenue, #3800
Seattle, WA 98101
(206) 516-3880
(206) 516-3883 (facsimile)
jnelson@susmangodfrey.com

Dated: October 24, 2006

## CERTIFICATE OF CONFERENCE

Pursuant to D. Del. LR 7.1.1, I certify that the parties have conferred in good faith to resolve the matter without court intervention.  My understanding is that this Motion will be opposed.

/s/  Justin A. Nelson

Justin A. Nelson

## RULE 7.1 DISCLOSURE STATEMENT

Kentucky Speedway has no parent corporation and no publicly-held corporation owns more than 10% of its stock.

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2006, I filed the foregoing **Plaintiff's Motion**

**to Compel Against Defendant Dover Motorsports, Inc. (Redacted Version)** with the

Clerk of Court. I also caused a copy of the same to be served upon the following

recipients by hand:

Richard G. Placey
Richard M. Donaldson
Montgomery, McCracken, Walker &
Rhoads, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
Email: rplacey@mmwr.com
Email: rdonaldson@mmwr.com


In addition, I caused the foregoing document to be served on the following

recipients by email:

| | |
|---|---|
| Helen M. Maher | Robert B. Craig |
| Boies, Schiller & Flexner LLP - New York | Taft, Stettinius & Hollister, LLP - |
| 333 Main Street | Covington |
| Armonk, NY 10504 | 1717 Dixie Highway |
| Email: hmaher@bsfllp.com | Suite 340 |
| | Covington, KY 41011-4704 |
| | Email: craigr@taftlaw.com |
| | |
| | Guy I. Wade, III |
| | Melissa J. Swindle |
| | Rodney Acker |
| | Jenkens & Gilchrist, P.C. - Dallas |
| | 1445 Ross Avenue |
| | Suite 3700 |
| | Dallas, TX 75202-2799 |
| | Email: cbrophy@jenkens.com |
| | Email: gwade@jenkens.com |
| | Email: mswindle@jenkens.com |
| | Email: racker@jenkens.com |

By _____

John M. Seaman (I.D. No. 3863)
BOUCHARD MARGULES & FRIEDLANDER, P.A.
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
Telephone: 302.573.3500
jseaman@bmf-law.com

# EXHIBIT 1

*Kentucky Speedway*
*05/30/06*

AO88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

DISTRICT OF _____ DELAWARE

Kentucky Speedway, LLC
V.
National Association for Stock Car

Auto Racing, Inc., *et al.*

**SUBPOENA IN A CIVIL CASE**

Case Number:[1]

2-05-CV-138
(currently pending in Eastern
District of Kentucky)

TO:     Dover Motorsports, Inc.
        1131 North DuPont Highway
        Dover, Delaware 19901

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date, and time specified below to
testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition
in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

X  YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the
place, date, and time specified below (list documents or objects):

See Exhibit A attached.

| PLACE | DATE AND TIME |
|---|---|
| Brandywine Process, 2500 Delaware Ave., Wilmington, DE 19806 (800) 899-2577 | June 15, 2006 (or at place and time otherwise agreed by counsel) |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers,
directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated,
the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER'S SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Attorney for Plaintiff Kentucky Speedway, LLC | May 30, 2006 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Kevin A. Nelson, Susman Godfrey L.L.P., 1201 Third Avenue, Suite 3800, Seattle, WA 98101-3000  (206) 516-3880

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on next page)

676444v1/008870

[1] If action is pending in district other than district    .uance, state district under case number.
AO88 (Rev. 1/94) Subpoena in a Civil Case

| PROOF OF SERVICE | | |
|---|---|---|
| | DATE | PLACE |
| SERVED | | |
| SERVED ON (PRINT NAME) | | MANNER OF SERVICE |
| | | |
| SERVED BY (PRINT NAME) | | TITLE |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                    DATE                              SIGNATURE OF SERVER

                                                      ADDRESS OF SERVER

676444v1/008870

Rule 45, Federal Rules of Civil Procedure     Parts C & D:

(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.

(2)  (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to comply production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)  (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)  fails to allow reasonable time for compliance,

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend

trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B) If a subpoena

(i)  requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in who behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

676444v1/008870

## EXHIBIT A

## DEFINITIONS

1.    "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

2.    "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computerized data compilations.  A draft or non-identical copy is a separate document within the meaning of this term.

3.    "Person" means any natural person or any business, legal or governmental entity or association.

4.    The term "RELATED TO" or "RELATED THERETO" or "RELATING TO" or "RELATING THERETO" or "REFLECTING" when used with respect to a given subject matter or the content of DOCUMENTS means any DOCUMENT or thing that sets forth, describes, reflects, constitutes, concerns, contains, embodies, identifies, states, refers to, or is in any other way relevant to a given subject or transaction.

5.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside if its scope.

6.    The term "NASCAR" shall mean the National Association for Stock Car Auto Racing, Inc. and any officer, director, official, employee, agent, attorney, expert, trustee, consultant or representative, any present or former subsidiary, parent, division, predecessor, successor, and any person acting or authorized to act on their behalf.

7.    The term "ISC" or "INTERNATIONAL SPEEDWAY" shall mean International Speedway Corp. and any officer, director, official, employee, agent, attorney, expert, trustee, consultant or representative, any present or former subsidiary, parent, division, predecessor, successor, and any person acting or authorized to act on its behalf.

8.    The terms "YOU" and "YOUR" shall mean Dover Motorsports, Inc. and any officer, director, official, employee, agent, attorney, expert, trustee, consultant or representative, any present or former subsidiary, parent, division, predecessor, successor, and any person acting or authorized to act on their behalf.

9.    The term "NEXTEL CUP" shall mean the NASCAR Nextel Cup Series and the NASCAR Winston Cup Series.

10.    The term "KENTUCKY SPEEDWAY" means Kentucky Speedway, LLC and any officer, director, official, employee, agent, attorney, expert, trustee, consultant or representative, any present or former subsidiary, parent, affiliate, division, predecessor, successor, and any person acting or authorized to act on their behalf.

11.    The term "person" means natural persons, corporations, firms, partnerships, unincorporated associations, trusts or other legal, business or governmental entities.

12.    "Relating to"; "respecting"; "in respect of"; "relative to"; "relate to"; "related to"; "regarding"; "reflecting"; "evidencing"; "concerning"; "discussing"; "recording"; "analyzing"; "describing"; "summarizing"; "referring to"; or "commenting on the subject matter referred to in each request" have as broad a scope as the discovery permitted under the mutual agreement of the parties or under Federal Rule of Civil Procedure 26(b), whichever is broader.

13.    "Racetrack" means any venue that has hosted or seeks to host any NASCAR-sanctioned event, including Nextel Cup, Busch, and Craftsman Truck Series races, and includes any officer,

director, official, employee, agent, attorney, expert, trustee, consultant or representative of the racetrack, and any present or former subsidiary, parent, affiliate, division, predecessor, successor, and any person acting or authorized to act on the racetrack's behalf. The term includes those venues that have not yet been built so long as the venue would seek to host a NASCAR-sanctioned event if constructed.

14.     "Owned by" means those racetracks where you hold a controlling ownership interest.

15.     "Ownership interest" means owning all or part of a corporation, joint venture, partnership, or other business, person, or entity, either directly or indirectly.

## INSTRUCTIONS

1.      Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, each party shall produce the requested documents as they are kept in the usual course of business. Documents should be marked to indicate the identity of the individual party producing such documents.

2.      If any document responsive to any of these requests is withheld by asserting any privilege or immunity from production, submit a schedule at the time of production setting forth for each document withheld, the following information:

       a.      The type of document (e.g., letter, memorandum, etc.);

       b.      The date the document was prepared, and the date of any meeting or conversation reflected or referred to in the document;

       c.      The name of each author, co-author or preparer of the document and the name of each recipient or addressee, including each recipient of a copy of the document;

       d.      If the documents reflect or refer to a meeting or conversation, the name of each person who was present at or was a party to the meeting or conversation; the subject matter of the information contained in the document;

e.    The nature of the privilege or immunity asserted; and

f.    A brief explanation of why the document is believed to be privileged or immune from production.

3.    Produce the originals of any document requested and all copies thereof if any copy is other than identical with the original.

4.    All documents should be produced in their entirety, including all attachments and enclosures, along with their original folders, binders, or other covers or containers.

5.    If, for any reason, any of the documents or tangible things to be produced by any plaintiff pursuant to this request have been destroyed, lost or otherwise disposed of, state for each category the following information:

a.    The date the document or tangible thing was lost, destroyed or disposed of;

b.    All witnesses who have knowledge of the loss, destruction or disposal of the object or tangible thing; and

c.    The details concerning the loss of such documents, including the reason for the destruction or disposal and the person authorizing it.

## TIME PERIOD

Unless otherwise stated in a Request, produce all responsive documents created on or after January 1, 1992.

## DOCUMENTS TO BE PRODUCED

1.    The following documents from *Francis Ferko v. National Association for Stock Car Racing, Inc. et al.*, Case No. 4:02CV50 (Eastern District of Texas):

a.    All documents produced by you or to you in accordance with discovery conducted

      b.     All depositions of you or any of your officers, directors, or employees.

2.     All documents showing any ownership interest, whether direct or indirect, held by any officer, director, or employee of ISC or NASCAR, in you.

3.     All documents showing any ownership interest, whether direct or indirect, held by any officer, director, or employee of ISC or NASCAR, in any corporation, joint venture, partnership, or other business in which you, your officers, directors, or employees have an ownership interest, excluding any corporation that is publicly traded on the New York Stock Exchange, NASDAQ, or the American Stock Exchange.

4.     All documents showing any ownership interest of you, your officers, directors, or employees in ISC or NASCAR.

5.     All documents related to the market share or market position of NASCAR.

6.     All documents related to the market share of market position of ISC.

7.     All documents related to the number of tracks owned by ISC.

8.     All documents related to any anticompetitive behavior or activity by ISC or NASCAR.

9.     All documents related to the economic impact of a racetrack in a particular geographic area.

10.    Documents sufficient to show the amount of revenue your racetrack(s) have received or could receive from hosting a Nextel Cup race.

676551v1/008870          5

11.    All documents reflecting any business relationship or financial arrangement between you and any racetrack not owned by you.

12.    All documents relating to communications between you and any officer, director, official, employee, agent, attorney, expert, trustee, consultant or representative of any racetrack not owned by you.

13.    All documents relating to any change in NASCAR's realignment policy or procedures, whether formal or informal, including but not limited to realigning Nextel Cup races from one venue to another provided both racetracks are owned or affiliated with the same entity and not realigning any Nextel Cup race from an existing racetrack to another owner.

14.    All documents relating to NASCAR's decision to limit the number of allowable race teams operated by a single owner, or race entries owned by a single owner.

15.    All documents relating to the number of Nextel Cup races that NASCAR sanctions in a season, how NASCAR allocates Nextel Cup races among racetracks, or when in the season a particular racetrack will host a Nextel Cup event.

16.    All documents relating to consideration of Kentucky Speedway for a Nextel Cup race.

17.    All documents relating to Kentucky Speedway.

18.    Documents sufficient to show your document retention or destruction policy.

19.    All documents relating to your view, assessments, and opinions about the qualities, characteristics, advantages, and disadvantages of each or any racetrack that currently hosts, has hosted, seeks to host, or is capable of hosting a Nextel Cup Race.

676551v1/008870                                        6

20.    All documents relating to any attempt of any racetrack owner(s), including you, to acquire or purchase in whole or in part, or merge with, another racetrack or its owner(s), whether successful or unsuccessful.

21.    All documents relating to any racetrack's, or its owner's, reaction to NASCAR's decision to negotiate a television broadcast agreement on behalf of all racetracks.

22.    All documents relating to any changes to the terms of any NASCAR sanctioning agreement.

23.    All documents related to the amount or percentage of revenue allocated to racetracks, drivers, and NASCAR by the Nextel Cup sanction agreements, including but not limited to any potential changes to the amount or percentage.

24.    All documents relating to NASCAR's and/or ISC's decision to award or not award a Nextel Cup race to any racetrack owned by you that has hosted or sought to host a Nextel Cup race.

25.    All documents relating to NASCAR's and/or ISC's decision to award or not award a Nextel Cup race to any racetrack not owned by you that has hosted or sought to host a Nextel Cup race.

26.    Documents sufficient to show the following for each racetrack owned by you, or in which you have an equity interest or affiliation, awarded a Nextel Cup race since 1990:

    a.    The sanctioning of each Nextel Cup race, including but not limited to all Nextel Cup sanctioning agreements;

676551v1/008870                    7

b.    The seating capacity for the racetrack, broken down by general

admission/grandstand, luxury suites, club seats;

c.    Parking capacity, and recreational vehicles and trailer spaces for the racetrack;

d.    The geographic location, age, construction and renovation history;

e.    Configuration and track length of the racetrack;

f.    The ticket sales for the Nextel Cup event;

g.    The advertising revenue for the Nextel Cup event;

h.    The facility amenities for the Nextel Cup event, including but not limited to

concession sales, program and merchandise sales, fees for hospitality tents, and fees for souvenir

trailers;

i.    The racetrack safety records;

j.    Complaints or suggestions about the racetrack by drivers, owners, crew, and

spectators;

k.    Comments about the track by NASCAR;

l.    Comments about the track by any other racetrack;

m.    The television ratings for the Nextel Cup event;

n.    The broadcast fees for the Nextel Cup event;

o.    The race sponsorship for the Nextel Cup event;

    p.      Consumer preference for the Nextel Cup event;

    q.      The purse and prize money for the Nextel Cup event;

    r.      The portion of total revenue for the Nextel Cup event distributed to the racetrack;

    s.      The operating expenses for the event, including but not limited to fixed and variable costs, expenses related to the organization and operation of NASCAR, driver/team compensation, and racetrack compensation and administrative expenses;

    t.      The contract terms, conditions, and provisions for participation;

    u.      The ticket pricing for the Nextel Cup event;

    v.      Track ownership, including purchase and sale information.

    w.      Any reason why the racetrack has hosted a Nextel Cup race; and

    x.      The decision whether to allow the racetrack to host one or more Nextel Cup races.

27.    All documents relating to the decision of when and how you or any of your racetracks received the right to host a Nextel Cup event.

28.    All documents relating to communications between you and NASCAR regarding racetracks in which you do not, or did not at the time of the communication, own an equity interest.

29.    All documents relating to communications between you and ISC.

30.    All documents relating to a consideration or decision by NASCAR to award, sanction, add, withdraw, schedule, transfer, or deny one or more Nextel Cup races to any racetrack or racetrack owner(s), including you.

31.    All documents related to Richard Farmer, Richard Duchossois, Jerry Carroll, Mark Simendinger, John Lindahl, Bruce Lunsford, or Chris Sullivan.

32.    All documents related to www.thetracksuit.info

33.    All documents related to *Kentucky Speedway v. National Association for Stock Car Racing, Inc.*, Case No. 2-05-CV-138 (currently pending in the Eastern District of Kentucky), excepting any communications that are subject to the attorney-client privilege.

34.    All documents related to, including all documents related to any communications by, with, or about, UNITE HERE or the International Brotherhood of Teamsters, from January 1, 2004.

# EXHIBIT 2

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

ATTORNEYS AT LAW

123 SOUTH BROAD STREET
AVENUE OF THE ARTS
PHILADELPHIA, PA 19109
215-772-1500
FAX 215-772-7620

300 DELAWARE AVENUE
SUITE 750
WILMINGTON, DE 19801
302-504-7800
FAX 302-504-7820

LIBERTYVIEW
457 HADDONFIELD ROAD, SUITE 600
CHERRY HILL, NJ 08002
856-488-7700
FAX 856-488-7720

RICHARD G. PLACEY
ADMITTED IN DELAWARE, ILLINOIS,
NEW JERSEY & PENNSYLVANIA
DIRECT DIAL: (302) 504-7880

June 14, 2006

Via E-mail and U.S. Mail
Justin Nelson
Susman Godfrey LLP
1201 Third Avenue, Suite 3800
Seattle, WA 98101

Re:    Kentucky Speedway, LLC v. National Association of Stock Car
Auto Racing, Inc. et al; Civil Action No. 2:05-cv-00138-WOB (E.D.Ky.)

Dear Counsel:

The purpose of this letter is to request that Plaintiff withdraw the subpoena served on June 8, 2006 to Dover Motorsports, Inc. ("Dover") for reasons which will be explained below. The requested withdrawal would be without prejudice to Plaintiff issuing a new and narrowly tailored subpoena to Dover once Plaintiff has obtained the documents sought in the subpoena which plainly can be obtained from parties in the action or public sources; if this does not eliminate the need for a subpoena altogether, it should at least enable Plaintiff to narrowly tailor a subpoena to avoid the undue burden and expense imposed by this subpoena. I am authorized to accept service of a subsequent Delaware subpoena upon Dover should you agree to proceed in that fashion.

Overall, the current subpoena seeks documents for almost a fifteen year period, and contains 34 broad requests and many sub-parts. While many of the individual requests are unduly burdensome and expensive for a non-party, taken as a whole the subpoena is breathtakingly broad and burdensome, and thus improper. In addition, the individual requests are themselves improper for the following reasons:

- Documents That Should be Obtained from the Parties: The following requests on their face seek documents that can be obtained one or more of the parties: Nos. 1-7, 10, 13-17, 22-25 and 30.

2084950v1

A LIMITED LIABILITY PARTNERSHIP FORMED IN PENNSYLVANIA
LOUIS A. PETRONI - NEW JERSEY RESPONSIBLE PARTNER

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

Justin Nelson
June 14, 2006
Page 2

- <u>Requests for Documents That are Publicly Available:</u>  The following requests seek documents that, to the extent they exist, are in the public domain and therefore can be obtained from public sources: Nos. 2, 5 and 6.

- <u>Requests that are Overbroad and Vague:</u>  These following requests are so broad and/or vague, or both, that responding to such requests would be unduly and unfairly burdensome and expensive for a non-party: Nos. 5-12, 17, 19-26, 28, 29, and 31-34.

- <u>Requests for Documents That are Not Relevant.</u>  These requests on their face seek documents that are not even relevant to the Kentucky Action: Nos. 11 and 18. For this reason as well, Plaintiff should not have issued, and should have withdrawn such requests.

- <u>Requests that are so Broad as to Seek Privileged or Highly Proprietary Documents.</u> The following requests are so broad that they seek privileged documents (such as communications with counsel about negotiations and the like) or documents that are highly proprietary business information: Nos. 11, 12, 19, 20, 26 and 34.

In addition, Dover has already been forced to incur substantial expense in responding to Plaintiff's Ohio subpoena and Plaintiff's now withdrawn motion in Kentucky. Given that, we must insist that Plaintiff reimburse Dover for the expenses incurred in responding to that subpoena and motion and, if a narrowly tailored subpoena is ultimately issued, we will expect advance payment of the costs of searching for and collecting the documents. Such payments were not included with the subpoena.

As you may know, in connection with the plaintiff's efforts to issue subpoenas from Ohio and Kentucky, I attempted to get the plaintiff's counsel who were proceeding with the Ohio subpoena and the Kentucky motion to approach this in a less expensive and burdensome manner, but was unsuccessful. My request that Plaintiff withdraw the Ohio subpoena was refused, and thus Dover was required to serve a response. Plaintiff did ultimately withdraw the improper Kentucky motion, but only after Dover was required to prepare and serve an opposition to that frivolous motion. Substantial expense was unnecessarily incurred as a result.

In light of that history, I trust that you understand the necessity for serving you with the enclosed Motion of Non-party Dover Motorsports Inc. for Sanctions Pursuant F.R. Civ. P. 45, 11 and 26 and supporting documents. As the motion notes, it is not being filed with the court but rather is being served upon you in accordance with the provisions of Rule 11(c). This is part of my request that Plaintiff withdraw the instant subpoena and, if documents are truly

2084950v1

MONTGOMERY, McCRACKEN, WALKER & RHOADS, LLP

Justin Nelson
June 14, 2006
Page 3

needed from Dover, that Plaintiff proceed with a narrowly tailored subpoena once it has
exhausted all efforts to obtain documents from the parties and public sources. The reasons that
the instant subpoena is improper and violative of the rules are discussed in detail in the Motion,
and I ask that Plaintiffs give that reasoning and the request for withdrawal of the subpoena
serious consideration before proceeding.

In that regard, the subpoena, which was not served until June 8, 2006, seeks a
response by June 15, 2006. I would obviously prefer that Plaintiff give full consideration to
withdrawing the subpoena, and to the arguments made in the enclosed motion, before we
proceed with formal proceedings on that subpoena. Accordingly, I request that you either (1)
withdraw the subpoena prior to June 15, 2006 so that no response is required or (2) if you do not
wish to make that decision by the 15th, that we extend the time for any response to the subpoena
until the time (approximately 21 days) within which Plaintiff may withdraw the subpoena and
avoid sanctions under the enclosed motion (which is being served upon you today) has run. This
will make the full time period available for Plaintiff to decide whether or not to withdraw the
subpoena before Dover is required to bear the additional burden and expense of responding to
the subpoena.

I am hopeful that you will see that it is really in no one's interest here for Plaintiff
to proceed with a blunderbuss subpoena, particularly when many of the documents can and
should be obtained from the parties. I will call you shortly so that we can discuss proceeding as
discussed above rather than proceeding to litigate over a subpoena such as the one that is
currently pending.

Very truly yours,

Richard G. Placey

RGP:pal
Enclosures

cc:    Bill Markovits (w/encl.)
       Kimberly S. Amrine, Esquire (w/encl.)
       Robert B. Craig, Esquire (w/encl.)

2084950v1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENTUCKY SPEEDWAY, LLC | : | MISCELLANEOUS NO: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL ASSOCIATION | : | |
| FOR STOCK CAR AUTO | : | Relates to subpoena issued for C.A. |
| RACING, INC., ET AL., | : | No. 2-05-CV-138 (Currently pending |
| | : | in Eastern District of Kentucky) |
| Defendants. | : | |

## MOTION OF NON-PARTY DOVER MOTORSPORTS, INC. FOR SANCTIONS PURSUANT TO F.R.CIV.P 45, 11 AND 26

NOTICE: This motion is being served upon you, but not filed, in accordance with F.R.Civ.P 11, which provides in part:

A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected. If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees. F.R.Civ.P 11(c)(1)(A).

Pursuant to that rule, it is requested that the subpoena which is the subject of this motion be withdrawn within 21 days and that the time for any response(s) to such subpoena be extended until such 21 day period expires.

2084945v1

Pursuant to Rules 45, 11 and 26(g), Non-Party Dover Motorsports, Inc. ("Dover") moves for the imposition of sanctions upon Plaintiff for violation of such rules in the issuance and service of its subpoenas upon Dover. In support of this motion, Dover relies on the attached Opening Brief in support of such motion, which it incorporates herein by reference.

Respectfully submitted,

Dated: June 14, 2006

Richard G. Placey, Esquire (DE I.D. No. 4206)
Richard M. Donaldson, Esquire (DE I.D. No. 4367)
MONTGOMERY, McCRACKEN,
 WALKER & RHOADS, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
Tel: (302) 504-7880
Fax: (302) 504-7820

Attorneys for Non-Party
Dover Motorsports, Inc.

Of Counsel:

Klaus M. Belohoubek, Esquire
Senior Vice President and General Counsel
Dover Motorsports, Inc.
Concord Plaza
3505 Silverside Road
Plaza Centre Bldg., Suite 203
Wilmington, DE 19810

-2-

2084945v1

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENTUCKY SPEEDWAY, LLC | : | MISCELLANEOUS NO: |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| NATIONAL ASSOCIATION | : | |
| FOR STOCK CAR AUTO | : | Relates to subpoena issued for C.A. |
| RACING, INC., ET AL., | : | No. 2-05-CV-138 (Currently pending |
| | : | in Eastern District of Kentucky) |
| Defendants. | : | |

OPENING BRIEF IN SUPPORT OF THE MOTION OF
NON-PARTY DOVER MOTORSPORTS, INC. FOR
SANCTIONS PURSUANT TO F.R.CIV.P 45 AND 11

Dated: June 14, 2006

Richard G. Placey, Esquire (DE I.D. No. 4206)
Richard M. Donaldson, Esquire (DE I.D. No. 4367)
MONTGOMERY, McCRACKEN,
  WALKER & RHOADS, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
Tel: (302) 504-7880
Fax: (302) 504-7820

Attorneys for Non-Party
Dover Motorsports, Inc.

Of Counsel:

Klaus M. Belohoubek, Esquire
Senior Vice President and General Counsel
Dover Motorsports, Inc.
Concord Plaza
3505 Silverside Road
Plaza Centre Bldg., Suite 203
Wilmington, DE 19810

2084912v1

## TABLE OF CONTENTS

I.    STATEMENT OF NATURE AND STAGE OF THIS PROCEEDING ........................... 1

    A.    The Ohio Subpoena............................................................................................. 1

    B.    The Kentucky Motion for "Nationwide Service of Subpoenas." ........................... 1

    C.    Plaintiff's Delaware Subpoena ........................................................................... 1

II.    SUMMARY OF ARGUMENT ........................................................................................ 2

III.    FACTUAL STATEMENT .............................................................................................. 2

    A.    The Delaware Subpoena Violates Rule 45, Rule 11 and Rule 26(g).................... 2

    B.    The Instant Violation of Rule 45, Rule 11 and Rule 26(g) Must be Seen In
Light of Plaintiff's Prior Burdensome and Expensive Conduct in Ohio and
Kentucky. ............................................................................................................ 3

IV.    ARGUMENT .................................................................................................................. 4

    A.    Plaintiff's Conduct Violates Rules 45, 11 and 26(g) and Sanctions Should
Be Imposed for Plaintiff's Issuance of and Failure to Withdraw the
Subpoena, Particularly in Light of Plaintiff's Prior Conduct. ............................... 4

V.    CONCLUSION................................................................................................................ 5

2084912v1

TABLE OF AUTHORITIES

## I.   STATEMENT OF NATURE AND STAGE OF THIS PROCEEDING

This proceeding in Delaware arises out of Plaintiff's efforts to issue subpoenas to various non-parties arising from an antitrust action pending in Kentucky, captioned <u>Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al</u>; Civil Action No. 2:05-cv-00138-WOB (E.D.Ky.) (the "Kentucky Litigation")[1]. The instant subpoena in Delaware is now Plaintiff's **third** unduly expensive and burdensome subpoena to which Dover Motorsports, Inc has been required to respond.

### A.   The Ohio Subpoena.

On or about April 14, 2006, Plaintiffs attempted to issue a subpoena relating to the Kentucky Litigation from the Southern District of Ohio to Dover at its place of business in Dover, Delaware. A copy of this Ohio subpoena is in the Appendix. (App ___). It is undisputed that Dover is far more than 100 miles from any part of the Southern District of Ohio.

Upon receipt of the subpoena, counsel for Dover contacted Plaintiff's counsel and requested that the Ohio subpoena be withdrawn and that a valid Delaware subpoena be issued in its place. Counsel for Dover even offered to accept service of such a (proper) subpoena in order to expedite the process. Plaintiff's counsel refused and refused to withdraw the Ohio subpoena.

Accordingly, on May 8, 2006, Dover was forced to serve protective Rule 45 objections to the Ohio subpoena putting on record its objections to that subpoena. A copy of those objections – made necessary because Plaintiff forced Dover to waste time and resources on a plainly improper subpoena – is also in the Appendix (App ___). This was plainly an undue expense and burden on Dover in violation of the applicable rules discussed below.

### B.   The Kentucky Motion for "Nationwide Service of Subpoenas."

Plaintiff then filed a motion in the Kentucky Litigation itself, seeking leave to serve third party witnesses anywhere in the country with subpoenas issued from Kentucky. <u>See</u> Docket Item 105 in the Kentucky Litigation (copy at Appendix ___). That motion sought to require Dover (and other third party witnesses) to respond to subpoenas and litigate any disputes or issues that arise from those subpoenas in a jurisdiction far from home, with all of the additional expense and costs necessitated by having to do so.

That motion was utterly baseless, and was ultimately withdrawn. In it, plaintiff sought the right to make nationwide service of subpoenas on the basis of (a) 15 U.S.C. §22 – which applies to service of a complaint on a defendant, <u>and not to subpoenas at all,</u> and (b) 15 U.S.C. §23, which does apply to subpoenas – <u>but only to those issued in actions brought by the federal government</u>.

---

[1] A copy of the docket in the Kentucky Litigation is in the Appendix (App___).

Dover and other non-parties responded to that motion, pointing out that the relief sought was not even permitted by the above statutes – those upon which Plaintiff was purportedly relying in the motion. See Docket Items 111 and 112 in the Kentucky Litigation (a copy of Dover's response is at Appendix ___).

After putting Dover to the expense of responding to this baseless motion in Kentucky, Plaintiff withdrew it. See Docket Items 113 and 114 in the Kentucky Litigation (App___). Thus, Dover was forced to undertake the undue expense and burden of this response as well.

**C.    Plaintiff's Delaware Subpoena.**

Thereafter, on June 8, 2006 Plaintiff finally bothered to serve a Delaware subpoena on Dover, and demanded a response in 7 days – by June 15, 2006. This subpoena demands that non-party Dover respond to 34 requests (NOT including subparts), and that it produce documents from 1992 to the present – a period of over 14 years. As will be explained in the Factual Statement section below, this subpoena served upon Dover is improper for a variety of reasons, including in particular because the documents sought can be obtained from parties to the litigation and because the requests made are breathtakingly overbroad and vague and thus impose unreasonable and undue burden and expense on a non-party. Taken as a whole, or broken down by request, this subpoena is yet another undue burden and expense and again violates the applicable rules.

In light of this, Dover requested that Plaintiff withdraw this subpoena and, if after obtaining documents from the parties and the public Plaintiff believes that certain additional documents might be needed, that Plaintiff reserve the right to serve a narrowly tailored subpoena upon Dover. Dover's counsel again offered to accept service of such a subpoena issued in Delaware. [explanation of events thereafter to be inserted if subpoena not withdrawn]

## II.    SUMMARY OF ARGUMENT

1.    Sanctions under Rule 45, Rule 11 and Rule 26(g), in the form of fees, costs and other losses should be imposed for Plaintiff's issuance of three different subpoenas, requiring multiple responses in multiple jurisdictions, and its refusal to withdraw the overbroad Delaware subpoena and issue a narrowly tailored subpoena after Plaintiff obtains documents from the parties and from public sources.

## III.    FACTUAL STATEMENT

As explained above, Plaintiff has attempted to force Dover to respond to its subpoenas in Ohio, Kentucky and now in Delaware. Each time, Plaintiff has refused to withdraw the relevant subpoena or motion before Dover was required to incur the expense and burden of responding.

-2-

### A.    The Delaware Subpoena Violates Rule 45, Rule 11 and Rule 26(g)

Plaintiff was asked to withdraw the Delaware subpoena because it is unduly burdensome and expensive and thus violates Rules 45, Rule 11 and Rule 26(g). The particular problems can be summarized as follows:

Documents That Should be Obtained from the Parties: These requests seek documents that NASCAR and ISC (the defendants in the Kentucky Action) have. Such documents can be and – to the extent relevant and non-privileged -- presumably have been obtained from those parties. Examples of these are Request No. 1 (Documents produced in or deposition transcripts from Ferko v. NASCAR), Nos. 2, 3 & 4 (Documents showing ownership interests held by ISC or NASCAR in Dover or the ownership interests in ISC or NASCAR). The subpoena is too long and burdensome for each such request to be discussed here, but the following requests are improper for this reason: Nos. 1-7, 10, 13-17, 22-25 and 30.

In light of the requirements of Rule 45 that subpoenas not impose an undue burden on third parties and that documents be obtained from parties where possible (so that non-parties are not burdened), Plaintiff should never have issued such a subpoena. Plainly Plaintiff should have withdrawn the subpoena when this problem was brought to its attention. See also F.R.Civ.P 11 and F.R.Civ.P 26(g). [discussion of plaintiff's response to be inserted if subpoena not withdrawn]

Requests for Documents That are Publicly Available: These requests seek documents that, to the extent they exist, are in the public domain and therefore should be obtained from public sources. See Request Nos. 2, 5 and 6. For this reason as well, Plaintiff should have withdrawn the subpoena.

Requests that are Overbroad and Vague: These requests are so broad and/or vague, or both, that responding to such requests would be unduly and unfairly burdensome and expensive for a non-party. To take a few examples, Request No. 12 seeks "[a]ll documents relating to communications between you and any officer, director, official, employee, agent, attorney, expert, consultant, trustee or representative of any racetrack not owned by you." By this request, Plaintiff seeks to impose upon Dover the burden and expense of searching for and collecting for its benefit anything relating to any communication with any racetrack (worldwide apparently!) from 1992 to the present. Many other requests are similar, such as No. 26 which seeks such things as (in subpart j) all documents about "[c]omplaints or suggestions about the racetrack by drivers, owners, crew **and spectators.**" Again, the subpoena is too long and burdensome for each such request to be discussed here, but the following requests are improper for this reason: Nos. 5-12, 17, 19-26, 28, 29, and 31-34.

In light of the requirements of Rule 45, not to mention Rule 11 and Rule 26(g), Plaintiff should never have issued such a subpoena, and should have withdrawn it when this problem was brought to Plaintiff's attention. See also F.R.Civ.P 11 and F.R.Civ.P 26(g). [discussion of plaintiff's response to be inserted if subpoena not withdrawn].

-3-

Requests for Documents That are Not Relevant.  These requests on their face seek documents that are not even relevant to the Kentucky Action.  See Request Nos. 11 and 18. For this reason as well, Plaintiff should not have issued, and should have withdrawn such requests.

Requests that are so Broad as to Seek Privileged or Highly Proprietary Documents. Certain requests are so broad that they seek privileged documents (such as communications with counsel about negotiations and the like) or documents that are highly proprietary business information.  Examples of these include Nos. 11, 12, 19, 20, 26 and 34.  These should have been withdrawn for this reason and should never have been issued in the first place.

Each of the individual requests can not be considered in a vacuum.  The subpoena as a whole simply magnifies these problems exponentially by lumping all of such improper, expensive and burdensome demands together.  The result is a 34 item (not including sub-parts) subpoena, seeking documents over almost fifteen years.  Thus, even putting aside the individual items (which are themselves improper), particularly when considered as a whole the subpoena violates Rule 45, as well as Rules 11 and 26.  It should never have been issued and should have been withdrawn.

**B.    The Instant Violation of Rule 45, Rule 11 and Rule 26(g) Must be Seen In Light of Plaintiff's Prior Burdensome and Expensive Conduct in Ohio and Kentucky.**

In connection with Plaintiff's refusal to withdraw the instant subpoena, the burden and expense imposed on Dover by Plaintiff's earlier (and invalid) efforts to subpoena Dover must be borne in mind.  Plaintiff has already imposed significant burdens and expense upon Dover with regard to Plaintiff's subpoenas by its issuance of a subpoena from Ohio, its refusal to withdraw that subpoena even though it was plainly improper, and then its (ultimately withdrawn) Motion in Kentucky for so-called "nationwide service of subpoenas."

Despite a specific request and an offer to accept service in Delaware, Plaintiff refused to withdraw the Ohio subpoena, and so Dover was required to incur the expense of serving a response.  Dover has asked Plaintiff to reimburse it for the costs of this response [discussion of plaintiff's response to be inserted]

Plaintiff then filed the completely unfounded "nationwide service of subpoenas" motion in Kentucky.  Dover was again required to respond, at significant expense.  After Dover was forced to respond to this motion, and pointed out the lack of any legal basis for the motion, Plaintiff then withdrew it.  However, that baseless motion should never have been filed in the first place, and thus the time and expense involved in preparing a response for the Kentucky court should never have been incurred. Dover has asked Plaintiff to reimburse it for the costs of this response [discussion of plaintiff's response to be inserted]

-4-

## IV.    ARGUMENT

### A.    Plaintiff's Conduct Violates Rules 45, 11 and 26(g) and Sanctions Should Be Imposed for Plaintiff's Issuance of and Failure to Withdraw the Subpoena, Particularly in Light of Plaintiff's Prior Conduct.

Rule 45 provides in pertinent part:

(c) Protection of Persons Subject to Subpoenas.

(1) <u>A party</u> or an attorney responsible for the issuance and service of a subpoena <u>shall take reasonable steps to avoid imposing undue burden or expense</u> on a person subject to that subpoena. <u>The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction,</u> which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

\*          \*          \*

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it . . .

(iv) subjects a person to undue burden.

<u>Id.</u> (emphasis added). Rules 11 and 26(g) impose similar requirements upon those serving discovery. These rules, and Rule 45 in particular, require a party to obtain documents from other parties and public sources where possible and to affirmatively act to avoid imposing an undue burden on non-parties. Moreover, when a party violates this requirement, the imposition of sanctions is <u>mandatory.</u> For the factual reasons set forth above, the instant subpoena violated these requirements. Moreover, that violation came after and on top of the undue expense imposed by Plaintiff's Ohio subpoena (and refusal to withdraw that subpoena), and the Kentucky "nationwide service of subpoenas" motion (and failure to withdraw that motion until after briefing was complete).

In light of all of this, at a minimum Plaintiff should have withdrawn the instant subpoena when requested to do so by Dover. Such withdrawal would not have prevented Plaintiff from issuing a narrowly tailored subpoena to Dover -- if additional documents were really needed after it obtained (and carefully reviewed) documents from the parties and public sources. Indeed, Dover again offered to accept service of a Delaware subpoena later if Plaintiff did in fact withdraw the instant one. [discussion of plaintiff's response to be inserted]

-5-

## V.    CONCLUSION

Plaintiff should not have proceeded with the unnecessary, overly broad and unduly burdensome and expensive subpoena, and should have withdrawn it when the problems were very specifically pointed out. Plaintiff also should have reimbursed Dover for the unnecessary costs imposed by its efforts to issue Ohio and Kentucky subpoenas. For these reasons, as more fully argued above, pursuant to Rules 45, 11 and 26(g) Plaintiff should be required to reimburse Dover for all of its costs and expenses (including attorneys fees) incurred in responding to the subpoena in Ohio, the "nationwide service of subpoenas" motion in Kentucky and the instant subpoena.

Respectfully submitted,

Dated: June 14, 2006

Richard G. Placey, Esquire (DE I.D. No. 4206)
Richard M. Donaldson, Esquire (DE I.D. No. 4367)
MONTGOMERY, McCRACKEN,
  WALKER & RHOADS, LLP
300 Delaware Avenue, Suite 750
Wilmington, DE 19801
Tel: (302) 504-7880
Fax: (302) 504-7820

Attorneys for Non-Party
Dover Motorsports, Inc.

Of Counsel:

Klaus M. Belohoubek, Esquire
Senior Vice President and General Counsel
Dover Motorsports, Inc.
Concord Plaza
3505 Silverside Road
Plaza Centre Bldg., Suite 203
Wilmington, DE 19810

2084912v1

Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; C...   Page 1 of 2

## Phadra Sparks

| | |
|---|---|
| **From:** | Jeff McLaren |
| **Sent:** | Wednesday, July 05, 2006 9:13 AM |
| **To:** | File Clerks Houston |
| **Subject:** | FW: Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; Civil Action No. 2:05-cv-00138-WOB (E.D.Ky.) |

**Attachments:** Speedway - Letter to Nelson.pdf; Speedway - Motion.pdf; Speedway - Brief.pdf

# Kentucky Speedway D

# Jeff McLaren
# Paralegal

**From:** Justin A. Nelson
**Sent:** Wednesday, June 14, 2006 11:40 AM
**To:** Bill Markovits; David Filkin; Fay Stilz; James R. Cummins; Jeff McLaren; Jerry Carroll; Justin A. Nelson; Larry Thrailkill; Mark D. Guilfoyle; Mark Simendinger; Paul DeMarco; Richard G. Meyer; Stan Chesley; Steve Susman; Vineet Bhatia
**Subject:** FW: Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; Civil Action No. 2:05-cv-00138-WOB (E.D.Ky.)

**From:** Placey, Richard [mailto:RPlacey@mmwr.com]
**Sent:** Wednesday, June 14, 2006 9:38 AM
**To:** Justin A. Nelson
**Cc:** bmarkovits@mgattorneys.com; kamrine@fbtlaw.com; craigr@taftlaw.com; Lorenz, Pat
**Subject:** Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; Civil Action No. 2:05-cv-00138-WOB (E.D.Ky.)

Mr. Nelson:

Our office represents Dover Motorsports, Inc., with regard to the subpoena you served on June 8th. Enclosed are courtesy copies of a letter and moving papers being served (but not filed) with regard to such subpoena. As you will see, I would like to discuss this with you in an effort to avoid another unnecessary set of filings with regard to Plaintiff's subpoenas.

<<Speedway - Letter to Nelson.pdf>>    <<Speedway - Motion.pdf>> <<Speedway - Brief.pdf>>

Richard G. Placey
(admitted in DE, PA, NJ and IL)
Montgomery, McCracken, Walker & Rhoads LLP
300 Delaware Avenue, Suite 750
Wilmington DE 19801

7/12/2006

Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; C...   Page 2 of 2

Telephone: (302) 504-7880
Fax. (302) 504 7820
Philadelphia (PA) Telephone (215) 772-7424
Cherry Hill (NJ) Telephone (856) 488-7700

7/12/2006

# EXHIBIT 3

Google Desktop: Categories

# Google Desktop

placey and categories            Search    Desktop Preferences
                                            Advanced Search

## Cached messages                               Message **2** of **2** in conversation

**« Older | Newer »    View Entire Thread (2)**    Reply | Reply to all | Forward | View in Outlook

✉  **Categories**

From: Justin A. Nelson <jnelson@SusmanGodfrey.com>
To: Placey, Richard <RPlacey@mmwr.com>
Date: Sep 6 2006 - 10:02am

🖉  708982_1.DOC - 43k - View in Outlook

Happy to discuss any of these with you.

Justin A. Nelson
Susman Godfrey
1201 Third Avenue
Suite 3800
Seattle, WA 98101
206-516-3867

This message is intended only for the people to whom it is addressed and is
intended to be a confidential attorney-client communication.  If this message is not
addressed to you, please delete it and notify me.

**« Older | Newer »    View Entire Thread (2)**    Reply | Reply to all | Forward | View in Outlook

placey and categories            Search

1.    Any document, including any external or internal emails, regarding the terms of a
      NASCAR Nextel Cup sanctioning agreement with you, including the terms of such
      agreements, but specifically excluding the sanctioning agreement itself;

2.    Any document reflecting any discussion or communication regarding the changes to the
      sanctioning agreement.

3.    Any document reflecting negotiations as to any NASCAR Nextel cup race.

4.    Any document reflecting the market power, market share, or market position of
      NASCAR and/or ISC, including but not limited to the number of tracks owned by ISC.

5.    Any demographic study showing the type or geographic location of fans that attend a
      Nascar-sanctioned race at your racetrack .

6.    Any demographic study showing the type or geographic location of fans that attend an
      IRL, CART, or Formula 1 race at your racetrack.

7.    Any documents showing any communications between you and Nascar and/or ISC
      regarding Nascar Nextel Cup races, including adding a race to the schedule, realignment,
      the type and number of races at your racetrack, transferring a race to another racetrack,
      withdrawing a race, the location of the race, the fan base of the race, denying a race,
      acquiring or merging with you, or other geographic locations where a Nextel Cup race
      might occur, but specifically excluding those documents that relate solely to the logistics
      of staging the race itself.

8.    Any documents reflecting any attempts or inquiries by any other person or racetrack to
      buy, acquire, or merge with you, including any right of first refusal, first option to
      purchase, or other option to purchase the track.

9.    Any documents regarding Kentucky Speedway, specifically excluding race schedules or
      other documents that simply reflect information already in the public domain.

10.   Documents sufficient to show the total revenue, gross profit, and net profit for Nascar
      Nextel Cup races.

11.   All documents reflecting any communications with Bill France Sr., Bill France Jr., Brian
      France, Lesa Kennedy France, Jim France, John Saunders, John Graham, Glenn Padgett,
      Gary Crotty, or Mike Helton.

12.    Documents sufficient to show whether you or any of your officers or directors hold any ownership interest, whether direct or indirect, in ISC or NASCAR.

13.    All documents related to any anticompetitive behavior or activity by ISC or NASCAR.

14.    All documents reflecting any business relationship or financial arrangement between you and any racetrack not owned by you.

15.    All documents related to NASCAR's and/or ISC's decision to award or not award a Nextel Cup race to any racetrack owned by you that has hosted or sought to host a Nextel Cup race.

16.    All documents related to the decision of when and how you or any of your racetracks received the right to host a Nextel Cup event.

17.    All documents relating to communications between you and NASCAR and/or ISC regarding racetracks in which you do not, or did not at the time of the communication, own an equity interest.

18.    All documents relating to a consideration or decision by NASCAR and/or ISC to award, sanction, add, withdraw, schedule, transfer, or deny one of more Nextel Cup races to any racetrack or racetrack owner(s), including you.

19.    All documents related to Richard Farmer, Richard Duchossois, Jerry Carroll, Mark Simendinger, John Lindahl, Bruce Lunsford, or Chris Sullivan.

20.    All documents related to www.thetracksuit.info.

21.    All documents related to *Kentucky Speedway v. National Association for Stock Car Racing, Inc.*, Case No. 2-05-CV-138 (currently pending in the Eastern District of Kentucky), excepting any communications that are subject to the attorney-client privilege.

22.    All documents related to, including all documents related to any communications by, with, or about, UNITE HERE or the International Brotherhood of Teamsters, from January 1, 2004.

708982v1/008870

# EXHIBIT 4

Date  11-30-05

CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

KENTUCKY SPEEDWAY, LLC                :      Case Number  2-05-CV-138
A Kentucky Limited Liability Corporation
2216 Dixie Highway, Suite 200         :
Ft. Mitchell, Kentucky  41017
                                      :
    PLAINTIFF,
                                      :
    vs.                                      FIRST AMENDED COMPLAINT
                                      :              AND
NATIONAL ASSOCIATION OF STOCK                    JURY DEMAND
CAR AUTO RACING, INC., AKA NASCAR     :
A Florida Corporation
1801 W. International Speedway Blvd.   :
Daytona Beach, Florida  32114-1234
                                      :

and                                   :

INTERNATIONAL SPEEDWAY                :
CORPORATION
A Florida Corporation                 :
1801 W. International Speedway Blvd.
Daytona Beach, Florida  32114         :

    DEFENDANTS.                       :

        Plaintiff, Kentucky Speedway, LLC (hereinafter referred to as "Kentucky Speedway"),

by its undersigned attorneys, alleges upon knowledge with respect to its own acts and on

information and belief with respect to all other matters, as follows:

## NATURE OF THE ACTION

        1.      The National Association for Stock Car Auto Racing, Inc. ("NASCAR") and

International Speedway Corporation ("ISC") have engaged in multiple violations of the federal

antitrust laws to the detriment of race fans throughout the United States. The illegal actions of

NASCAR and ISC have harmed every aspect of stock car racing. They have hurt race fans by causing higher ticket prices and creating fewer options to watch their favorite drivers. They have hurt the drivers by limiting the amount of money awarded by the tracks to the competitors, by restricting the races in which they can compete, and by discouraging the construction of new tracks. They have hurt sponsors by giving them fewer options in deciding to align with a particular race. They have hurt television and radio broadcasters by limiting the number of races featuring the highest-caliber drivers. And they have hurt independent racetracks such as Kentucky Speedway by doling out NEXTEL Cup races to those tracks that will best protect the market power of NASCAR and ISC – to the detriment of Kentucky Speedway and of all those who want to see true competition in the stock car racing industry. The actions of NASCAR and ISC in shutting out competition make the most egregious tactics of drivers fighting for position on the track look like a Sunday afternoon drive in the country.

2.      NASCAR and ISC are the primary providers of NASCAR-sanctioned stock-car racing in the United States including, but not limited to, the NASCAR NEXTEL Cup Series, the NASCAR Busch Series, and the NASCAR Craftsman Truck Series. NASCAR has illegally maintained a monopoly in the premium stock car racing market by, among other things, refusing to sanction a NEXTEL Cup Series racing event at the Kentucky Speedway and instituting rules and procedures that effectively prevent Kentucky Speedway from staging a competing premium stock car race. NASCAR has also illegally leveraged its monopoly in the premium stock car racing market in an attempt to monopolize the market for hosting premium stock car races through ISC – a company that is owned in part by NASCAR's principals.

3.      NASCAR and ISC have acted, and continue to act, individually and in combination and collusion with each other and other companies that control tracks hosting the

2

NASCAR NEXTEL Cup Series, to illegally restrict the award of NASCAR's primary product races, the NASCAR NEXTEL Cup Series, so as to:

(a)     assure that ISC racetracks or racetracks in which ISC has an equity interest are awarded the majority of these races;

(b)     institute policies and procedures that have the purpose and effect of restraining the ability of non-ISC racetracks to develop competing products;

(c)     schedule, and realign when necessary, NASCAR NEXTEL Cup Series races in order to maximize current revenue to ISC racetracks and injure competing racetracks, such as Kentucky Speedway;

(d)     award NASCAR NEXTEL Cup Series races to ISC substantially in advance of the award of NASCAR NEXTEL Cup Series races to competing racetracks;

(e)     reserve NASCAR NEXTEL Cup Series race dates for award to newly constructed or purchased ISC racetracks, or racetracks ISC is considering purchasing, while withholding the award of these race dates to other qualified competing racetracks, such as Kentucky Speedway;

(f)     award multiple NASCAR NEXTEL Cup Series races to ISC racetracks while awarding no NASCAR NEXTEL Cup Series races to qualified competing racetracks such as Kentucky Speedway; and

(g)     award NASCAR NEXTEL Cup Series races to ISC racetracks while withholding award of these races to competing racetracks, such as Kentucky Speedway, irrespective of seating capacity, ticket sales, attendance, facility amenities, track location, track condition and safety, television ratings, race sponsorships, and/or consumer preference.

4.    Kentucky Speedway brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for damages and injunctive relief for NASCAR and ISC's violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. Kentucky Speedway seeks an injunction requiring NASCAR to establish a competitive bidding process for NEXTEL Cup events and prohibiting further violations of the antitrust laws. Kentucky Speedway also seeks damages in excess of $400,000,000, which would be automatically trebled under federal law.

## THE PARTIES

5.    Plaintiff Kentucky Speedway, a limited liability corporation, organized under the laws of the Commonwealth of Kentucky, owns and operates the Kentucky Speedway located in Sparta, Kentucky. Plaintiff's principal place of business is in Ft. Mitchell, Kentucky.

6.    Defendant NASCAR is a for-profit corporation organized under the laws of the State of Florida, with its principal place of business in Daytona Beach, Florida. Defendant NASCAR conducts business in the Commonwealth of Kentucky and in this federal district. NASCAR sanctions and establishes rules for automotive racing events on racetracks throughout the United States. NASCAR's income is derived from sanctioning and other fees charged to tracks, licensing fees for NASCAR merchandise, revenues generated from television and radio broadcasts of NASCAR-sanctioned race events, and other racing related sources.

7.    Defendant ISC is a for-profit, publicly traded corporation organized under the laws of the State of Florida, with its principal place of business in Daytona Beach, Florida. Defendant ISC conducts business in the Commonwealth of Kentucky and in this federal district. ISC currently owns, operates or has an equity interest in at least 14 motor sports facilities located in Florida, North Carolina, South Carolina, Alabama, California, Virginia, Michigan, Illinois,

4

New York, Kansas, Arizona, and Pennsylvania, including Daytona International Speedway; Martinsville Speedway; Darlington Raceway; Talladega Superspeedway; California Speedway; Richmond International Raceway; Michigan International Speedway; Watkins Glen International; Kansas Speedway; Phoenix International Raceway; Homestead-Miami Speedway and Nazareth Speedway. ISC also holds a 37% indirect equity interest in Raceway Associates, LLC, which owns and operates Chicagoland Speedway and Route 66 Raceway.

8.    NASCAR is the beneficial owner of more than 10% of ISC stock, and the two companies, while distinct legal entities, share or have shared common officers. For example:

William France -- Chairman of the Board of ISC; served as Chief Executive Officer of ISC until 2003; served as Chairman of NASCAR for 31 years until September 2003 and remains Vice Chairman.

James France -- Chief Executive Officer and Director of ISC; member of the Board of Directors of NASCAR.

Lesa (France) Kennedy -- President and Director of ISC; member of the Board of Directors of NASCAR; and

Brian France – Director of ISC; currently Chairman and CEO of NASCAR.

### JURISDICTION AND VENUE

9.    This Court has jurisdiction over this civil action pursuant to 15 U.S.C. § 26 and 28 U.S.C. §§ 1331, 1332, and 1337(a). The sum in controversy exceeds $75,000, exclusive of interests and costs.

10.    Venue is proper in this district under 15 U.S.C. §§ 15, 22, 26 and 28 U.S.C. § 1391 because: the defendants transact business, committed an illegal or tortious act, and/or are

found within this district; and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

## INTERSTATE TRADE AND COMMERCE

11.    At all times relevant hereto, the defendants have engaged in a continuous flow of business organizing, regulating, promoting and marketing NASCAR-sanctioned racing at tracks in the United States. The defendants' business activities that are the subject of this complaint are within the flow of interstate trade and commerce and have had, and continue to have, a substantial effect upon such trade and commerce.

## STATEMENT OF FACTS

### The Business of NASCAR

12.    NASCAR is the largest motor sport sanctioning body in the United States. The first NASCAR race in the "strictly stock" division, which became known as the "Grand National" in 1950 and is now known as the NEXTEL Cup Series, was held at the Charlotte, North Carolina Fairgrounds on June 19, 1949. The "strictly stock" division was open to competitors who drove full-sized American made passenger cars with parts required to be listed in the manufacturer's catalog for each model.

13.    During the 1950's, NASCAR began to flourish and corporate sponsors began to take an active role in the sport. Car manufacturers began to back individual drivers, paying them to drive their cars. By the mid-1960's, NASCAR's rules had changed from a stock car having to be "stock," to a heavily modified car in everything except body outline.

14.    In the late 1960's, NASCAR made major changes in its own structure. NASCAR entered into an agreement with R.J. Reynolds to sponsor an elite division of NASCAR racing and beginning with the 1971 season, the top division of NASCAR became known as the Winston

Cup Series. This association with R.J. Reynolds continued until the Series' sponsorship transferred to NEXTEL Communications in 2004 and the Series' name was changed to the NEXTEL Cup Series.

15.    As the Winston Cup became the top competitive series, a new points system was instituted and significant cash benefits were awarded for competing for these championship points. Standing in championship points became important to the drivers and their teams. ABC began coverage of NASCAR races on Wide World of Sports. In 1979, the Daytona 500 became the first stock car race that was nationally televised from start to finish on CBS.

16.    In 2004, NEXTEL took over sponsorship of the premium series from R.J. Reynolds. At that same time, NASCAR instituted another rule change wherein the top ten point earners through the first 26 races would participate in a ten-race "playoff" called "The Chase for the NEXTEL Cup." NASCAR has also developed and implements rules wherein NASCAR may impose fines and can reduce driver and owner championship points, in its sole discretion, for a variety of activities such as "rough driving," failure to meet specifications, and "inappropriate behavior," through which NASCAR controls both NASCAR-related and non-NASCAR related activities of drivers, crews, owners, and sponsors. Through its system, NASCAR also limits the number of times a driver can test or operate his race car at any race track during the racing season and enforces these restrictions with substantial fines. NASCAR rules designate participation in a non-NASCAR race as "testing."

17.    Today, NASCAR sanctions and establishes rules for automotive racing events on racetracks throughout the United States and Canada. NASCAR's income is derived from sanctioning and other fees charged to tracks, licensing fees for NASCAR merchandise, revenues generated from television and radio broadcasts of NASCAR-sanctioned races events, and other

7

racing related sources. Currently, the three largest racing series sanctioned by NASCAR are the NEXTEL Cup, the Busch Series and the Craftsman Truck Series. NASCAR sanctions approximately 95 races each year in 25 states through its NEXTEL Cup Series, Busch Series, and Craftsman Truck Series.

18.     NASCAR racing is the most popular spectator sport in the United States. It has the second highest television rating in professional spectator sports in the United States, the National Football League being the first.

19.     In the United States, television broadcast rights are split between FOX/FX and NBC/TNT, with FOX/FX airing the first half of the season and NBC/TNT airing the second half. The networks alternate coverage of the Daytona 500 with Fox getting the odd years and NBC the even ones. The current television contract is valued at $2.4 billion. 95% of the television revenue is allocated to the NEXTEL Cup Series and 5% of the television revenue is allocated to the Busch Series. Fox-owned Speed Channel carries the entire Craftsman Truck Series schedule. NASCAR claims a fan base of 75,000,000 people -- one in three U.S. adults are NASCAR fans. Attendance at NASCAR-sanctioned events exceeds 7,000,000. In 2003, 17 of the top 20 attended sporting events in the U.S. were NASCAR sanctioned events. Women make up 40% of NASCAR's fan based and 42% of NASCAR fans earn $50,000 or more per year. More than 70 of the Forbes 500 Companies participate in NASCAR, which is more than any other sport. NASCAR fans are almost twice as likely as baseball and basketball fans to purchase a sponsor's product. NASCAR is expected to generate approximately $3,600,000,000 in United States revenues in the year 2006.

**The Kentucky Speedway**

8

20.    Plaintiff is the owner and operator of the Kentucky Speedway located in Sparta, Kentucky. The Kentucky Speedway is a 1.5 mile tri-oval racing facility that opened in 2000 incorporating state-of-the-art racing safety features, sitting on 858 acres of land. The Kentucky Speedway was designed and built to host premium stock car racing events, and, more specifically, NEXTEL Cup Series events.

21.    The Speedway currently has 66,089 grandstand seats; 50 luxury suites; 210 interior private club seats; 2100 outdoor private club seats; 100 private recreational vehicle spaces on the racetrack's back stretch; 300 reserved camping spots; over 2,000 general camping spots; 104 separate garage double-door stalls; 4 competitor lounges; 2 tire centers; a 635 foot pedestrian tunnel; an infield escalator; a grandstand escalator; a 130 seat infield media center; a 100 seat grandstand press box; an infield banquet room seating 350 and an infield care center. Additional grandstand seats can easily be added to the facility so that the racetrack can accommodate in excess of 100,000 and as many as 180,000 spectators.

22.    The Kentucky Speedway is located near Interstate 71 and is easily accessible as a result of $46 million in completed Kentucky road improvements, including the widening of Interstate 71 and the development of a new interchange off Interstate 71, directly tying into the south end of Kentucky Speedway property, to specifically accommodate traffic patterns to the Speedway, and $52 million in ongoing Kentucky road improvements. The Speedway is also immediately accessible via helicopter.

23.    The Kentucky Speedway, while located in the Commonwealth of Kentucky, is in close proximity to the State of Ohio and the State of Indiana and is within 100 miles of 6.9 million residents. The Kentucky Speedway is located near the Cincinnati/Northern Kentucky International Airport, which is Delta's newest and most modern hub, offering 620 daily

9

departures to 120 cities worldwide, is within a one hour flight of half of the U.S. population, and is within a one hour flight of half of the U.S. manufacturing base.

24.    During its five racing seasons (2000, 2001, 2002, 2003, and 2004), the Kentucky Speedway has outperformed other facilities that were awarded NASCAR Craftsman Truck and NASCAR Busch Series stand-alone races, in attendance and sponsorship.    The Kentucky Speedway has also demonstrated that it can attract major corporate sponsorship for the racing events it hosts.

25.    Despite the competitive seating capacity, ticket sales, attendance, facility amenities, track location, track and track safety conditions, potential television ratings and race sponsorships offered by the Kentucky Speedway, NASCAR has refused to award premium races to the Kentucky Speedway, including but not limited to NASCAR NEXTEL Cup Series races, for the years 2000, 2001, 2002, 2003, 2004 and 2005.

### THE RELEVANT MARKETS

26.    There are two primary relevant products markets for Kentucky Speedway's claims.  The first product market is the market for premium stock-car races and related testing and events.  The NEXTEL Cup Series Races, which are controlled by NASCAR, are the only premium stock-car racing events sanctioned in the United States.  Premium stock-car racing does not have a reasonably interchangeable substitute.  Other stock-car racing, such as NASCAR Busch Series races, are in different product markets due to differences in consumer demand, consumer pricing, television revenue, and corporate sponsorship.  Racetracks, such as the Kentucky Speedway, would derive substantially different economic benefits from hosting a NEXTEL Cup race, as opposed to a Busch Series race.

10

27.     The second product market is the market for hosting a premium stock car racing event.  Very few racetracks in the United States are capable of hosting a premium stock-car racing event, because of issues relating to television broadcasting, fan accommodations, track conditions, and track facilities.  Racetracks capable of hosting a premium stock car race do not have a reasonable interchangeable substitute.

28.     The relevant geographic market for Plaintiff's claim is the United States.

## ANTICOMPETITIVE CONDUCT

29.     NASCAR is a monopolist in the market for premium stock car races.  NASCAR's NEXTEL Cup series are the only premium stock car races that are currently sanctioned and hosted in the United States.  NASCAR has the ability to control prices in connection with premium stock car races, including sanction fees, purses, merchandising rights and broadcasting revenue.  NASCAR also has the ability to control output in the premium stock car racing market, and has artificially restricted the supply of premium stock car races well below consumer demand.  In addition, NASCAR, through various anticompetitive rules and practices, has excluded competition in the premium stock car racing market.

30.     NASCAR has developed and implemented a NASCAR NEXTEL Cup Series points system, and other rules and regulations, through which NASCAR controls both NASCAR-related and non-NASCAR-related activities of drivers, crews, owners, and sponsors. The NASCAR point system effectively prevents participation in a non-NASCAR race in lieu of a NASCAR race, due to the substantial financial penalty involved.  NASCAR rules allowing fines and discipline with unreviewable discretion keep drivers from taking any action -- such as driving in a non-NASCAR race -- that would be viewed unfavorably by NASCAR.  And specific NASCAR rules also prevent competition.  For example, NASCAR limits the number of times a

11

driver can test his car, and includes non-NASCAR races as "testing." As a result of the restrictions and penalties NASCAR assesses against drivers, crews, owners and sponsors, it is currently impossible for competing racetracks to offer NASCAR NEXTEL Cup Series format races and other functions related to NASCAR NEXTEL Cup Series format stock-car racing to the general public. Absent the various anticompetitive actions, Kentucky Speedway would have competed by offering, in part, larger purses, larger capacity and ticket sales, better amenities and safer tracks. Drivers, teams, owners, sponsors and the general public would have benefited from this competition.

31.    By starving competing racetracks of revenue, NASCAR and ISC are able to maintain and enhance their monopoly power through either: 1) purchase of those racetracks at fire-sale prices by ISC; 2) financially crippling those racetracks to reduce their potential competitive threat in the premium stock car race market; or 3) eliminating those racetracks from the market. Once ISC owns a racetrack, NASCAR will then increase the revenue to the newly-owned ISC racetrack by either scheduling a NEXTEL Cup race or directing other NASCAR-related revenue to that racetrack. Homestead-Miami is an example of this conduct – it was unable to obtain a NEXTEL Cup race until ISC assumed ownership. The scheme also benefits ISC, which has gained increasing control of the market for racetracks capable of holding a premium stock car race.

32.    The actions of defendants not only stifle current competition in the markets for premium stock car racing and hosting, it also inhibits future competition as well. Any investor interested in spending the hundreds of millions of dollars necessary to build a state-of-the-art racetrack would be deterred with the knowledge that its ability to host a NASCAR NEXTEL Cup race would not be decided by a competitive process. Rather, the defendants would make a

decision based upon whether it would increase NASCAR's and ISC's market power. Moreover, the defendants' practices make it impossible to enter with a competing product in the premium stock car race market.

33.    NASCAR has unlawfully abused its monopoly power in the premium stock car race market both to maintain and enhance its power in that market and as an attempt to monopolize the premium stock car hosting market through ISC. NASCAR and ISC have engaged in a scheme to financially injure competing racetracks by, among other things, refusing to award NEXTEL Cup races to those racetracks. Since 1999, despite dramatically increased demand, NASCAR has created only 3 additional NASCAR NEXTEL Cup Series races, each one at an ISC-owned racetrack in Florida, Illinois, and Kansas. Tracks affiliated with ISC currently host 20 of the 38 NEXTEL CUP Series events. ISC, through its conspiracy with NASCAR, has currently publicized plans to open new tracks in New York and the Pacific Northwest, for the purpose of hosting additional NEXTEL Cup Series races.

34.    NASCAR's purpose in refusing to award a NEXTEL Cup Race to Kentucky Speedway is to maintain its monopoly in the market for premium stock car races and to increase ISC's market power in the premium stock car hosting market. NASCAR gives ISC-owned racetracks the NEXTEL CUP Races, gives them large broadcast revenues, and charges them lower purse and sanction fees, in order to prevent any potential rival in the market for premium stock car races. In short, NASCAR doles out its racing slots to those tracks that will best protect its monopoly.

35.    In a competitive market, all racetracks competing for premium stock car races would be able to bid to host a NASCAR NEXTEL Cup Race. NASCAR would then decide where to hold the race on objective factors. Such competition would benefit drivers by

potentially increasing purse sizes and helping to ensure track safety. It would benefit sponsors and broadcasters by giving them more choice. And, most importantly, it would benefit race fans by lowering ticket prices and acknowledging consumer preference.

36.    More fundamentally, a competitive bidding process would benefit NASCAR itself. NASCAR would receive more revenue from an individual racetrack in a competitive bidding process. NASCAR's failure to maximize its own profits through this process makes sense only if NASCAR is protecting its monopoly.

37.    The defendants' actions unlawfully allocate markets, unlawfully fix the prices of purses, sanction fees and broadcast rights, and unlawfully restrict Kentucky Speedway and other actual or potential competitors from participating in a NASCAR NEXTEL Cup Series race, or from hosting a competing premium stock car race or event.

## ANTITRUST STANDING

38.    Kentucky Speedway is a proper party to seek redress under the Clayton Act Section 4, 15 U.S.C. §15(a). Kentucky Speedway is a competitor or potential competitor in the markets which are restrained and has suffered direct antitrust injury. There is no potential for duplicative recovery or an apportionment of the damages, or a more direct victim of the challenged conduct. There is a direct causal relationship between the challenged conduct and Kentucky Speedway's injuries, and these injuries are neither tenuous nor speculative.

39.    NASCAR and ISC's illicit activities have caused direct antitrust injury to Kentucky Speedway.  Absent defendants' unlawful monopolization and restraint of trade Kentucky Speedway would have received from NASCAR a NASCAR-sanctioned NEXTEL Cup Series stock-car race, or Kentucky Speedway would have been able to attract top stock-car

14

drivers and their teams to compete in NASCAR primary format-type stock-car races, and other related events, at Kentucky Speedway.

40.     NASCAR and ISC's illicit, anticompetitive conduct has harmed race fans by depriving them of high-quality races at the best available and most state-of-the-art facilities. By controlling and artificially restricting the market for premium stock car racing, NASCAR and ISC has raised consumer costs in order to extract monopoly profits, which have then been split between NASCAR, ISC and other racetracks willing to participate in NASCAR and ISC's illegal scheme. Absent defendants' restraints of trade and unlawful monopolization, the number of premium stock car races would increase, the quality of those races would improve, and consumer cost would decrease. In short, consumers would benefit, and consumer preference, which is currently ignored by NASCAR and ISC, would be served.

## COUNT I

### Sherman Act § 1

41.     Plaintiff incorporates Paragraphs 1 through 43 as if fully restated herein and for its First Cause of Action states as follows.

42.     NASCAR and ISC are independent legal entities that have engaged in a continuing contract, combination and conspiracy, among themselves and with other companies that control tracks hosting NASCAR sanctioned events, the primary object of which is to unreasonably restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 through the various actions previously described.

43.     The intent and effect of the conspiracy has been in part to boycott and exclude Kentucky Speedway from the market for premium stock car races, and to eliminate Kentucky Speedway from the market for hosting premium stock car races. The defendants have

15

unlawfully allocated markets among themselves for premium stock car races and for hosting premium stock car races. The defendants have unlawfully conspired to fix the prices of purses, sanction fees and broadcast rights.

44.     The anticompetitive actions of NASCAR and ISC have had a significant adverse effect on competition in the market for premium stock car races and in the market for hosting premium stock car races. No pro-competitive reasons exist that justify the anticompetitive actions of NASCAR and ISC.

45.     The anticompetitive actions of NASCAR and ISC have directly injured Kentucky Speedway in its business and property. Kentucky Speedway's injuries and damages are ongoing and will continue unless a mandatory injunction is granted.

## COUNT II

### Sherman Act § 2

46.     Plaintiff incorporates Paragraphs 1 through 48 as if fully restated herein and for its First Cause of Action states as follows.

47.     NASCAR has, through the anticompetitive actions described above, intentionally and wrongfully maintained and enhanced its monopoly power in the market for premium stock car racing, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. NASCAR has implemented rules and practices with the intent and effect of preventing Kentucky Speedway and other actual or potential competitors from participating in the market for premium stock car racing. Moreover, NASCAR's refusal to deal with Kentucky Speedway through its refusal to award a NEXTEL Cup Series race is for the same, anticompetitive reason. NASCAR has also refused to create a competitive process for allocating NEXTEL Cup races, with the purpose and

16

effect of maintaining and enhancing its monopoly, to the detriment of competition and consumers.

48.     ISC has, through the anticompetitive actions described above, attempted to monopolize the market for hosting premium stock car races, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. ISC has a specific intent to monopolize this market, and has a dangerous probability of success of doing so, given its increasing market share, the concentration of competitors, barriers to entry previously discussed, and other factors.

49.     NASCAR and ISC, through the anticompetitive actions described above, have conspired to monopolize the markets for premium stock car races and hosting premium stock car races, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

50.     If NASCAR and ISC are determined to be a single entity, then this entity has, through the anticompetitive actions described above, both monopolized the market for premium stock car racing, and attempted to monopolize the market for hosting premium stock car races, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In addition, this entity has, through the anticompetitive actions described above, attempted to unlawfully leverage its monopoly power in the premium stock car racing market to attempt to monopolize the market for hosting premium stock car races, with a dangerous probability of success.

51.     The anticompetitive actions of NASCAR and ISC have directly injured Kentucky Speedway in its business and property. Kentucky Speedway's injuries and damages are ongoing and will continue unless a mandatory injunction is granted.

## DEMAND FOR RELIEF

WHEREFORE, plaintiff demands the following relief:

17

a.    An injunction against defendants: ordering them to cease and desist from their unlawful monopolization and conspiracy; requiring NASCAR to eliminate or modify its rules and practices as necessary to permit full and fair competition in the provision of the right to host premium stock car races; and requiring NASCAR to institute a competitive bidding process to permit full and fair competition for the right to host a NEXTEL Cup Series race;

b.    The award of a NASCAR NEXTEL Cup Series stock-car race for the year 2006 and the right to compete for the award of a NASCAR NEXTEL Cup Series stock-car race each year thereafter;

c.    An award of the damages plaintiff has sustained due to the defendants' unlawful conduct as alleged herein;

d.    An award of treble damages to plaintiff as provided by law; and

e.    Such additional relief, legal or equitable, to which plaintiff may be entitled.

Dated: November 30, 2005

Stanley M. Chesley (KY Bar #11810)
James R. Cummins
Fay E. Stilz
WAITE, SCHNEIDER, BAYLESS & CHESLEY
CO., L.P.A.
1513 4th & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
(513) 621-0267
(513) 621-0262 (fax)
stanchesley@wsbclaw.cc
jimcummins@wsbclaw.cc
faystilz@wsbclaw.cc

W.B. Markovits
MARKOVITS & GREIWE CO., L.P.A.
119 East Court Street, Suite 500
Cincinnati, Ohio 45202
(513) 977-4774
(513) 621-7086 (fax)

18

bmarkovits@mgattorneys.com

Stephen D. Susman
Vineet Bhatia
SUSMAN GODFREY, L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666
ssusman@susmangodfrey.com
vbhatia@susmangodrey.com

Justin A. Nelson
SUSMAN GODFREY, L.L.P.
1201 Third Avenue, Suite 3100
Seattle, Washington 98101-3000
Telephone: (206) 516-3880
Fax:  (206) 516-3883
jnelson@susmangodfrey.com

### ATTORNEYS FOR PLAINTIFF

### JURY DEMAND

Plaintiff requests a trial by jury on all issues triable before a jury under the laws applicable to this case.

19

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served upon the following counsel of record, by ordinary United States Mail, this 30th day of November 2005.

Stanley M. Chesley

Stuart H. Singer, Esq.
William T. Dzurilla, Esq.
Boies, Schiller & Flexner
401 E. Las Olas Blvd., #1200
Ft. Lauderdale, FL 33301
**Counsel for Defendant**
*National Association for Stock Car Auto Racing, Inc.*

Helen Maher, Esq.
Boies, Schiller & Flexner
333 Main Street
Armonk, NY 10504
**Counsel for Defendant**
*National Association for Stock Car Auto Racing, Inc.*

Sheryl G. Snyder, Esq.
Frost Brown Todd
400 W. Market St., 32nd Floor
Louisville, KY 40202
**Counsel for Defendant**
*National Association for Stock Car Auto Racing, Inc.*

Matthew C. Blickensderfer, Esq.
Kimberly S. Amrine, Esq.
Frost Brown Todd
201 E. 5th Street, #2200
Cincinnati, Ohio 45202

20

**Counsel for Defendant**
*National Association for Stock Car Auto Racing, Inc.*

Rodney Acker, Esq.
Guy I. Wade, III, Esq.
Melissa J. Swindle, Esq.
Christopher W. Brophy, Esq.
Jenkins & Gilchrist
1445 Ross Ave., #3700
Dallas, TX 75202
**Counsel for Defendant**
*International Speedway Corporation*

Robert B. Craig, Esq.
Taft, Stettinius & Hollister
1717 Dixie Highway, #340
Covington, KY 41011
**Counsel for Defendant**
*International Speedway Corporation*

G. Jack Donson, Jr., Esq.
Taft, Stettinius & Hollister
425 Walnut Street, #1800
Cincinnati, Ohio 45202
**Counsel for Defendant**
*International Speedway Corporation*

# EXHIBIT 5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

| | | |
|---|---|---|
| KENTUCKY SPEEDWAY, LLC | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | Case No. 2-05-cv-138 |
| NATIONAL ASSOCIATION OF | : | Honorable William O. Bertelsman |
| STOCK CAR RACING, INC., | : | Magistrate Judge J. Gregory Wehrman |
| | : | |
| and | : | |
| | : | |
| INTERNATIONAL SPEEDWAY | : | |
| CORPORATION, | : | |
| | : | |
| Defendants. | : | |

CONFIDENTIALITY STIPULATION AND ORDER

IT IS HEREBY STIPULATED AND AGREED by and between the parties to the above-captioned action (the "Action"), subject to the approval of the Court, as follows:

**Scope of Order**

1.      This Confidentiality Stipulation and Order ("Stipulation and Order") applies to all information including, without limitation, documents, writings, video or audio tapes, computer-generated, or recorded information in any form, materials, initial and supplemental disclosures, oral or written testimony, answers to interrogatories, responses to requests for admission, deposition testimony, deposition transcripts and exhibits, and other responses to requests for information (the "Discovery Materials") produced by any party or a third party ("Producing Party").

1

**Use of Discovery Materials**

2.    Except as set forth in Paragraph 3 below, this Stipulation and Order has no effect upon, and its scope shall not extend to, any party's use of its own Discovery Materials that it produces.

**Designation of Confidential and Highly Confidential Information**

3.    Any Discovery Materials may be designated by the Producing Party as "Confidential" or "Highly Confidential" in accordance with the standards of paragraphs 3(a) and 3(b) below. Only the producing party may designate a document as "Confidential or Highly Confidential, with the exception that Discovery Materials produced by another party or a third party may be designated by a non-producing party as "Confidential" or "Highly Confidential" in accordance with the standards of paragraphs 3(a) and 3(b) below, if the Discovery Materials contain documents or information previously provided by such party to the Producing Party with the understanding that such documents or information would be treated as confidential in the ordinary course of business. In that case, the designating party shall be deemed a "Producing Party" for purposes of this Stipulation and Order.

a.  To designate Discovery Materials as "Confidential," the Producing Party must have a reasonable, good faith belief that the Discovery Materials fall within Federal Rule of Civil Procedure 26(c)(7).

b.  To designate Discovery Materials as "Highly Confidential," the Producing Party must have a reasonable, good faith belief that the Discovery Materials fall within Federal Rule of Civil Procedure 26(c)(7), and that disclosure of the Discovery Materials to any officer, director, or employee for any party in this Action, would create an undue risk of significant competitive injury to the Producing Party's business that would not exist in the absence of such disclosure.

2

c.  Confidential Information and Highly Confidential information shall not include any document, thing or information that was, is, or becomes public knowledge in a manner other than by violation of this Stipulation and Order or by any other unlawful means.

d.  A party shall designate as "Confidential" or "Highly Confidential" only those parts of the document that contain "Confidential" or "Highly Confidential" information, unless the entire document contains such information, in which case a party may designate the entire document as "Confidential" or "Highly Confidential."

4.  The Producing Party shall designate written Discovery Materials as Confidential or Highly Confidential, respectively, by marking or stamping each page of such document (or the first page of a multi-page document provided the document is securely bound) **"Confidential: Kentucky Speedway v. NASCAR" or "Highly Confidential: Kentucky Speedway v. NASCAR"** prior to production.  With respect to Discovery Materials in computerized or electronic format, the Producing Party shall designate the Discovery Materials as Confidential or Highly Confidential in a writing delivered along with the Discovery Materials when a copy of it is provided to another party.  Recipients of Discovery Materials produced in computerized or electronic format shall also treat all print-outs of such material in accordance with the written designation and shall mark or stamp such print-outs with the above-described written designation.  With respect to Discovery Materials that constitute objects or other things, the Producing Party shall designate the Discovery Materials as Confidential or Highly Confidential by marking or stamping the words **"Confidential: Kentucky Speedway v. NASCAR" or "Highly Confidential: Kentucky Speedway v. NASCAR"** in a conspicuous location on the thing or object.

3

5.    Failure of the designating party to mark a document or thing as Confidential or Highly Confidential in accordance with this Stipulation and Order shall not preclude either party from thereafter in good faith marking the document or thing so long as it does so promptly after learning of the initial failure and requests in writing that the document or information be treated as Confidential or Highly Confidential in accordance with this Stipulation and Order. Where a designating party belatedly designates documents or information as Confidential or Highly Confidential, counsel for the receiving party shall take such steps as reasonably necessary to mark and treat the document or thing in accordance with this Stipulation and Order. The document or thing shall thereafter be subject to this Stipulation and Order. Neither party shall incur liability for disclosures made in good faith prior to notice of confidentiality designations.

6.    Counsel for any party must state on the record at the deposition that the party wishes to designate all or part of the transcript as Confidential or Highly Confidential. If any counsel does so state, the party shall designate in writing to all parties within twenty-one (21) business days after the deposition transcript is received by such counsel, all or any portion or portions of such transcript, as Confidential or Highly Confidential Information provided the designated portion or portions meet the standards set forth in paragraph 3(a) or 3(b).   In the event that the deponent submits changes to his/her transcript, counsel for any party may, in writing to all parties within twenty-one (21) business days after the revised transcript is received by such counsel, designate all or any revised portion or portions of such transcript as Confidential or Highly Confidential Information. All exhibits to any transcript shall retain their original designations.   All copies of deposition transcripts and/or exhibits designated as Confidential shall be prominently marked **"Confidential: Kentucky Speedway v. NASCAR."**

4

All copies of deposition transcripts and/or exhibits designated as **Highly Confidential shall be prominently marked "Highly Confidential: Kentucky Speedway v. NASCAR."**

7.    The parties disagree about whether court proceedings should be closed. Nevertheless, with respect to testimony elicited during hearings and other proceedings, whenever counsel for any party believes that any question is likely to result in the disclosure of Confidential or Highly Confidential Information or that any answer contains Confidential or Highly Confidential Information, such counsel may move the court to close the hearings to the public during the time that such Confidential or Highly Confidential Information is disclosed.

8.    In the event that counsel for any party determines to file with the Court any pleadings, motions, briefs or other papers that contain Confidential or Highly Confidential Information, such papers or exhibits to papers filed with the Court, or portions thereof containing Confidential or Highly Confidential Information, shall be filed under seal or its equivalent accompanied by a statement on the face of the sealed envelope substantially in the form set forth below.

**CONFIDENTIAL**

**(or HIGHLY CONFIDENTIAL where applicable)**

UNDER SEAL

The parties shall not include Confidential or Highly Confidential Information in the title of the documents filed with the Court so that, in all instances, the titles of the documents – and the Court's docket sheet reflecting those titles – may remain public. To help ensure appropriate public access to filed materials, the filing party shall within ten (10) days after filing confer with all other parties to ensure that a public version with appropriate redactions shall be made available. However, no public version may be filed or made available in the absence of the

agreement of all parties or court order. If the parties disagree about whether any information should remain under seal, the parties shall follow the procedure set forth in ¶12.

9.      Discovery Materials designated as "Confidential" ("Confidential Information"), including attorney work product, briefs and/or appendices containing the same, except with the prior consent of the Producing Party or upon prior Order of this Court, shall not be disclosed by anyone to any person or entity other than the following:

    a.  The Court and Court personnel;

    b.Outside    Counsel of record for the respective parties in this Action and their secretaries, legal assistants, or other support personnel as reasonably necessary to assist outside counsel in this Action, none of whom may be or have been an officer, director or employee of any party or the entities identified in Exhibit B, who served in that capacity after July 13, 2005, or a present officer, director or employee of any entity, or its subsidiaries or affiliated entities, that operates a motorsports facility which hosts professional stock car races;

    c.  Inside counsel for each of the parties to this Action provided each attorney first executes a sworn statement in the form annexed hereto as Exhibit A;

    d.Su  bject to paragraph 18 below, (i) outside testifying or consulting experts retained in good faith to assist Outside Counsel in the Action (who shall execute a sworn statement in the form annexed hereto as Exhibit A, a copy of which shall be retained by counsel retaining said expert) none of whom may be or have been an officer, director or employee of any party or the entities identified in Exhibit B, who served in that capacity after July 13, 2005; (ii) litigation support vendors who are expressly retained to assist counsel of record for the parties in this Action (who shall execute a sworn statement in the form annexed hereto as Exhibit A, a copy of which shall be retained by counsel retaining said vendor), none of whom may be or have

6

been an officer, director or employee of any party or the entities identified in Exhibit B, who served in that capacity after July 13, 2005, or a present officer, director or employee of any entity, or its subsidiaries or affiliated entities, that operates a motorsports facility which hosts professional stock car races; and (iii) persons not covered by other sub-parts of this paragraph who the receiving party reasonably believes have independent knowledge of the Confidential Information.  In the event a party chooses to rely on an officer, director or employee of an opposing party, or an officer, director, or employee of any entity identified in Exhibit B, or an entity or its subsidiaries or affiliated entities that operates a motorsports facility which hosts professional stock car races, as a consulting or testifying expert, such party shall inform the opposing parties of its intention to allow the expert to view confidential information, and the parties shall confer promptly to determine whether the expert can view confidential information. If the parties are unable to agree, any opposing party has ten (10) days to seek protection from the Court or any objection to the expert is waived.  No disclosure of Confidential Information from an objecting party or third party shall be made to that expert until the matter is resolved by the Court or upon agreement of the parties;

e.  Current officers, directors, and employees of each of the parties who are reasonably necessary to assist counsel in the preparation and litigation of the Action, provided each such person first executes a sworn statement in the form annexed hereto as Exhibit A;

f.  Current and former officers, directors and employees of the parties who were employed and/or served as a director at the time when the Confidential Information was created and whom the receiving party reasonably believes have independent knowledge of the Confidential Information;

g.Curr   ent officers and directors of the producing party;

7

h. Any    person listed as the author, addressee or copied recipient of the Confidential Information or who lawfully received the Confidential Information in the ordinary course of business;

i.  With respect to persons not covered by subparts (a) through (h) of this paragraph, and only during the deposition of such person, any person who may appear, based on the Confidential Information itself or testimony in a deposition, to have independent knowledge of the contents of the Confidential Information or the specific events, transactions, discussions, or data reflected therein. Such person shall not be entitled to retain a copy of any Confidential Information produced during the deposition;

j.  Court reporters, stenographers or video operators at depositions, court or arbitral proceedings at which Confidential Information is disclosed provided such persons are subject to confidentiality undertakings with their employers with respect to the information disclosed or who have read and executed a sworn statement in the form annexed hereto as Exhibit A;

k. W itnesses at in-court proceedings and anyone present for an in-court proceeding. This provision is subject to the results of a motion made pursuant to Paragraph 7; and

l.  Any other person designated by the Court in the Action, upon such terms as the Court may deem proper.

10.    "Highly Confidential Information":

Only those people falling within one of the categories of Paragraph 9 may view Discovery Materials designated as "Highly Confidential," except that no current officer, director, or employee of any party, including inside counsel for any party, who does not otherwise fall

8

within a category listed in Paragraph 9 may view Highly Confidential material. Trial counsel David Filkin, given his relationship to Duchossois Industries, shall be excluded from review of Highly Confidential materials.

       11.    Any person who is not currently employed by a party and who is shown Confidential Information or Highly Confidential Information pursuant to Paragraphs 9 and 10 shall, prior to being given any Confidential Information or Highly Confidential Information, read this Stipulation and Order and agree to abide by its terms, and execute a sworn statement in the form annexed hereto as Exhibit A.

**Challenges to Designations**

       12.    If any party objects to the designation of any Discovery Materials as "Confidential" or "Highly Confidential" or seeks to use such materials other than as permitted by this Stipulation and Order, the party shall provide written notice to counsel for the party making the designation. The parties shall promptly confer in a good faith effort to resolve the dispute. If the parties are unable to resolve the dispute after conferring, and upon not less than five (5) days notice, the objecting party shall attempt to resolve the disagreement by scheduling a telephone conference with the Magistrate Judge through oral motion, prior to filing any written motion for relief. Until the Court rules on the oral or written motion, the Discovery Materials shall be treated in a manner consistent with their designation as "Confidential" or "Highly Confidential." In the event that court intervention is required, the producing party shall have the burden of establishing in its response to the oral or written motion that the Discovery Materials remain entitled to the "Confidential" or "Highly Confidential" designation as defined in this Stipulation and Order, and that any confidential material outweighs the public's right of access.

**General Provisions**

13.    The parties, and all people or entities subject to this Protective Order, may not use Discovery Materials designated as Confidential or Highly Confidential pursuant to the terms of this Stipulation and Order for any purpose other than in connection with the above-captioned proceeding, or any appeals there from, unless specific written authorization is provided by the Producing Party.

14.    This Stipulation and Order or the existence of such shall not be offered or admitted into evidence at trial in the Action, or argued to any jury in the Action or otherwise disclosed to such jury, but the meaning of such designations, as defined in this Stipulation and Order, as Confidential and Highly Confidential Information may be explained to the jury by the Court.  Similarly, the failure of a party to object to the designation of Discovery Materials as Confidential or Highly Confidential shall not be argued or accepted as an admission that such Discovery Materials are in fact entitled to treatment as Confidential Information or Highly Confidential Information.

15.    Upon receipt of written notice from the Producing Party of a claim that Discovery Materials subject to work product immunity or the attorney client privilege were inadvertently produced, setting forth sufficient information about the Discovery Materials and the circumstances of their inadvertent production to permit the privilege/immunity issue and the inadvertent production issue to be litigated, all copies of such inadvertently-produced Discovery Materials shall be returned to the Producing Party by the receiving party, and the receiving party shall not use or disclose the inadvertently-produced Discovery Materials for any purpose except as provided in this paragraph.  A receiving party may contest the claim of privilege or immunity by filing a motion within thirty (30) business days of receiving notice of the inadvertent

disclosure. During the pendency of such motion the receiving party need not return all copies of the Discovery Materials to the Producing Party; however the receiving party may not use or disclose the Discovery Materials for any purpose other than the prosecution of the motion challenging the privilege or immunity claim.

16.    This Stipulation and Order shall have no effect on the admissibility or discoverability of any Confidential Information or Highly Confidential Information, nor does it create a presumption that Discovery Materials designated as "Confidential" or "Highly Confidential" actually constitute a trade secret, or proprietary or otherwise protectable confidential information.

17.    Any party served with a subpoena or other notice compelling the production of Confidential Information or Highly Confidential Information received in connection with this Action shall give prompt written notice to the Producing Party as far in advance of the requested production date as possible, but in no event less than five (5) business days prior to production. The fact that the subpoena or other notice compels the production of Confidential or Highly Confidential Information does not change any deadline or due date specified by the subpoena or other notice.

18.    Subject to the requirements and limitations of Paragraphs 9 and 10, Outside Counsel may disclose Confidential or Highly Confidential Information to a consulting or testifying expert who is actively assisting the preparation for and/or trial of this Action, if (1) such expert has been given a copy of this Stipulation and Order and (2) such expert has signed a Confidentiality Agreement in the form of attached Exhibit A.

19.    This Protective Order can be modified at any time by order of the Court. Nothing herein shall prevent any party from seeking by appropriate motion to the Court, or by

11

negotiation, further, greater or lesser protection with respect to the use or disclosure of any Confidential Information or Highly Confidential Information.

20.    The parties agree to seek approval of the Court with respect to this Stipulation and Order. Notwithstanding the pendency of approval by the Court, this Stipulation and Order shall become effective among such parties who have executed this agreement immediately upon its execution. If approval by the Court is ultimately denied, the parties shall negotiate in good faith to reach agreement upon revisions to this Stipulation and Order that are satisfactory to the parties and to the Court, but until such further agreement is reached, no party shall treat any Confidential Information or Highly Confidential Information produced prior to that time other than as provided for herein.

21.    Any non-party to the Action that is served with a Subpoena Duces Tecum in connection with the Action may produce documents pursuant to said Subpoena under the terms of this Stipulation and Order, provided that such non-party is furnished with a copy of this Stipulation and Order and agrees to be bound thereby with respect to the designation and treatment of Confidential Information and Highly Confidential Information.

22.    Within 30 days after the conclusion of the Action, including all appeals, any and all originals and copies of Discovery Materials maintaining a designation of Confidential or Highly Confidential Information shall, at the option of the Producing Party, be returned to the Producing Party or destroyed, except that outside counsel for each party in this Action may maintain in its files one copy of each of the following (except for exhibits attached to any of the following or portions of transcripts that were designated as Confidential or Highly Confidential Information): documents filed with the Court, written discovery requests and responses, deposition transcripts and attorney work product. Upon request from any party, a party shall

12

provide written certification that it has complied with this Paragraph. The parties shall retain each Exhibit A executed during the pendency of the Action and shall provide copies to each of the other parties at the conclusion of the Action and if a Producing Party has reasonable grounds to believe that Highly Confidential Information has been disclosed in violation of this Stipulation and Order or such Highly Confidential Information is being or was used by someone for purposes other than this Litigation, the other parties shall indicate at the conclusion of the Action which persons executing Exhibit A (if any) reviewed Highly Confidential Information. After the conclusion of the Action, the provisions of this Stipulation and Order shall continue to be binding until further order of this Court, and this Court shall retain jurisdiction over the parties and any other person who has had access to Confidential or Highly Confidential Information pursuant to this Stipulation and Order, in order to enforce the provisions of this Stipulation and Order.

23.    This Stipulation and Order may be executed in counterparts.

This ____ day of _____, 2006.

So Stipulated:

Guy I. Wade, III
Jenkens & Gilchrist
1445 Ross Avenue, Suite 3200
Dallas, Texas 75202

13

Robert B. Craig
Taft, Stettinius & Hollister, LLP
1717 Dixie Highway
Suite 340
Covington, Kentucky 41011-4704

*ATTORNEYS FOR DEFENDANT*
*INTERNATIONAL SPEEDWAY CORPORATION*


Stuart H. Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301


Matthew C. Blickensderfer
Frost Brown Todd LLC
201 E. Fifth Street
2200 PNC Center
Cincinnati, Ohio 45202

*ATTORNEYS FOR DEFENDANT*
*NATIONAL ASSOCIATION FOR*
*STOCK CAR AUTO RACING, INC.*


Stephen D. Susman
Susman Godfrey, LLP
1000 Louisiana Street
Suite 5100
Houston, Texas 77002-5096


Stanley M. Chesley
WAITE, SCHNEIDER,
BAYLESS & CHESLEY
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202


14

Robert B. Craig
Taft, Stettinius & Hollister, LLP
1717 Dixie Highway
Suite 340
Covington, Kentucky 41011-4704

*ATTORNEYS FOR DEFENDANT*
*INTERNATIONAL SPEEDWAY CORPORATION*

Stuart H. Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301

Matthew C. Blickensderfer
Frost Brown Todd LLC
201 E. Fifth Street
2200 PNC Center
Cincinnati, Ohio 45202

*ATTORNEYS FOR DEFENDANT*
*NATIONAL ASSOCIATION FOR*
*STOCK CAR AUTO RACING, INC.*

Stephen D. Susman
Susman Godfrey, LLP
1000 Louisiana Street
Suite 5100
Houston, Texas 77002-5096

Stanley M. Chesley
WAITE, SCHNEIDER,
BAYLESS & CHESLEY
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202

14

Robert B. Craig
Taft, Stettinius & Hollister, LLP
1717 Dixie Highway
Suite 340
Covington, Kentucky 41011-4704

*ATTORNEYS FOR DEFENDANT
INTERNATIONAL SPEEDWAY CORPORATION*


Stuart H. Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301

Matthew C. Blickensderfer
Frost Brown Todd LLC
201 E. Fifth Street
2200 PNC Center
Cincinnati, Ohio 45202

*ATTORNEYS FOR DEFENDANT
NATIONAL ASSOCIATION FOR
STOCK CAR AUTO RACING, INC.*


Stephen D. Susman
Susman Godfrey, LLP
1000 Louisiana Street
Suite 5100
Houston, Texas 77002-5096


Stanley M. Chesley
WAITE, SCHNEIDER,
BAYLESS & CHESLEY
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202

14

Robert B. Craig
Taft, Stettinius & Hollister, LLP
1717 Dixie Highway
Suite 340
Covington, Kentucky 41011-4704

*ATTORNEYS FOR DEFENDANT
INTERNATIONAL SPEEDWAY CORPORATION*

Stuart H. Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301

Matthew C. Blickensderfer
Frost Brown Todd LLC
201 E. Fifth Street
2200 PNC Center
Cincinnati, Ohio 45202

*ATTORNEYS FOR DEFENDANT
NATIONAL ASSOCIATION FOR
STOCK CAR AUTO RACING, INC.*

Stephen D. Susman
Susman Godfrey, LLP
1000 Louisiana Street
Suite 5100
Houston, Texas 77002-5096

Stanley M. Chesley
WAITE, SCHNEIDER,
BAYLESS & CHESLEY
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202

14

Robert B. Craig
Taft, Stettinius & Hollister, LLP
1717 Dixie Highway
Suite 340
Covington, Kentucky 41011-4704

*ATTORNEYS FOR DEFENDANT*
*INTERNATIONAL SPEEDWAY CORPORATION*

Stuart H. Singer
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Blvd.
Suite 1200
Fort Lauderdale, Florida 33301

Matthew C. Blickensderfer
Frost Brown Todd LLC
201 E. Fifth Street
2200 PNC Center
Cincinnati, Ohio 45202

*ATTORNEYS FOR DEFENDANT*
*NATIONAL ASSOCIATION FOR*
*STOCK CAR AUTO RACING, INC.*

Stephen D. Susman
Susman Godfrey LLP
1000 Louisiana Street
Suite 5100
Houston, Texas 77002-5096

Stanley M. Chesley
WAITE, SCHNEIDER,
BAYLESS & CHESLEY
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202

14

Mark D. Guilfoyle
Deters, Benzinger & LaVelle, P.S.C.
207 Thomas More Parkway
Crestview Hills, Kentucky 41017-2596

*ATTORNEYS FOR PLAINTIFF*
*KENTUCKY SPEEDWAY, LLC*

So ordered.

_____

United States District Judge
William O. Bertelsman

DATE:_____

15

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
AT COVINGTON

|                                                      |   |                                                              |
|------------------------------------------------------|---|--------------------------------------------------------------|
|                                                      | : |                                                              |
| KENTUCKY SPEEDWAY, LLC,                              | : |                                                              |
|                                                      | : |                                                              |
| Plaintiff,                                           | : |                                                              |
|                                                      | : |                                                              |
| vs.                                                  | : |                                                              |
|                                                      | : | Case No. 2-05-cv-138                                         |
| NATIONAL ASSOCIATION OF                              | : | Honorable William O. Bertelsman                              |
| STOCK CAR RACING, INC.,                              | : |                                                              |
|                                                      | : |                                                              |
| and                                                  | : |                                                              |
|                                                      | : |                                                              |
| INTERNATIONAL SPEEDWAY                               | : |                                                              |
| CORPORATION,                                         | : |                                                              |
|                                                      | : |                                                              |
| Defendants.                                          | : |                                                              |

**EXHIBIT A**

**CONFIDENTIALITY AGREEMENT AND UNDERTAKING FOR
RECEIVING CONFIDENTIAL OR HIGHLY CONFIDENTIAL INFORMATION**

I, _____, state the following:

1.    I have read and understand the Stipulation and Order to which this Exhibit A is annexed (and whose definitions are incorporated herein) and I attest to my understanding that access to information designated as "CONFIDENTIAL" and/or "HIGHLY CONFIDENTIAL" may be provided to me and that such access shall be pursuant to the terms and conditions and restrictions of the Stipulation and Order. I agree to be bound by the terms of the Stipulation and Order both with respect to this Court's powers of supervision of the litigation of the Action, and, contractually to any Producing Party, which I acknowledge to be an expressly intended beneficiary of the undertakings I give in this Confidentiality Agreement and Undertaking. I

16

hereby submit to the jurisdiction of the United States District Court for the Eastern District of Kentucky for purposes of enforcement of the Stipulation and Order.

2.    I shall not use or disclose any Confidential Information and/or Highly Confidential Information to others, except in accordance with the Stipulation and Order, and I shall not in any way make use of facts and other information obtained from reviewing such Confidential and/or Highly Confidential Information in connection with any activity other than this Litigation or any purpose other than participating in this Litigation. I understand that, in the event that I fail to abide by the terms of this Confidentiality Agreement or the Stipulation and Order, I shall be subject to sanctions by way of contempt of Court, such other or additional relief the Court may deem appropriate, and to separate legal and equitable recourse by the adversely affected Producing Party.

_____
Signature

_____
Printed Name

_____
Address

**SWORN TO** and subscribed before me this ____ day of _____, 2005

_____
Notary Public

17

## EXHIBIT B

### INTERNATIONAL SPEEDWAY CORPORATION'S
### SUBSIDIARIES AND/OR AFFILIATES

Americrown Service Corporation
ASC Holdings, Inc.
ASC Promotions, Inc.
Brecklin, Inc.
The California Speedway Corporation (d/b/a California Speedway)
Chicago Holdings, Inc.
Darlington Raceway of South Carolina, LLC
Daytona International Speedway, LLC
Event Equipment Leasing, Inc.
Event Support Corporation
Great Western Sports, Inc.
HBP, Inc.
Homestead-Miami Speedway, LLC
International Speedway, Inc.
ISC Properties, Inc.
ISC Publications, Inc.
ISC.COM, LLC
Kansas Speedway Development Corp.
Kansas Speedway Corporation
Leisure Entertainment of Florida, Inc.
Martinsville International, Inc. (d/b/a Martinsville Speedway)
Miami Speedway Corp.
Michigan International Speedway, Inc.
Motor Racing Network, Inc.
Motorsports Alliance, LLC
Motorsports Acceptance Corporation
Motorsports Authentics, LLC
Motorsports Authentics, Inc.
Motorsports International Corp.
New York International Speedway Corporation
North American Testing Company
Pennsylvania International Raceway, Inc.
Phoenix Speedway Corp.
Raceway Associates, LLC
Richmond International Raceway, Inc.
Rocky Mountain Speedway Corporation
SMISC, LLC
Southeastern Hay & Nursery, Inc.
Talladega Superspeedway, LLC
Watkins Glen International, Inc.
88 Corp.

18

380 Development, LLC

## NASCAR'S SUBSIDIARIES

Real Air Leasing LLC
Motorsports Safety Technology LLC

# EXHIBIT 6

## Justin A. Nelson

| | |
|---|---|
| **From:** | Placey, Richard [RPlacey@mmwr.com] |
| **Sent:** | Friday, August 18, 2006 2:58 PM |
| **To:** | Justin A. Nelson |
| **Cc:** | Lorenz, Pat |
| **Subject:** | RE: Kentucky Speedway v. NASCAR, et al. |

Again just to avoid later misunderstandings about what is on the table, and without prejudice to anyone unless and until we reach agreement, Dover Motorsports' offer of today was to do the following now on the basis set forth below:

1.    To produce demographic studies for the last 3 years

2.    To produce internal communications between the current executive officers (listed on the proxy) at Dover for the last 3 years about the following topics, but excluding internal communications involving counsel:

      a.    Moving Dover's Nextel cup races

      b.    Transferring Dover's Nextel cup races to another track

      c.    Dover getting a new or adding a Nextel cup race(s)

      d    Acquisition of Dover by ISC

      e.    Kentucky Speedway, excluding communications analyzing the potential acquisition deal or reflecting Dover internal strategy for dealing with Kentucky's proposals

Dover is willing to do this now and drop its existing sanctions claims if (i) this completely resolves all requests for documents from Plaintiff in this case (i.e, there is no coming back for more documents, recognizing that depositions are a different issue) and (ii) some to be negotiated amount is paid to defray Dover's fees and costs (we both recognize that it may be better to just set an amount rather than allocate it to past vs future items).

As we have debated at some length, we believe that Plaintiff is required obtain and review the documents from the parties before burdening non-parties like Dover with document subpoenas (if the non-party documents are then needed), but you believe that Plaintiff cannot wait until the documents requested from the parties are received and reviewed.  Accordingly, this offer is being made expressly to accommodate Plaintiff's position in this regard, but is without prejudice to our underlying position on that issue or to yours.


----Original Message-----
**From:** Justin A. Nelson [mailto:jnelson@SusmanGodfrey.com]
**Sent:** Thursday, August 03, 2006 4:15 PM
**To:** Placey, Richard
**Cc:** Lorenz, Pat
**Subject:** RE: Kentucky Speedway v. NASCAR, et al.

      Richard –

      Without prejudice to either side, as you say, I agree that this is what we talked about as the potential basis for a deal.  I would add only that it's either of Dover's Nextel Cup races, and that it's acquisition of Dover by any other party, not just ISC.  (In typing this, I realize that we actually might need a limited category of

10/20/2006

external as well as internal communications for those documents between Dover and another, non-ISC entity, about acquisitions. We would not need the external communications, if they exist, between Dover and ISC.)

Justin A. Nelson
Susman Godfrey
1201 Third Avenue
Suite 3800
Seattle, WA 98101
206-516-3867

This message is intended only for the people to whom it is addressed and is intended to be a confidential attorney-client communication. If this message is not addressed to you, please delete it and notify me.

---

**From:** Placey, Richard [mailto:RPlacey@mmwr.com]
**Sent:** Thursday, August 03, 2006 1:03 PM
**To:** Justin A. Nelson
**Cc:** Lorenz, Pat
**Subject:** Kentucky Speedway v. NASCAR, et al.

So that we do not later have a mis-understanding as to the items on the table from our discussion earlier today, I understand that what plaintiff is looking for Dover to produce as the potential basis of a deal (without prejudice to either side unless and until an actual agreement blessed by both clients is reached) is

1.    Any demographic studies of Dover's race attendees

2.    Documents reflecting <u>internal communications</u> at Dover about the following five items:

     a.    Moving Dover's Nextel cup race

     b.    Transferring Dover's Nextel cup race to another track

     c.    Dover getting a new or adding a Nextel cup race

     d    Acquisition of Dover by ISC

     e.    Kentucky Speedway (I am assuming that this does not include communications about mundane items like fire safety,

       traffic control and probably dozens of similar items, and that we would need to focus this item with better precision)

We both recognize that there are other less detailed matters that were and are part of the discussion (such as whether plaintiff can come back later for other things, the payment of fees and other issues). However, if I have the "list of items" part of the discussion wrong, please tell me so that I can be sure that I accurately convey plaintiff's list of items to my client.

Richard G. Placey
(admitted in DE, PA, NJ and IL)
Montgomery, McCracken, Walker & Rhoads LLP
300 Delaware Avenue, Suite 750
Wilmington DE 19801
Telephone: (302) 504-7880

10/20/2006

Fax. (302) 504 7820
Philadelphia (PA) Telephone (215) 772-7424
Cherry Hill (NJ) Telephone (856) 488-7700

10/20/2006

# EXHIBIT 7

## Justin A. Nelson

**From:**     Placey, Richard [RPlacey@mmwr.com]

**Sent:**     Friday, July 07, 2006 1:51 PM

**To:**       Justin A. Nelson

**Cc:**       Bill Markovits; Lorenz, Pat

**Subject:**  RE: Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; Civil
              Action No. 2:05-cv-00138-WOB (E.D.Ky.)

Can you let me know where we are on this? I thought you were going to think about this after our discussion in
June and let me know what Plaintiff wants to do. Obviously, I would like to get the subpoena withdrawn (as
always, without prejudice to a narrower subpoena when you go through defendants' documents) before July 10.
Thanks

      -----Original Message-----
      **From:** Justin A. Nelson [mailto:jnelson@SusmanGodfrey.com]
      **Sent:** Wednesday, June 14, 2006 1:24 PM
      **To:** Placey, Richard
      **Cc:** Bill Markovits
      **Subject:** RE: Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; Civil
      Action No. 2:05-cv-00138-WOB (E.D.Ky.)

      Richard,

      I would appreciate the opportunity to discuss these issues with you in more depth and to discuss ways in
      which we might resolve this issue. Perhaps we can talk tomorrow or Friday? In the interim, I agree to
      move the due date to July 10, which is well over the 21 days you request in your letter.

      Justin A. Nelson
      Susman Godfrey
      1201 Third Avenue
      Suite 3800
      Seattle, WA 98101
      206-516-3867

      This message is intended only for the people to whom it is addressed and is intended to be a confidential
      attorney-client communication. If this message is not addressed to you, please delete it and notify me.

      **From:** Placey, Richard [mailto:RPlacey@mmwr.com]
      **Sent:** Wednesday, June 14, 2006 9:38 AM
      **To:** Justin A. Nelson
      **Cc:** bmarkovits@mgattorneys.com; kamrine@fbtlaw.com; craigr@taftlaw.com; Lorenz, Pat
      **Subject:** Kentucky Speedway, LLC v. National Association of Stock Car Auto Racing, Inc. et al; Civil Action
      No. 2:05-cv-00138-WOB (E.D.Ky.)


      Mr. Nelson:

      Our office represents Dover Motorsports, Inc., with regard to the subpoena you served on June 8th.
      Enclosed are courtesy copies of a letter and moving papers being served (but not filed) with regard to such
      subpoena. As you will see, I would like to discuss this with you in an effort to avoid another unnecessary
      set of filings with regard to Plaintiff's subpoenas.

      <<Speedway - Letter to Nelson.pdf>>     <<Speedway - Motion.pdf>> <<Speedway - Brief.pdf>>


10/20/2006

Richard G. Placey
(admitted in DE, PA, NJ and IL)
Montgomery, McCracken, Walker & Rhoads LLP
300 Delaware Avenue, Suite 750
Wilmington DE 19801
Telephone: (302) 504-7880
Fax. (302) 504 7820
Philadelphia (PA) Telephone (215) 772-7424
Cherry Hill (NJ) Telephone (856) 488-7700

10/20/2006

# TAB 16

LEXSEE 2004 U.S. DIST. LEXIS 8108

**IN RE CURRENCY CONVERSION FEE ANTITRUST LITIGATION**

**MDL No. 1409, M 21-95**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 8108; 2004-1 Trade Cas. (CCH) P74,373*

**April 21, 2004, Decided**

**SUBSEQUENT HISTORY:** Reconsideration denied by *In re Currency Conversion Fee Antitrust Litig., 2004 U.S. Dist. LEXIS 14249 (S.D.N.Y., July 27, 2004)*

**PRIOR HISTORY:** *In re Currency Conversion Fee Antitrust Litig., 2003 U.S. Dist. LEXIS 18636 (S.D.N.Y., Oct. 21, 2003)*

**DISPOSITION:** Plaintiffs' motion to compel granted in part.

**COUNSEL:** [*1] Merrill G. Davidoff, Esq., Berger & Montague, P.C., Philadelphia, Pennsylvania, Co-Counsel for Plaintiffs.

Daniel D. Edelman, Esq., Heller Ehrman White & McAuliffe LLP, New York, New York, Attorneys for Defendant Visa U.S.A. Inc.

Fiona Schaeffer, Esq., Weil, Gotshal & Manges LLP, New York, New York, Attorneys for Defendant Master-Card International Corp.

Julia Strickland, Esq., Stroock & Stroock & Lavan LLP, Los Angeles, California, Attorneys for Non-Party American Express Co.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION:**

ORDER

WILLIAM H. PAULEY III, District Judge:

This consolidated class action alleges violations of the Sherman Act, *15 U.S.C. § 1 et seq.*, and the Truth in Lending Act ("TILA"), *15 U.S.C. § 1601 et seq.*, arising out of an alleged price-fixing conspiracy by and among Visa and Mastercard and their member banks with respect to currency conversion fees. n1 Presently before this Court are plaintiffs' and defendants' motions to compel compliance with their respective subpoenas directed to non-party American Express Company ("American Express"). For the reasons set forth below, [*2] plaintiffs' motion is granted in part and denied in part.

> n1 For a comprehensive overview of the facts and legal issues at the heart of this action, this Court refers to its prior decision, familiarity with which is presumed. See *In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385 (S.D.N.Y. 2003)*.

DISCUSSION

American Express' position that compliance with both plaintiffs' and defendants' subpoenas is unduly burdensome, would compromise trade secrets, and yield irrelevant information is without merit. First, to argue that the production of documents concerning American Express' foreign currency conversion pricing and practices is irrelevant to an antitrust action borders on the frivolous. This Court gives no credence to American Express' contention that foreign currency conversion information from the third player in a three-player market is irrelevant to an antitrust action focusing on foreign currency conversion fees. Further, this Court is not bound by the California [*3] state court's discovery limitations in Schwarcz v. Visa International Corp., an action this Court notes is much more limited in scope and does not contain an antitrust component.

Second, American Express' concern that production of the subpoenaed documents would compromise its trade secrets and other confidential information is obviated by the presence of the confidentiality agreement and

2004 U.S. Dist. LEXIS 8108, *; 2004-1 Trade Cas. (CCH) P74,373

protective order in this action. Indeed, the confidentiality agreement was amended in consultation with American Express, and contains strong protections for American Express documents.

Finally, American Express' argument that the production called for by the parties' respective subpoenas would be unduly burdensome is a concern to which this Court is sympathetic. However, American Express is a sophisticated company with vast experience in litigation of all types, and can certainly undertake this production with a minimum of disruption to its normal practices.

Accordingly, the parties' motions to compel the production of documents by American Express are granted. The parties are directed to meet and confer concerning streamlining the document requests. If the parties are unable to agree on the [*4] parameters of production, they are directed to send a letter to this Court by April

30, 2004, and this Court will refer the issue to the magistrate judge for the limited purpose of tailoring the specific requests in each subpoena to lessen the burden on American Express and ensure that the parties receive the relevant market and pricing information in accord with this Order. Finally, if American Express claims that it does not have any documents responsive to a particular request, it is ordered to furnish the parties with an affidavit to that effect.

Dated: April 21, 2004
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III

U.S.D.J.

# TAB 17

LEXSEE 2000 U.S. DIST. LEXIS 6925

**UNITED STATES OF AMERICA, Plaintiff, v. DENTSPLY INTERNATIONAL, INC., Defendant.**

**Civil Action No. 99-5 MMS**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE**

*2000 U.S. Dist. LEXIS 6925; 2000-1 Trade Cas. (CCH) P72,919*

**February 1, 2000, Argued**
**May 10, 2000, Decided**

**NOTICE:** [*1]   FOR ELECTRONIC PUBLICATION ONLY

**DISPOSITION:** Order entered granting the Motion to Compel.

**COUNSEL:** Carl Schnee, Esquire, United States Attorney, and Judith M. Kinney, Esquire, Assistant United States Attorney, United States Department of Justice, Wilmington, Delaware, for plaintiff.

Mark J. Botti, Esquire, William E. Berlin, Esquire, Jon B. Jacobs, Esquire, Sanford M. Adler, Esquire, Frederick S. Young, Esquire, Dionne C. Lomax, Esquire, and Eliza T. Platts-Mills, Esquire, Of Counsel, United States Department of Justice, Washington, D.C., for plaintiff.

James P. Hughes, Jr., Esquire, and John W. Shaw, Esquire, Young, Conaway, Stargatt & Taylor, Wilmington, Delaware, for Dentsply International Inc., defendant.

Margaret M. Zwisler, Esquire, Richard A. Ripley, Esquire, Kelly A. Clement, Esquire, and Eric J. McCarthy, Esquire, Of Counsel, Howrey & Simon, Washington, D.C., for Dentsply International, Inc., defendant.

**JUDGES:** Murray M. Schwartz, Senior District Judge.

**OPINION BY:** Murray M. Schwartz

**OPINION:**

**MEMORANDUM OPINION ON PLAINTIFF'S MOTION TO COMPEL**

Argued: February 1, 2000
Dated: May 10, 2000
Wilmington, Delaware

Murray M. Schwartz
**Senior District Judge**

**I. Introduction** [*2]

On January 5, 1999, the United States Department of Justice ("United States" or "government") filed a complaint against Dentsply International, Inc. ("Dentsply"), seeking equitable and other relief for Dentsply's alleged violations of § § 1 and 2 of the Sherman Act, *15 U.S.C. § § 1,* 2, and § 3 of the Clayton Act, *15 U.S.C. § 14, inter alia,* through exclusive dealing arrangements that effectively deny effective distribution outlets to competing manufacturers of prefabricated artificial teeth. Docket Item (D.I.) 1. Pursuant to *Fed. R. Civ. P. 37(a)* and D. Del. L.R. 7.1.1, the United States filed a motion to compel Dentsply to produce requested information related to its competitive position in foreign markets. D.I. 176 ("Motion to Compel"). The United States contends this information is directly relevant to the action and, therefore, is discoverable under *Fed. R. Civ. P. 26(b)(1).* Dentsply counters that its foreign market position is not relevant to the claims and defenses in this case and that the burden and expense of the foreign market discovery will outweigh its likely benefit. Although the Court has some concern about the ultimate admissibility [*3] and weight of the information the United States seeks to discover, the information has the potential to be relevant to the intent of the exclusive dealer criteria and its impact in the United States market place. In light of the liberal thrust of the discovery rules, limited foreign discovery by the United States will be permitted.

**II. Factual and Procedural Background**

The United States' complaint alleges Dentsply has engaged, and continues to engage, in various actions to unlawfully maintain monopoly power in the market for prefabricated, artificial teeth. The government alleges Dentsply denies competing manufacturers of artificial

2000 U.S. Dist. LEXIS 6925, *; 2000-1 Trade Cas. (CCH) P72,919

teeth access to independent distributors (known in the industry as "dealers") of artificial teeth in the United States, in violation of § § 1 and 2 of the Sherman Act and § 3 of the Clayton Act. The government alleges the dealers are an essential link in the existing distribution network if manufacturers of artificial teeth are to effectively distribute their products in the United States. It further complains that Dentsply has entered into restrictive agreements and taken other actions to induce and compel dealers not to carry certain competing [*4] lines of artificial teeth. As a result of Dentsply's actions, particularly "Dealer Criterion Number 6," n1 the United States contends rival manufacturers of artificial teeth have been foreclosed from selling their teeth through the large majority of outlets that carry artificial teeth. n2 The United States asserts this reduces competition among artificial teeth manufacturers and results in higher prices, fewer choices, less market information, and lower quality artificial teeth. In its complaint, the United States alleges that both domestic and foreign artificial tooth manufacturers compete with Dentsply more successfully outside the United States, D.I. 1, PP 11-13, where, the United States contends, their access to dealers is not restricted by Dentsply.

n1 "Dealer Criterion Number 6" is Dentsply's requirement that dealers carrying its artificial teeth "may not add further tooth lines to their product offering." D.I. 1, P 22.

n2 The United States' complaint states that almost all artificial teeth sold in this country are used by dental laboratories to make dentures. Although some manufacturers of artificial teeth sell their product directly to dental laboratories, dealers (also referred to in the complaint as "dental laboratory dealers," "independent dealers," and "independent distributors") are the primary channel through which dental laboratories purchase artificial teeth.

[*5]

The United States has sought to obtain information and documents that Dentsply possesses regarding its competitive position and business strategy in foreign markets in a variety of ways at several different times. Dentsply has objected to production of such information, but has produced limited documents and permitted questioning of some of its officers and employees on these issues at their depositions.

First, on March 2, 1999, the United States served on Dentsply its First Request for Production of Documents ("First Document Request"), which included document

requests 22 and 23 pertaining to Dentsply's competitive position in foreign markets. n3 D.I. 178 at A-16. In Dentsply's April 1, 1999 Objections and Responses to Plaintiff's First Document Request, Dentsply asserted a general objection to the United States' document request definition of "Dentsply" as including all domestic and foreign subsidiaries and affiliates. The ground of the objection was that such entities had no relation to the litigation. Id. at A-23. Dentsply also objected to Requests No. 22 and 23 on the grounds that the United States should have requested documents pursuant to the discovery procedures of the [*6] forum countries where the documents were located. However, Dentsply further stated that, subject to its general objections, it would "produce responsive documents maintained in the United States located after a reasonable search." n4 Id. at A-40-41. Subsequently, by letter dated April 27, 1999, Dentsply informed the United States it would not produce any documents responsive to Request Nos. 22 or 23, whether maintained inside or outside the United States on the ground that Dentsply's foreign activities were not relevant to this action and the requested discovery would therefore be unduly burdensome. D.I. 190, Exhibit (Ex.) A.

n3 The pertinent requests sought:

22. All documents that report, describe, summarize, analyze, discuss or comment on competition from, or the marketing or sales strategies, marked shares or projected market shares, market conditions or the profitability of, any company, including your company, in the supply, manufacture, distribution or sale of prefabricated artificial teeth or dentures in any country other than the United States, including all strategic plans, long-range plans and business plans of any such company.

23. All documents that report, describe, summarize, analyze, discuss or comment on the following for any country outside of the United States:

a. the methods, channels, strategies, means, or policies of distributing prefabricated artificial teeth;

b. the selection, retention, monitoring, supervision or termi-

Case 1:06-mc-00203-***-MPT    Document 3-6    Filed 10/24/2006    Page 7 of 11

Page 3

2000 U.S. Dist. LEXIS 6925, *; 2000-1 Trade Cas. (CCH) P72,919

nation of dealers or dental labora-
tories generally or any specific
dealer or dental laboratory;

    c. exclusive arrangements
with dealers, dental laboratories,
or dentists; or

    d. the utility, advantages, or
disadvantages of distributing teeth
through dealers, including the
various services dealers provide to
dental laboratories or their suppli-
ers of dental products, including
your company.

D.I. 178 at A-16.

[*7]

    n4 The Court disagrees with the United
States' assertion that Dentsply waived its rele-
vance objections to interrogatories 22 and 23 in
its April 1, 1999 response. Dentsply's general ob-
jection to providing any information regarding
Dentsply's foreign affiliates or subsidiaries, in-
corporated by reference in the specific objections
to interrogatories 22 and 23, was a sufficient as-
sertion of a relevance objection. *See id.* at A-23,
40-41.

After various attempts by the parties to resolve the
dispute, the United States, by letter dated May 3, 1999,
informed Dentsply that it would ask the Court to compel
production of documents responsive to Requests No. 22
and 23 regarding international matters, as well as to cer-
tain other requests, if the parties were unable to reach an
agreement. D.I. 178, at A-52-53. Dentsply responded
that it "maintained its objections" to the international
discovery. D.I. 190, Ex. C. During a meet and confer
between the parties on May 20, 1999, Dentsply agreed
"that if [its] search of Dentsply's active files located
documents from the international divisions that were
responsive [*8] to an outstanding request," Dentsply
would produce those documents. *Id.*, Ex. D. "Dentsply's
active files" encompassed "files from Dentsply's corpo-
rate offices, excluding the warehouse archives, that
[Dentsply had] reason to believe might contain docu-
ments responsive to document requests to the extent they
pertain to Dentsply's domestic artificial tooth business
operations." *Id.*, Ex. E. The United States agreed to re-
view those documents to see whether they contained the
information the United States was seeking before decid-

ing whether it was necessary to compel production of
additional documents. *See* D.I. 178, at A-54-56.

Contemporaneous with the parties' dispute over
documents, on April 16, 1999, the United States served
its First Set of Interrogatories on Dentsply, which in-
cluded one interrogatory seeking Dentsply's annual unit
and dollar sales of artificial teeth in countries other than
the United States. n5 *Id.* at A-65. On May 17, 1999,
Dentsply refused to answer this interrogatory on the
ground that such information is beyond the scope of the
subject matter of this antitrust litigation, and would im-
pose an undue burden and expense on Dentsply. *Id.* at A-
73. [*9]

    n5 The relevant interrogatory requested:

    2. State your company's an-
nual unit and dollar sales, sepa-
rately for each type or line of pre-
fabricated artificial teeth your
company sold or manufactured in
any country other than the United
States, separately for each country,
and separately for 1985 and each
subsequent year. *Id.* at A-65.

During the depositions of at least six Dentsply em-
ployees, taken by the United States over a period from
August 19, 1999 to November 5, 1999, the United States
asked questions regarding Dentsply's market shares and
means of distribution in other countries, as well as other
international issues. Dentsply did not object to the rele-
vance of any question on international facts at any of
these depositions, and its employees and officers pro-
vided answers to those questions. n6 Subsequently,
Dentsply asserted its relevancy objection to international
discovery during the deposition of Chris Clark, former
Vice President and General Manager of Dentsply's
Trubyte division, on December 15, 1999. When [*10]
the topic of Dentsply's international operations was
broached, counsel for Dentsply indicated Mr. Clark
would not be permitted to answer any questions regard-
ing international issues.

    n6 The United States argues that Dentsply
did not make a relevancy objection to any of the
above-cited deposition testimony and that the
United States is entitled to discovery requesting
information regarding these issues "to clarify,
confirm, or supplement the selected information
Dentsply has produced." D.I. 177, at 11. This ar-
gument is not persuasive, because relevancy ob-

2000 U.S. Dist. LEXIS 6925, *; 2000-1 Trade Cas. (CCH) P72,919

jections need not be raised at depositions. *See Fed. R. Civ. P. 32(d)(3)(A)*.

Pursuant to *Fed. R.Civ. P. 30(b)(6)*, on December 7, 1999, the United States noticed a deposition requesting Dentsply to produce a witness to testify on Dentsply's competitive position in Canada, Australia, and several European countries. D.I. 161. Dentsply informed the United States on December 17, 1999, that it would not produce any witness to testify about international facts based [*11] on its standing objection to international discovery. During the parties' meet and confer, the United States offered to narrow the information sought. Dentsply maintained its relevancy objection. The United States' Motion to Compel international discovery followed.

### III. Discussion

The United States requests the Court to enter an order compelling Dentsply to produce the following information relating to its competitive position in the prefabricated artificial teeth market in Canada, Australia, England, France, and Germany:

> (1) [Dentsply's] market share in each of its two most recent, complete fiscal years, along with any estimates of the market shares of its competitors;

> (2) annual strategic or business plans of each of its two most recent, complete fiscal years;

> (3) a statement of whether it has a policy that is the same as, or similar to, its Dealer Criteria # 6 in the United States, which provides that its dealers "may not add further tooth lines to their product offering," and, if not, a full and complete description of why it does not have such a policy; and

> (4) any documents created since January 1, 1990 discussing any plan or proposal to adopt [*12] a policy that is the same as, or similar to, its Dealer Criteria # 6 in the United States.

D.I. 176 (attached proposed Order). Each of the above items is encompassed by one of the discovery requests already served by the United States. n7 Aside from the documents requested in item number 4, the United States will accept production of the requested information in the form most convenient to Dentsply, be it as an inter-

rogatory answer, responsive documents, or the deposition testimony of a person who can provide the information requested. *Id.*

> n7 The foreign discovery requested in the Motion to Compel is more limited than the original discovery requests.

### A. Legal Standard

Pursuant to *Rule 26(b)(1) of the Federal Rules of Civil Procedure*, parties may obtain discovery of "any matter, not privileged, which is relevant to the subject matter involved in the pending action." *Fed. R. Civ. P. 26(b)(1)*. Discoverable material is not limited to that which would be admissible at trial, but also includes any [*13] non-privileged information that "appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Relevance is a fact-specific inquiry and, therefore, the determination of relevance lies within the trial court's broad discretion. *See, e.g., Watson v. Lowcountry Red Cross, 974 F.2d 482, 489 (4th Cir. 1992);* 6 James Wm. Moore et al., *Moore's Federal Practice § 26.41*[2] (3d ed. 1999) ("Moore's"). Relevance has been construed liberally under Rule 26(b)(1), to "encompass any matter that bears on, or that reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, 57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978); see also In re ML-Lee Acquisition Fund II, 151 F.R.D. 37, 39 (D. Del. 1993)* ("Discovery should ordinarily be allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." (quotation omitted)); *Pennwalt Corp v. Plough, Inc., 85 F.R.D. 257, 259 (D. Del. 1979); Moore's § 26.41*[2], at 26-89. Liberal discovery [*14] is particularly appropriate in a government antitrust suit because of the important public interest involved. *See Moore's § 26.46*[1]; *see also id. §* 26.41[1] ("In antitrust and other complex litigation, discovery is expected to be somewhat of a 'fishing expedition.'" (citation omitted)).

Although courts should liberally construe relevancy in the discovery context, discovery is not without bounds. The Federal Rules of Civil Procedure allow a court to limit discovery that would otherwise be permissible under Rule 26(b)(1) on a showing that the burden or expense associated with producing the information outweighs the likely benefit to the requesting party in obtaining the discovery. *See Fed. R. Civ. P. 26(b)(2)(iii)*. n8 This provision was added to Rule 26(b) to "guard against redundant or disproportionate discovery." *Id.* (Advisory Committee Notes to the 1983 Amendment). Rule 26 vests the district courts with broad discretion to

Case 1:06-mc-00203-***-MPT    Document 3-6    Filed 10/24/2006    Page 9 of 11

Page 5

2000 U.S. Dist. LEXIS 6925, *; 2000-1 Trade Cas. (CCH) P72,919

tailor discovery. *See Crawford - El v. Britton, 523 U.S. 574, 118 S. Ct. 1584, 1597, 140 L. Ed. 2d 759 (1998)*.

> n8 *Fed. R. Civ. P. 26(b)* states in relevant part:

> > (2) Limitations. . . . The frequency or extent of use of the discovery methods otherwise permitted under these rules and by any local rules shall be limited by the court if it determines that:
> >
> > . . .
> >
> > (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

[*15]

**B. Relevance of Discovery Sought by the United States**

The United States asserts the information it seeks to compel is relevant to a comparison between Dentsply's market share in the United States and in five other countries that have "mature markets" like the United States and where it believes Dentsply does not restrict its dealers from carrying or adding competing tooth lines. The United States has obtained through third party discovery information supporting its belief that Dentsply does not use any restrictive dealer criteria akin to Dealer Criteria No. 6 in other countries, D.I. 178, at 82-83, 84-87, 88-89, 96, and that Dentsply's market share in these countries is lower, sometimes substantially lower, than its market share in the United States. *Id.* at 90-92, 93-96. D.I. 205, at 4. In its discovery requests for foreign market information, the United States seeks confirmatory and supplemental information on these issues. The government maintains the information it seeks is relevant because it is probative of the intent and competitive effects of Dentsply's Dealer Criteria No. 6 in the United States.

Dentsply counters the foreign market data is irrelevant in this litigation [*16] where the relevant market has been defined as the United States. Dentsply argues that the facts relevant to the United States' claim that Dentsply has violated antitrust laws by imposing a condition on its United States dealers that has foreclosed com-

petitors from entering the artificial tooth market in the United States, are whether and to what extent competitive artificial teeth entered the United States market and what effect, if any, Dentsply's United States distribution policy has had on the ability of competitive artificial teeth to enter the United States market. Dentsply contends that the success of competitors in foreign markets, even if true, is simply not a fact of consequence in determining whether there is a causal relationship between Dentsply's distribution policy and competitors' performance in the United States. D.I. 190, at 8. n9 Given the Court's duty to construe relevancy broadly at the discovery stage, *see, e.g., Oppenheimer Fund, Inc., 437 U.S. at 351; In re ML-Lee Acquisition Fund II, 151 F.R.D. at 39; Pennwalt Corp, 85 F.R.D. at 259,* it disagrees.

> n9 In support of its argument, Dentsply cites *Fed R. Evid. 402* (presumably Dentsply intended to cite *Fed. R. Evid. 401*) for the definition of relevance. D.I. 190, at 8. However, as discussed *supra*, section III. A., relevance is construed more broadly at the discovery stage than at trial.

[*17]

The fact that the United States is the relevant market in this case does not necessarily limit discovery to the United States. *See generally Kellam Energy, Inc. v. Duncan, 616 F. Supp. 215, 219 (D. Del. 1985)* (antitrust case stating that "regardless of how [the] geographic market is eventually defined in this action, the boundaries of that market do not set the geographic limit of discovery"). A "general policy of allowing liberal discovery in antitrust cases" has been observed by this Court because "broad discovery may be needed to uncover evidence of invidious design, pattern, or intent." *Id. at 217* (citations omitted).

Dentsply's intent in adopting Dealer Criteria No. 6 is relevant to assessing the legality of Dentsply's conduct under sections 1 and 2 of the Sherman Act. *See, e.g., Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 602, 86 L. Ed. 2d 467, 105 S. Ct. 2847 (1985)* (section 2); *Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 (3d Cir. 1996)* (section 1). In this case, a comparison between Dentsply's distribution policies in this country and in other markets could be probative of [*18] the purpose and significance of Dealer Criteria No. 6 in the United States. *Cf. Aspen Skiing Co., 472 U.S. at 603-04 & n.30* (Without engaging in an exhaustive comparative analysis, the Court looked to other geographic markets and defendant's conduct in other markets in determining whether the defendant's conduct was "a decision of a monopolist to make an important change in the character of the market."). Moreover any discussions

Case 1:06-mc-00203-***-MPT    Document 3-6    Filed 10/24/2006    Page 10 of 11

Page 6

2000 U.S. Dist. LEXIS 6925, *; 2000-1 Trade Cas. (CCH) P72,919

surrounding consideration by Dentsply of whether to employ distribution criteria similar to Criteria No. 6 in other countries clearly could be probative of the intent of Criteria No. 6 in the United States. Therefore, the Court concludes that items two through four of the United States' proposed Order accompanying its Motion to Compel may produce information relevant to the issue of Dentsply's purpose in adopting Dealer Criteria No. 6.

The United States in this case desires that the Court assess the competitive effects of Dealer Criteria No. 6 by comparing the market shares of Dentsply and its primary competitors in countries where the allegedly restrictive Dealer Criteria No. 6 is not imposed with market shares in the United States where [*19] Dentsply employs that dealer criteria. The United States seeks to use the foreign market share comparisons to show the competitive effects of Criteria No. 6 in part because it has been unable to parse the effects of that dealer criteria geographically within the United States or time-wise. n10 D.I. 205, at 15. The parties have not cited, and the Court has not found, any cases on point as to whether comparative foreign market data is relevant to prove the effects of an alleged anti-competitive company policy imposed in this country. However, use of comparative market data in an analogous context suggests that comparing Dentsply's market share in the United States to its market share in the named five countries may be relevant in assessing the competitive effects of Dentsply's allegedly restrictive dealer criteria. Cf. Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 116 n.11, 124-25, 23 L. Ed. 2d 129, 89 S. Ct. 1562 (1969) (district court calculated damages resulting from Zenith's exclusion from the Canadian television market by assuming that, absent the conspiracy, its market share in Canada would have been roughly equal to its market share in the United [*20] States during the same period). n11 Therefore, at this discovery stage, there is sufficient relevance of the comparative market data sought by the first item of the proposed order accompanying the Motion to Compel so as to preclude shielding it from discovery. n12

n10 Dealer Criteria No. 6 appears to have been applied nation-wide and, although it was not memorialized in writing until 1993, the United States believes that it existed informally within the company since the 1980s. D.I. 205, at 15.

n11 The type of evidence relied upon included testimony that, had Zenith been free from the unlawful activity, it would have had the same proportion of the Canadian market as it did in the United States; that the principal competitors in Canada were counterparts of the principal competitors in the United States; that promotion and advertising flowed back and forth between the two countries; and that distributors were available in Canada but were frightened off by the illegal activities and threats in Canada. See Hazeltine Research, Inc. v. Zenith Radio Corp., 418 F.2d 21, 25-26 (7th Cir. 1969). The United States seeks to present similar kinds of evidence in this case.

The Court disagrees with Dentsply's blanket assertion that Zenith Radio Corp. is entirely different from this case. Moreover, there are companion private treble damages actions accompanying the government complaint. Under Zenith Radio Corp., the comparative market data may be discoverable at the damages phase of those actions.

[*21]

n12 The Court cautions, although evidence on Dentsply's foreign market position and distribution policy in foreign markets is relevant for discovery purposes, the Court is not passing on the ultimate admissibility of such evidence for trial.

## C. Whether the Burden and Expense of the Requested Discovery Will Outweigh its Likely Benefit

Dentsply asserts that, even assuming the requested foreign discovery is relevant, the burden and expense of granting the United States' request will outweigh the likely utility of the information and, therefore, the request should be denied. See Fed. R. Civ. P. 26(b)(2)(iii). Dentsply does not contend that the specific information and documents sought by the United States' motion to compel would be burdensome to produce. Rather, Dentsply asserts that if the Court permits the foreign discovery, it will be compelled to undertake burdensome and expensive third party discovery to rebut any comparative market evidence presented by the United States. More precisely, Dentsply contends that a market comparison is probative only if the markets involved are not [*22] dissimilar in any material respect, and that the limited information the United States seeks will not provide a basis for concluding that the markets in the five identified countries are comparable to the United States market. Thus, Dentsply maintains, because it will be entitled to respond to the United States' evidence by demonstrating that the idiosyncrasies of those markets preclude meaningful comparisons, granting the motion to compel will generate a whole separate phase of discovery on the markets for the distribution and sale of artificial teeth in

2000 U.S. Dist. LEXIS 6925, *; 2000-1 Trade Cas. (CCH) P72,919

these five countries. Therefore, Dentsply argues, the Court should exercise its discretion to deny the motion to compel because permitting the requested discovery will require it to undertake a disproportionate burden to rebut the foreign market information. D.I. 190 at 11.

Although Dentsply may need to conduct some additional discovery on the attributes of the artificial tooth market in the five specified countries in order to show that these markets are not comparable to the United States, the "precise extent of this discovery is unknown." D.I. 190, at 10. The Court believes the extent of rebuttal discovery is likely not as substantial [*23] as Dentsply asserts. Because Dentsply competes in these markets, its employees should be able to speak to salient market differences. Additionally, Dentsply has already received some discovery on these issues and, at the time of briefing, was in the process of deposing additional witnesses with discoverable information on these issues. n13 D.I. 195 at 5.

> n13 The deposition testimony of Brian F. Bremer, Vice Chairman of Austenal, Inc., a Dentsply competitor with European tooth operations, provides a case in point. *See* D.I. 222, at A2-A4 (explaining that one must look beyond changes in sales volume, to other factors, for example, changes in government health care reimbursement schedules in Germany, to determine impact on relative market shares). Such testimony appears to be the type of evidence already available to Dentsply that could be used to rebut the United States' theory.

Moreover, at the hearing on this motion, the United States represented that, irrespective of whether the Court grants its Motion to [*24] Compel, it intends to present what evidence it has on relative market shares and Dentsply's distribution policies in other countries in support of its theory that Dealer Criteria No. 6 restricts competition in the United States. D.I. 205, at 7. The United States points out that it has already obtained evidence,

mostly from third parties, that Dealer Criteria No. 6 is unique to the United States and that Dentsply's market share in this country is higher that its market share in other "mature markets." n14 The United States seeks through this Motion to Compel corroborative and supplemental information and documents from Dentsply. D.I. 195, at 1. Because the United States at this juncture intends to present foreign market evidence at trial, Dentsply at this point in time has no choice but to gather whatever additional information on these foreign markets it deems necessary to rebut the United States' argument, no matter how the Court decides this motion. It follows that the foreign discovery requested in the Motion to Compel will not in of itself generate burden and expense that will outweigh its likely benefit. Accordingly, the Court in its discretion will grant the Motion to Compel [*25] limited to Australia, Canada, England, France, and Germany.

> n14 The Court is in no position to determine the extent of such evidence; however, apparently interviews with executives of third party competitors who the United States has identified as likely trial witnesses included discussions of market shares and distribution relationships in other countries. Additionally, some of the documents produced by these companies reflect market shares and other information about foreign artificial tooth markets. D.I. 195, at 5; D.I. 196, at C-3-5. Apparently, Dentsply's own documents characterize these countries as "mature markets" like the United States. D.I. 195, at 1.

**V. Conclusion**

For the foregoing reasons, the Court concludes the information and documents sought by the United States' motion to compel are relevant under *Fed. R. Civ. P. 26(b)(1)* and that the burden and expense of the proposed discovery does not outweigh its likely benefits. An order will be entered granting the Motion to Compel.