## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

KENTUCKY SPEEDWAY, LLC     :     CASE NO:

          : 

      Plaintiff,     :     1:06-mc-00203-KAJ

          : 

      v.     : 

          : 

NATIONAL ASSOCIATION     : 

FOR STOCK CAR AUTO     : 

RACING, INC., ET AL.,     : 

          : 

      Defendants.     : 

## APPENDIX – VOLUME 2 OF 2
### TO BRIEF OF NON-PARTY DOVER MOTORSPORTS, INC.
### (1) IN SUPPORT OF DOVER'S MOTION TO STRIKE AND
### (2) IN OPPOSITION TO PLAINTIFF'S MOTION TO
### COMPEL AGAINST THIRD PARTY DOVER MOTORSPORTS INC.

| App. No. | Document |
|---|---|
| 73-148 | Transcript of Oral Argument in the Kentucky Action Before Judge William O. Bertelsman on January 12, 2006. |
| 149-167 | Declaration of Klaus M. Belohoubek, Esquire. |

Page 1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                            COVINGTON
 3   KENTUCKY SPEEDWAY, LLC,        :   Docket No. CV 05-138
                                    :
 4                   Plaintiff,     :   Covington, Kentucky
                                    :   January 12, 2006
 5           versus                 :   1:30 p.m.
                                    :
 6   NATIONAL ASSOCIATION OF STOCK CAR  :
     AUTO RACING, INC., et al.,     :
 7                                  :
                     Defendants.    :
 8
                            - - -
 9
                    TRANSCRIPT OF ORAL ARGUMENT
10              BEFORE JUDGE WILLIAM O. BERTELSMAN,
                UNITED STATES DISTRICT COURT JUDGE
11
                            - - -
12
     APPEARANCES:
13   For the Plaintiff:          STANLEY M. CHESLEY, ESQ.
                                 FAY E. STILZ, ESQ.
14                               Waite, Schneider, Bayless & Chesley
                                 1513 Fourth & Vine Tower
15                               One West Fourth Street
                                 Cincinnati, Ohio 45202-3865
16                                and
                                 STEPHEN D. SUSMAN, ESQ.
17                               JUSTIN A. NELSON, ESQ.
                                 Susman Godfrey, LLP
18                               1201 Third Avenue
                                 Suite 3100
19                               Seattle, Washington 98101-3000
                                  and
20                               MARK D. GUILFOYLE, ESQ.
                                 Deters, Benzinger & LaVelle, PSC
21                               207 Thomas More Parkway
                                 Crestview Hills, Kentucky 41017
22
     For the Defendant, NASCAR:  STUART H. SINGER, ESQ.
23                               Boies, Schiller & Flexner, LLP
                                 401 E. Olas Boulevard
24                               Suite 1200
                                 Fort Lauderdale, Florida 33301
25                                and
```

App. 73

Page 2

```
 1                                  HELEN M. MAHER, ESQ.
                                     of
 2                                  Boies, Schiller & Flexner, LLP
                                    333 Main Street
 3                                  Armonk, New York 10504
                                     and
 4                                  MATTHEW C. BLICKENSDERFER, ESQ.
                                     of
 5                                  Frost Brown Todd, LLC
                                    201 East Fifth Street
 6                                  Cincinnati, OH 45202
 7    On behalf of the defendant,   G. JACK DONSON, JR., ESQ.
      International Speedway         ROBERT B. CRAIG, ESQ.
 8    Corporation:                  Taft, Stettinius & Hollister, LLP
                                    1717 Dixie Highway
 9                                  Suite 340
                                    Covington, Kentucky 41011-4704
10                                   and
                                    RODNEY ACKER, ESQ.
11                                  GUY I. WADE, III, ESQ.
                                    Jenkens & Gilchrist
12                                  1445 Ross Avenue, Suite 3700
                                    Dallax, TX 75202-2799
13
      Court Reporter:               JOAN LAMPKE AVERDICK, RMR-CRR
14                                  Official Court Reporter
                                    35 W. Fifth Street, Box 1073
15                                  Covington, KY 41012
                                    (859) 291-9666
16
17
18
19
20
21
22
23
24
25    Proceedings recorded by mechanical stenography, transcripted via
      computer-aided transcription.
```

OFFICIAL COURT REPORTER

*App. 74*

Page 3

1          (Proceedings commenced in chambers at 1:30 p.m.)

2                THE COURT:  I hope everybody had good holidays.

3                MR. SINGER:  Yes, thank you.

4                THE COURT:  Okay.  Do you want to give the court

5    reporter your appearances?  Let's start with plaintiff.

6                MR. CHESLEY:  Stanley Chesley for the plaintiff.

7                MR. SUSMAN:  Steve Susman, plaintiff.

8                MR. NELSON:  Justin Nelson for the plaintiff.

9                MS. STILZ:  Fay Stilz for the plaintiff.

10               MR. GUILFOYLE:  Mark Guilfoyle, plaintiff.

11               MR. CRAIG:  Rob Craig for Defendant International

12   Speedway Corp.

13               MR. WADE:  Guy Wade for International Speedway Corp.

14               MR. DONSON:  Jack Donson for International Speedway

15   Corp.

16               MR. ACKER:  Rodney Acker for International Speedway

17   Corp.

18               MR. SINGER:  Stuart Singer for NASCAR.

19               THE COURT:  All right.  Everybody who's going to talk

20   got a seat?  Okay.

21               All right.  We're here on several motions, and I guess

22   the best way to do it is start with that group of motions that

23   goes to whether the amended complaint states a cause of action.

24   So who wants to be heard on that first?

25               MR. SINGER:  Your Honor, I'm Stuart Singer on behalf of

App. 75

Page 4

1    NASCAR, and I'm prepared to argue on the standing issues --

2              THE COURT:  Okay.

3              MR. SINGER:  -- which we have briefed.  There are two

4    distinct claims that plaintiff has asserted here for standing

5    purposes.  They're set forth, we think, in paragraph 2 of the

6    amended complaint.

7              The first is a claim that the plaintiff, as a result of

8    alleged anticompetitive conduct, would have been the recipient of

9    a NASCAR NEXTEL Cup race sanction.  And the second is a claim

10   that, based on some rules not very clearly identified but

11   referenced mainly with respect to point systems and rules

12   regarding testing cars, but for those rules, the Plaintiff

13   Kentucky Speedway would have been in position to and would have

14   competed as an independent against NASCAR.

15             We think both of those claims are deficient for lack of

16   antitrust injury and antitrust standing.  If the Court will

17   permit me, I'd like to start with three general points.

18             THE COURT:  Okay.

19             MR. SINGER:  The first is that, as set forth in our

20   reply brief, the cases that we rely upon are cases that have

21   ruled upon 12(b) motions to dismiss.  They have either been cases

22   where that motion has been granted or, in one case, where the

23   Sixth Circuit reversed the denial of a motion to dismiss.  And

24   they've dealt with antitrust standing.  So we think this is a

25   very appropriate juncture at a case to consider the issue of

OFFICIAL COURT REPORTER

*App. 76*

Page 5

1    whether the plaintiff's theory of the case is sufficient to go

2    forward.

3           THE COURT:  I've got a number of questions here.  I was

4    going to let you proceed a little further, but you've touched on

5    the first one.  And that is, in an antitrust case, is a motion to

6    dismiss based on a different standard than in other cases?

7           MR. SINGER:  We don't think the standard changes.

8           THE COURT:  All right.  Well, then the complaint should

9    be construed very liberally; and if, under any construction of

10   the complaint, there might be grounds for relief, the motion

11   should be denied.

12          MR. SINGER:  We think the general rule applies, but we

13   think that the Court -- what the Courts have done, and the reason

14   you have a lot of cases that have dismissed antitrust complaints

15   for lack of antitrust injury, is that there has to be a theory of

16   antitrust injury set forth in the complaint.  That's not a matter

17   of fact.  That's a matter generally of applying the law.  And

18   that is why cases in other courts have specifically dismissed

19   claims from disappointed applicants for sports franchises,

20   because that theory is deficient as a matter of antitrust law.

21          The second general point I would make would be that,

22   particularly in the Sixth Circuit, the issue of antitrust injury

23   and antitrust standing has been recognized as being very

24   fundamental.

25          THE COURT:  That's true.

*App. 77*

1        MR. SINGER:  Sixth Circuit said, I believe, in the

2  Highpoint v. Hewlett-Packard case that this is at the very center

3  of antitrust law.  It determines whether a particular case is

4  glued to the purpose of antitrust law.  It's not a technicality.

5  And in several cases, the Sixth Circuit has expressed -- in fact,

6  recognized that this Circuit has been reasonably aggressive in

7  getting rid of cases for lack of antitrust injury, for the lack

8  of a claim of injury to competition, rather than an injury to a

9  competitor, and, critically, that the nature of the injury that

10  the plaintiff relies upon is as a result of what makes that

11  anticompetitive.

12       And that is -- and we'll go into this in more detail --

13  the essential flaw here:  That you have an injury to a potential

14  competitor, but basically to a potential applicant for a

15  franchise, but not to competition, and that, to the extent they

16  allege things about competition in the market, when you get down

17  to what they're complaining about, it's their lack of a franchise

18  to participate in NASCAR's racing.

19       THE COURT:  Well, this touches on my second question:

20  Is what the complaint alleges that the market is premium or

21  NEXTEL -- same thing apparently -- premium or NEXTEL races as one

22  market, and it says in the second market it is hosting those

23  races.  Okay.  Do you agree with that definition of the market,

24  or do you have some other market you'd like to suggest?

25       MR. SINGER:  For purposes of this motion, we've

App. 78

1    accepted that definition.

2             THE COURT:  Okay.

3             MR. SINGER:  If the case were to go forward, we would

4    quarrel with that definition.

5             THE COURT:  Okay.

6             MR. SINGER:  We think it's too narrow.  But for these

7    purposes, particularly since we're on a motion to dismiss, that's

8    the type of thing we feel like we do accept.

9             THE COURT:  Okay.  He alleges further that NASCAR

10   engaged in a conspiracy at least with a codefendant, one other

11   coconspirator, and perhaps others, to achieve a monopoly in that

12   market.

13            MR. SINGER:  It's a general allegation --

14            THE COURT:  Or to attempt to monopolize that market.

15            MR. SINGER:  They've made that general allegation.

16            THE COURT:  And further, that they've engaged in

17   predatory activity to achieve the scheme of monopolization.

18            MR. SINGER:  They have made a number of conclusiary

19   allegations with our activity.  I think that the complaint is

20   strikingly deficient in linking that to the alleged lack of a

21   franchise in Kentucky to be part of the number of races that are

22   run under NEXTEL Cup Series; and that for purposes of this

23   hearing, we can accept all of that and the Court can accept all

24   those, I think, as one common territory.

25            May have been Areeda said you can, for purposes of

OFFICIAL COURT REPORTER

*App. 79*

Page 8

1    looking at antitrust standing, accept the defendant's conduct and

2    focus instead on the plaintiff's position.  And that's what

3    really we've done here.  And that's why you don't have to dispute

4    the allegations that plaintiff is making about NASCAR and ISC's

5    conduct to conclude that, nevertheless, this plaintiff lacks

6    standing when it comes in and asks for a -- to be credentialed as

7    a NASCAR-sanctioned race for the NEXTEL Cup Series, and then

8    separately, the issue that the activity that they have alleged

9    has prevented Kentucky Speedway from competing as an independent.

10            And, in fact, the -- all the cases -- and there's been

11    a lot of dispute in the briefs about the cases, but what's

12    remarkable about that, Your Honor, is that this is not a

13    situation where Kentucky Speedway has a set of cases going in

14    their direction and where NASCAR has a set of cases going in our

15    direction.  Within this area of disappointed applicants are

16    sports franchises, as well as outside of sports, when people are

17    asking for credentials at a hospital, to become a member of a

18    trade association, those cases are all going our way, and

19    Kentucky Speedway is trying to draw distinctions and quibble with

20    them.  And we think that that is ultimately unsuccessful.

21            And if I might address more specifically with respect

22    to the first of the two areas, where they say, We are entitled to

23    be a holder of a NEXTEL Cup sanction.  They don't make clear

24    whether they're expecting this to be a new race that NASCAR has

25    to add to the schedule, whether it's to be taken away from some

App. 80

1   unnamed place where a race exists now.  They make the conclusion,

2   we would have gotten a race, and there's all this anticompetitive

3   activity.

4            Well, this is the type of claim that's been brought

5   time and time again in Federal Courts, invoking antitrust laws by

6   NFL applicants for an NFL team franchise --

7            THE COURT:  How can all this be resolved on the

8   allegations in the complaint?  Analyzing the market can be -- I'm

9   no antitrust expert by any means, but I've been reading up on it,

10  and here's one, one of the recent ones from the Sixth Circuit,

11  Spirit Airlines v. Northwest Airlines, 429 F.3d 190.  In there,

12  they take an airport, and they don't say -- and two airlines

13  competing in an airport -- Detroit I think it was -- and they

14  don't say the market is the whole airport.  They don't even say

15  the market is the whole terminal.  They say the market is one

16  route between Detroit and Boston, and that in that one, while

17  Northwest might not have had a monopoly in the whole airport,

18  they have a monopoly on that one route.  As I understand in the

19  complaint, they're saying you've got a monopoly on that one race.

20  They say more than that.

21           MR. SINGER:  Well, I think the different is, in the

22  Spirit Airlines v. Northwest Airlines, you're dealing with

23  competitors.

24           THE COURT:  That was my next question.  Who's the

25  buyer, who's the seller, or are they competitors?  Is NASCAR

App. 81

1    buying use of the track, or is the track buying the races?

2           MR. SINGER:  Well, I think it's a vertical relationship

3    between racetracks and NASCAR where it's a contractual

4    relationship where benefits are flowing in both directions.

5    There's certainly a sharing of television proceeds.  There's a

6    sanction going from NASCAR to the track to hold the race.

7           But what they are not is competitors in the sense that

8    Northwest Airlines and Spirit Airlines is a case where it clearly

9    is antitrust standing in the spirit, in the sense, that Spirit

10   Airlines is a competitor of Northwest.

11          THE COURT:  Well, they say they're a competitor of the

12   codefendant.

13          MR. SINGER:  Well, they say that -- and I know

14   Mr. Atkins will have more to say about that, but they're

15   certainly not a competitor of NASCAR, and we don't think that

16   they're a competitor with respect to the claims they've raised

17   here of ISC because it's not like they're competing to get one of

18   ISC's tracks or anything like that.  But certainly with respect

19   to NASCAR, Kentucky Speedway is not a competitor.  A competitor

20   would be a rival sanctioning body.  They're not a rival

21   sanctioning body that sanctions other races.

22          A competitor, they allege in their second claim, is

23   someone who would want to run an independent race.  Well, there's

24   nothing -- and they have to admit this -- in the agreements that

25   they have with NASCAR, the Busch and the Craftsman Series

App. 82

1    agreements, which prevents them from running an independent race

2    in competition with NASCAR.  And they acknowledge that.

3           So what they are arguing instead is that they would

4    have competed but for some point rules and some rules that deal

5    with testing.  And on that part of our argument, we say, first of

6    all, that they haven't shown that they have the preparedness to

7    compete as an independent race.

8           THE COURT:  That's the complaint.

9           MR. SINGER:  Well, the complaint in that regard has

10   a --

11          THE COURT:  How are you going to show all that in the

12   complaint?  I think they make a general allegation along those

13   lines.

14          MR. SINGER:  They do.  In paragraph 30 --

15          THE COURT:  But that would be pretty detailed.  They'd

16   be pleading a hundred pages of evidence, and then they'd be

17   hearing from me.

18          MR. SINGER:  Well, on paragraph 30, they say absent the

19   various alleged anticompetitive action, Kentucky Speedway would

20   have competed by offering larger purses, et cetera.

21          Now, first of all, that part of the case is not a claim

22   which gives them a right to a NASCAR NEXTEL Cup franchise.  That

23   is their second claim, which is that, but for those rules, they

24   would have been able to compete as an independent.  So at a

25   minimum, the part of the case where they're seeking a NASCAR

App. 83

1    NEXTEL Cup sanction should be dismissed.

2         On this other part, where they make this general

3    allegation, we think you could dismiss that as being

4    insufficient, but we think there's another alternative.  And that

5    is why we have said that the Court could convert this to a motion

6    for summary judgment and have limited discovery with respect to

7    that specific issue, because that specific issue --

8         THE COURT:  What specific issue?

9         MR. SINGER:  That issue would be, has Kentucky Speedway

10   really taken the steps required by the cases to be in a position

11   to compete as an independent with NASCAR and have they been

12   prevented from doing so by these two rules which they've

13   identified?  They have not made any allegation, Your Honor, that

14   they have tried to compete, that they've tried to run an

15   independent race.  They have not made any allegation that they

16   tried to get NASCAR drivers but they've been unable to do so.

17   They haven't made any allegation that there are no other drivers

18   available who they can't get.  No allegation about getting

19   financing that's been unavailable, or anything else that the case

20   law, which we've set forth in the briefs from various circuits,

21   have said is necessary before someone just comes in and says,

22   give us standing to say we were hurt, we would have competed, we

23   would have entered this market.

24        That is a discrete issue.  That is an issue which the

25   Court, before opening this Court up to massive discovery, can

App. 84

Page 13

1    say, let the parties deal with that specific issue and let's see,

2    even if they don't allege it, if there's any proof that would

3    support that type of a claim.  And that's essential for them to

4    go forward on that claim.

5            Going back, if I might, to the first claim about being

6    a holder of a NEXTEL Cup sanction, what does the plaintiff say

7    about the cases we've cited?  And there's a voluminous amount of

8    case law on this, from the NFL to the National Hockey League, in

9    basketball, let alone areas outside of sports where people who

10   apply for this type of a sanction, this type of a franchise,

11   Court say that is not antitrust injury.

12           They say two things.  The first thing they say is

13   that's different because those are leagues and NASCAR is not a

14   league; NASCAR is a single entity.  None of the cases say that

15   that's important on the issue of antitrust injury.  The cases

16   talk about the league in trying to figure out whether the,

17   per se, rule applies to concerted action or some rule of reason

18   because different teams in a league need to work together.

19   Nothing to do with the antitrust injury.  And economically, it

20   wouldn't, because the same rationale applies here.  They're

21   trying to get the benefits of a NASCAR sanction.

22           The complaint says there's too high ticket prices.

23   Well, who does that go to?  That revenue goes, in part, to

24   NASCAR, but in large part to the sponsor of the race, people who

25   hold those sanctions.

App. 85

Page 14

1        They allege, generally, TV has to pay a lot more than

2   we think hypothetically should be the case.  Well, who's the

3   beneficiary of higher broadcast contracts?  That's not just

4   NASCAR; that's shared with the promotors.

5        They fall exactly within what these cases say when they

6   say these are people who are trying to get the benefits of the

7   very same antitrust, anticompetitive conduct that they're

8   attacking.  And that is not what the antitrust laws are for, and

9   that's why they throw all these cases out of court, and generally

10  at an early stage.

11       The second point which is argued by the plaintiffs is,

12  they're not trying to join NASCAR; they're trying basically to

13  reform it.  They're trying to attack the entire industry and

14  allege that the industry broadly is anticompetitive.  Making that

15  type of allegation doesn't change things.  And, in fact, in a

16  number of the cases -- and we point this out on page 6 of our

17  reply brief -- dealt with similar allegations.

18       There was Murray against the National Football League

19  in Eastern District of Pennsylvania where there, the issue was

20  someone had an option agreement to acquire the New England

21  Patriots and the league said, no, we're not going to let you do

22  that.  And they said, well, this is a result of an

23  anticompetitive series of activities.  And it says, "Although

24  plaintiffs often state that the competitive process has been

25  harmed by the adoption of certain NFL policies, they have failed

OFFICIAL COURT REPORTER

*App. 86*

Page 15

1    to link their failure to obtain an expansion franchise to NFL

2    policies and to the competitive process that assertedly exists

3    for the market for the sale of ownership interests in an NFL

4    franchise."  And they say, "Try as plaintiffs might to

5    distinguish this case from Mid-South Grizzlies and a long line of

6    cases which stand for the proposition that an unsuccessful

7    applicant for a franchise has not suffered an antitrust injury,

8    we do not find the distinction compelling."

9         You have the Seattle Totems Hockey Club v. The National

10   Hockey League.  This is a Ninth Circuit case.  This dealt with

11   the issue of a franchise and denial of a National Hockey League

12   franchise.

13        THE COURT:  Are those in your brief?

14        MR. SINGER:  All these are in our brief.

15        THE COURT:  Okay.  I read them all, but focusing in on

16   a few, the Sixth Circuit ones.

17        MR. SINGER:  And there's Sixth Circuit cases we have

18   cited, like Index Services.

19        THE COURT:  We have two Sixth Circuit cases here within

20   the last month.  I don't want to say that they're inconsistent so

21   let me ask you if you think they're inconsistent.  And they could

22   be because the panels work on them and they go in and they

23   frequently don't see each other's work, and they come out about

24   the same time.  These came out about the same time, one

25   November 9th, one November 2nd.  But one is the one you cite,

App. 87

Page 16

1    Care Heating & Cooling, Judge Siler's case, and the other one is

2    Spirit Airlines that I was referring to.

3         You rely heavily in your brief on Judge -- on the one

4    that Judge Siler wrote, but does he not make an exception for

5    monopolies?  He says, "The vertical distribution restraints are

6    to be tested under the rule of reason.  Unlike many horizontal

7    agreements such as Group Boymans, price cartels and monopolies,

8    they're entirely void of redeeming competitive value.

9         Now, you're saying it's vertical.  Some of the

10   allegations in the complaint sound like they're saying it's

11   horizontal.  I'll ask them what they think, how they interpret

12   their own complaint in a second.  But they specifically make an

13   exception for monopolies and boycotts.  I don't know if there's a

14   boycott here, but they're certainly alleging a monopoly and an

15   attempt to monopolize.

16        MR. SINGER:  First of all, Your Honor, the Northwest

17   Airlines case is not a case that dealt with antitrust standing.

18   It was a case that a summary --

19        THE COURT:  It got as far as summary judgment, which

20   implied they had standing.  If they denied the summary judgment,

21   they must have thought they had standing.

22        MR. SINGER:  And we don't dispute that in a situation

23   where you have a competitor.  You have two airlines.  You have

24   Spirit Airlines suing Northwest Airlines.  And the issue there, I

25   think, was on the merits of the antitrust theory pled.

App. 88

Page 17

1          The issue with respect to Care Heating is significant

2   because there, the Court did find there was a lack of antitrust

3   injury, and there you had a situation where there was an

4   allegation that the distributor had conspired with one of the --

5   with the manufacturer.  So you had that element that would be --

6          THE COURT:  Aren't they alleging that here?  They're

7   alleging one racetrack conspired with NASCAR.

8          MR. SINGER:  They are.  And that is why we think Care

9   Heating was significant, because despite that allegation, the

10  result in Care Heating was to find there was no antitrust injury.

11         THE COURT:  But it makes an exception for a monopoly.

12  And then under Spirit, they had the two airlines.  I don't think

13  they allege -- these were just head to head.

14         MR. SINGER:  They were head to head.

15         THE COURT:  Trying to get control of this route.  I

16  thought what was interesting with that case is they narrowed the

17  market down to one route or two routes.

18         MR. SINGER:  It's interesting, the airline industry.

19         THE COURT:  The Supreme Court case said championship

20  boxing matches are a market.

21         MR. SINGER:  The market definitions issue will be

22  interesting.

23         THE COURT:  My problem is, I don't know if we can put

24  it all in the complaint.  You're not supposed to plead a lot of

25  evidence.

OFFICIAL COURT REPORTER

App. 89

Page 18

1    MR. SINGER:  We don't think that, with respect to the

2  first part of their case, there's anything they could plead which

3  would get around the problem that what they're seeking is a

4  NEXTEL Cup sanction.  And that means the theory of their case is,

5  we're entitled to be part of the group which is allegedly engaged

6  in anticompetitive conduct.  We're entitled to get part of

7  NASCAR's profits.

8    THE COURT:  You and I have discussed the theory of the

9  case.  Maybe we ought to ask them about the theory of the case.

10  You've covered your position pretty well.

11    MR. SINGER:  I think the rest is --

12    MR. DONSON:  And I would like to speak on behalf of

13  International Speedway.  We have separate grounds on the motion

14  to dismiss.

15    THE COURT:  Okay.  Let me hear you.  I was going to

16  save the long arm until we got through with this.

17    MR. DONSON:  No, no.  Mr. Acker is going to address the

18  long arm, but I'm going to address the antitrust aspect of it.

19    THE COURT:  You guys divide it up, but I had to do it

20  all.  Go ahead.

21    MR. DONSON:  Okay.  And Your Honor, I have two broad

22  points I'm going to make.  One is, I have an additional antitrust

23  injury argument that supplements Mr. Singer's argument and

24  supports dismissal of the claim with respect to the NEXTEL Cup.

25  And then going beyond the antitrust injury as to International

App. 90

1    Speedway Corporation, our motion argues that the complaint fails

2    to state a claim against International Speedway.  Regardless of

3    what happens on antitrust injury, regardless of what happens to

4    the claim against NASCAR, International Speedway should be

5    dismissed.  So those are my two broad points.

6              THE COURT:  Okay.

7              MR. DONSON:  But I want to focus very closely on a line

8    of Sixth Circuit cases, six cases out of the Sixth Circuit that

9    established what's called the necessary predicate principle of

10   antitrust standing.  And Your Honor, I submit these cases

11   absolutely require the dismissal of the claim with respect to the

12   NEXTEL Cup.

13             And cases -- we've cited them all, Axis, Hodges, Valley

14   Products, Watkins, CTUNIFY, and Care, a case you just referred

15   to.  There are six cases that have granted dismissal of antitrust

16   claims in circumstances that I submit are identical to this case.

17             And let me start with a few principles that come out of

18   these cases.  First of all, of these six cases, five of them are

19   12(b)(6) dismissals.  So the Sixth Circuit has said that

20   antitrust injury is a threshold dispositive issue, and it can be

21   addressed on the complaint, particularly in these circumstances.

22             Secondly, this is a --

23             THE COURT:  Yet other cases say you should be reluctant

24   to dismiss it on the complaint, depending on which way the Court

25   is inclined, I think.

Page 20

1    MR. DONSON:  But you have to focus on this particular

2    theory of dismissal.  The Sixth Circuit had zero problem

3    dismissing cases on 12(b)(6) based upon this theory.

4         The second point is, this is uniquely a Sixth Circuit

5    line of cases.  The Sixth Circuit created this necessary

6    predicate principle.  One of the cases cited, Cardizem, that they

7    cite says that it's the Sixth Circuit's laws on the antitrust

8    injury principle.  So this is a unique line of cases to the Sixth

9    Circuit.  And what's being cited from other circuits has no

10   bearing on this point.

11        And there are several other points before we get to how

12   the doctrine applies.  One addresses exactly what Your Honor has

13   been raising.  Your Honor said, well, they've alleged a

14   conspiracy, they've alleged a monopoly, they've alleged markets,

15   they've alleged a boycott.  Well, Your Honor, if you look at

16   these six cases, all of these cases assume an antitrust

17   violation.  They assume anticompetitive effects.  And

18   notwithstanding those assumptions -- and this is directly in

19   those opinions -- they say, we will assume for purposes of this

20   motion that this anticompetitive conduct occurred.  Nonetheless,

21   12(b)(6) dismissal was granted because of the failure to allege

22   antitrust injury, the failure to satisfy the necessary predicate

23   test.

24        I want to make just a couple of other points on this

25   before I explain the application of it.  One is, is that the

OFFICIAL COURT REPORTER

App. 92

Page 21

1   plaintiff absolutely must satisfy this necessary predicate

2   principle to go forward.  The Axis case that we cite says that

3   the case cannot go forward unless there is antitrust standing.

4   The Valley Products case that we cite is one that Judge Nelson

5   wrote, and he said, "This principle involves no balancing.  It is

6   not applied in selected cases.  It is applied in all antitrust

7   cases."

8            Another principle that comes out of these cases is that

9   it applies to all of plaintiff's claims.  The Axis case says it

10  applies to a Section 4 claim for damages.  That's the provision

11  that gives standing for damages.  It applies to a Section 16 case

12  for injunctive relief.  The Valley case says it applies to a

13  Section 1 claim, the boycott, the conspiracy to restrain trade.

14  Valley also applies it to a Section 2 claim, the monopoly, the

15  conspiracy-to-monopolize claim.  So these cases have complete

16  application on a Rule 12(b)(6) motion.

17           Now, let me explain what the principle is.  And I'm

18  going to start with the Valley Products case that Judge Nelson

19  wrote the opinion on.  And in this case, one of the defendants

20  was a franchisor of hotels.  It was called Hospitality Franchise

21  System, HFS.  They franchise the Ramada Inns, the Days Inns.

22           THE COURT:  Have you got the citation handy?

23           MR. DONSON:  Yeah.  It's 128 F.3d 928, and it was

24  decided by Judge Nelson in 1997.  And Your Honor, in this case,

25  the franchisor of these hotels -- the franchisees bought

App. 93

Page 22

1    trademarked logo amenities for the hotels.  They bought soap,

2    they bought shampoo --

3            THE COURT:  I think I heard that case.

4            MR. DONSON:  -- with the hotel's logo on it.  And there

5    had been six of these suppliers' logoed amenities for these

6    hotels.  Well, the franchisor, HFS, entered into an agreement

7    with two of those suppliers that they would be the sole suppliers

8    to the franchised hotels; and one of the excluded suppliers sued,

9    claiming that they were being excluded from the market,

10   anticompetitive behavior, all the others were being excluded from

11   the market, and that they were unable to sell logoed amenities to

12   these franchised hotels.

13           And the Sixth Circuit dismissed on Rule 12(b)(6), and

14   the analysis is exactly this, on the necessary predicate

15   principle.  The Sixth Circuit said that the injury to the logoed

16   amenities supplier, the excluded supplier, flowed directly -- and

17   those are the words of the Court, "flowed directly" -- from the

18   decision of the franchisor, HFS, not to continue the plaintiff as

19   a supplier of logoed amenities.  And that was the necessary

20   predicate to the exclusion of plaintiff; that the agreement

21   between the --

22           THE COURT:  I do recall that case now, but there was no

23   allegation of anybody getting a monopoly.

24           MR. DONSON:  Oh, yes, there was, Your Honor.

25           THE COURT:  I don't think.  Or at least what you're

App. 94

Page 23

1    talking about, it wouldn't involve a monopoly.  It would just

2    involve their decision not to --

3              MR. DONSON:  Well, it involves expressly a Section 2

4    claim, and the monopoly is that these two suppliers jointly

5    controlled the sale of the amenities to these franchisees.  All

6    other suppliers were excluded.

7              It clearly involves a claim of monopoly, but

8    furthermore -- and I want to go back to the point because this is

9    crystal clear in these cases -- the Court assumed a violation.

10   It assumed there was a conspiracy in restraint of trade.  It

11   assumed there was a violation of Section 2, and they said that's

12   for later; first we have to see whether the plaintiff satisfies

13   the necessary predicate principle of antitrust injury.  And Your

14   Honor, Valley Products is only one of six cases in the Sixth

15   Circuit --

16             THE COURT:  Maybe we better figure out what exactly the

17   complaint alleges.  All right.  It alleges a conspiracy between

18   NASCAR and the other defendant, your client, to control this

19   NEXTEL race.  And, as I read it, it says further -- and we'll

20   call on them to see if this is the right reading of it -- it says

21   further, if they can't get the NEXTEL race, they want to try to

22   get one of their own, but you guys have got all the drivers

23   locked up by this point system you've got.  And that's all part

24   of an existing monopoly or an attempt to monopolize, and that it

25   constitutes predatory conduct.

OFFICIAL COURT REPORTER

*App. 95*

1    MR. DONSON: Well, Your Honor, let's --

2    THE COURT: And the cases you're talking about don't

3  have any of that in it.

4    MR. DONSON: I disagree with you, respectfully.

5    THE COURT: Okay. That's your prerogative.

6    MR. DONSON: If you look at the cases, there's clear

7  allegations of an antitrust violation, and the assumption that

8  there was a violation and there were anticompetitive effects.

9  But let's look at some of these other six cases.

10    The Hodges case, which involved a shuttle service that

11  wanted to shuttle passengers from the Nashville Airport to

12  Opryland, and there was an allegation of a conspiracy among other

13  shuttle operators in the market and Opryland to monopolize the

14  market so that Opryland conducted all of the shuttle services.

15    So Hodges is a case where there is an allegation of a

16  conspiracy, where there is a claim of monopoly to monopolize

17  shuttle services to Opryland. The Court says, we'll assume all

18  that's so, but there was not antitrust injury because the

19  necessary predicate for the plaintiff's injury was the decision

20  of Opryland to deny the plaintiff access to Opryland. Plaintiff

21  could not bring its shuttles onto Opryland. That was the

22  necessary predicate, not the alleged conspiracy.

23    The same is absolutely true in this case. The

24  necessary predicate to plaintiff's injury, what plaintiff's

25  injury directly flows from, is NASCAR's decision not to license

App. 96

1    or not to provide NEXTEL Cup races to plaintiff.  The conspiracy

2    is secondary.  The direct and immediate cause, the necessary

3    predicate to plaintiff's injury, is NASCAR's decision to not

4    grant NEXTEL Cup races to the plaintiff.

5            And I can go through the other cases, the Care case,

6    which you cited.  That's a -- the Train American Standard Care

7    case that just was decided by the Sixth Circuit, that's a

8    conspiracy case.  And the claim was, is that the manufacturer,

9    Train, conspired with a distributor to license only it and to not

10   license the plaintiff.  Again, assuming a violation doesn't

11   matter.  It was the decision not to license the plaintiff, not

12   the conspiracy, that was the necessary predicate.  And you can go

13   through all of these cases.

14           In the CTUNIFY case we cited, they wanted to train

15   users of NEXTEL equipment.  That's what it had been doing.  It

16   claimed that there was an exclusive agreement, an unlawful

17   agreement, between Nortel and another trainer to lock up the

18   market, to exclude the plaintiff and to exclude everybody else.

19   And the Sixth Circuit said, case dismissed, Rule 12(b)(6);

20   there's no antitrust injury.  The injury of plaintiff flows

21   directly from Nortel's decision not to license plaintiff to

22   train, just like this plaintiff's decision -- or injury flows

23   directly from NASCAR's decision not to grant it NEXTEL Cup races,

24   not from any conspiracy.

25           You know, I don't know that you want me to go through

App. 97

Page 26

1    the facts of more of these cases.  I'm prepared to do so.

2              THE COURT:  I'll go back and review them.  If they were

3    in your brief, I read them, but I've been working on this a while

4    and it's been a couple weeks.

5              MR. DONSON:  Well, all six of them, and five of them

6    are 12(b)(6).

7              THE COURT:  Are they in your brief?

8              MR. DONSON:  Yes, Your Honor.

9              THE COURT:  I'll go back and read them again.

10             MR. DONSON:  Yes, Your Honor, they are.  Okay.  So that

11   principle, Your Honor, we submit, requires dismissal of the claim

12   with respect to the NEXTEL Cup Series.

13             Now, Your Honor, I want to -- while I have the floor,

14   as I said, ISC, or International Speedway, has a little different

15   situation than NASCAR.  Our motion says that regardless of

16   antitrust injury, regardless of whether this case goes forward

17   against NASCAR, that International Speedway should be dismissed.

18   And so I want to spend a few moments touching upon those points.

19             First of all, there are three claims against

20   International Speedway in the complaint.  Count 1 alleges a

21   conspiracy to restrain trade.  Count 2, in one of the paragraphs,

22   49, alleges that NASCAR and International Speedway conspired to

23   monopolize.  And so I'm going to start with those two claims.

24             Obviously, a predicate, a requirement, an essential

25   element of those two claims, is a conspiracy between

OFFICIAL COURT REPORTER

App. 98

1    International Speedway and NASCAR.

2           Now, Your Honor asked about what's the standard for

3    pleading in an antitrust case.  And the plaintiffs brought to

4    Your Honor's attention by way of a supplemental filing the

5    Twombly decision out of the Second Circuit in November -- it was

6    in October of 2005.  And I commend that decision to Your Honor.

7    It's approximately a 20-page decision discussing what needs to be

8    pled in an antitrust case.  And frankly, it's a more thorough

9    discussion than you will ordinarily find.  And what the Twombly

10   Court said is very, very instructive here.  They said that the

11   normal rules of Rule 8 pleading applies.

12          So first of all, all of plaintiff's claim about a

13   lessened standard in antitrust cases and a reduced standard in

14   antitrust cases, that's out.

15          THE COURT:  They didn't say it was reduced.  They just

16   said it was the ordinary one; that you don't ordinarily dismiss

17   something on the complaint unless it's patently frivolous.

18          MR. DONSON:  Okay.  Well, I read their briefs

19   differently.

20          THE COURT:  They said the ordinary rule applies.  You'd

21   be reluctant, which is true anyway, you're reluctant to dismiss

22   the case on a complaint, although actually I did an antitrust

23   case in another context a couple weeks ago and dismissed it on

24   the complaint, but it's a lot simpler situation than this.  But

25   go ahead.

App. 99

Page 28

1          MR. DONSON:  Let me articulate what Twombly says with

2     regard to pleading a conspiracy.

3          THE COURT:  Okay.

4          MR. DONSON:  First of all, it says that you have to

5     plead a factual predicate.  That's the holding of the case --

6          THE COURT:  Okay.

7          MR. DONSON:  -- in the opinion.  A Section 1 plaintiff

8     must allege a conspiracy, together with the factual predicate for

9     that assertion.

10          THE COURT:  Okay.

11          MR. DONSON:  It goes on to say that a mere bare-bones

12     statement of a conspiracy, the legal conclusion isn't sufficient.

13     And then it goes on to say that if the conspiracy is implausible,

14     that's insufficient.  So to have a factual predicate, it has to

15     be more than bare-bones, and it has to be plausible.  The

16     plaintiff fails those tests in this case.

17          Your Honor, you can look at the complaint at length,

18     and it alleges no acts by International Speedway Corporation.

19     You read the complaint.  NASCAR denied the NEXTEL Cup race.

20     NASCAR adopted the rules and practices that supposedly prevent

21     the creation of competing races.  Not one word as to how ISC

22     participated in that, only the bare-bones legal conclusion that

23     there was a conspiracy by ISC to participate.

24          And Your Honor, so the plaintiff first of all fails to

25     pass the bare-bones test of the case they brought to the Court's

App. 100

Page 29

1    attention.  But secondly, the plaintiff's conspiracy claim is

2    inherently implausible.  And I'm going to spend just a minute on

3    that.

4            Let's think about it for a minute.  The plaintiff is

5    saying that International Speedway conspired with NASCAR for

6    there to be rules and practices that will prevent competing

7    races.  Well, the plaintiff says those are the rules and

8    practices of NASCAR.  They're not ISC's rules and practices.

9    NASCAR is fully capable of adopting those rules and practices on

10   their own.  There is zero need -- they're NASCAR's rules.

11   They're not International Speedway's rules.  There is zero need

12   for NASCAR to conspire to adopt those rules.

13           And the Sixth Circuit has addressed this very point on

14   an antitrust conspiracy claim, very similar to this case.  This

15   involved Chrysler's marketing practices, policies, practices,

16   just like they're saying with respect to NASCAR.  This is what

17   the Sixth Circuit said:  "There can be no conspiracy where the

18   actor imposing the alleged restraint" -- NASCAR -- "does not need

19   the acquiescence of the other party" -- ISC -- "or any quid pro

20   quo from him."  NASCAR doesn't need any help from ISC to adopt

21   these rules and practices.

22           Their claim's implausible for another reason:  The

23   plaintiff says that these rules and practices prevent competing

24   races from occurring and that they would like to run competing

25   races.  And they say that --

OFFICIAL COURT REPORTER

App. 101

Page 30

1           THE COURT:  That makes them a competitor, doesn't it,

2    they want to run competing races?

3           MR. DONSON:  Well, I think Mr. Singer has addressed

4    that.  They attempt --

5           THE COURT:  He said they weren't a competitor.

6           MR. DONSON:  I'm sorry?

7           THE COURT:  He's saying they weren't a competitor.

8    You're saying they are.

9           MR. DONSON:  They're a competitor of International

10   Speedway Corporation, and they want to -- what they're saying,

11   with respect to these rules and practices, is they want to run --

12          THE COURT:  They want to run their own races.  Is that

13   one of the allegations of your complaint, plaintiff's counsel?

14          MR. CHESLEY:  Yes, Your Honor.

15          THE COURT:  That you want to run your own race if you

16   can't --

17          MR. CHESLEY:  Yes, points and the whole nine yards.

18          THE COURT:  That's what I thought.

19          MR. DONSON:  And that's exactly what they say.  So let

20   me apply that to the point I was making.

21          THE COURT:  So they want to be a competitor of NASCAR,

22   if they have to.  They'd rather get the NEXTEL, but if they

23   don't, can't get it, they'd like to be a competitor and run their

24   own race.  That's what I read it.  And they say you've got the

25   industry monopolized so they can't do it.

OFFICIAL COURT REPORTER

App. 102

1        MR. DONSON:  Well, Your Honor, let me return to the

2   conspiracy point.

3        THE COURT:  And if they pled that much in 500 cases,

4   then they'd have me striking their pleading for pleading

5   evidence.

6        MR. DONSON:  Well, Your Honor, they may have put a lot

7   of words in their complaint, but I ask Your Honor to look at that

8   complaint to see what they said about acts of International

9   Speedway Corporation, my client.

10       THE COURT:  They said that NASCAR and International

11  Speedway Corporation have interlocking ownership and probably

12  interlocking directors, although they didn't say that

13  specifically, and that NASCAR has a market monopolized and is

14  awarding these races based on these other racetracks that they

15  own a part of getting the majority of the profits.  And all it

16  takes for a conspiracy would be for the coconspirator to agree to

17  that and somebody to go do an overt act.

18       MR. DONSON:  Your Honor, they've pled no acts of

19  International Speedway Corporation --

20       THE COURT:  I do a lot of conspiracy in criminal cases,

21  and if A says to B, "We ought to go down and rob this bank," and

22  you could go down there, B, at 9:00 in the morning -- "and the

23  guard goes out for a cup of coffee at 9:00 every morning."  And B

24  goes down and robs the bank.  They're both guilty.  Doesn't

25  matter that B could have done it himself, if they actually got

App. 103

Page 32

1  into it and one guy went and did it.  Matter of fact, he doesn't

2  even have to go down and rob the bank.  He just has to go down

3  there with the intention to rob it, and if B -- if the guard

4  doesn't go for the coffee, he's still guilty.

5          MR. DONSON:  Well, Your Honor --

6          THE COURT:  And both of them are still guilty.

7          MR. DONSON:  But I respectfully ask you to look through

8  the complaint --

9          THE COURT:  So you're setting up a strong man and

10  knocking it down, as I understand the allegations of the

11  complaint.

12          MR. DONSON:  Well, let me finish my one point on

13  implausibility.

14          THE COURT:  Okay.

15          MR. DONSON:  They cited the Twombly case.  They're

16  saying as a track operator, they would benefit by having

17  competing races, races competing with the NEXTEL Cup.

18          International Speedway Corporation is a track operator,

19  too.  It could run NEXTEL Cup races.  It could run competing

20  races.  So the claim is that International Speedway joined a

21  conspiracy to defeat its own economic interest, its interest of

22  increasing its revenue by running more races.  Again, this is the

23  exact sort of failure, the exact sort of implausibility, that has

24  led to the dismissal of conspiracy claims in antitrust cases.

25          THE COURT:  Okay.  I admit that many of them are

*App. 104*

Page 33

1    dismissed on the complaint, probably because the Courts realize

2    there's not a big probability of success and there's a lot of

3    money to be involved in litigating these cases.  So you do see

4    more being dismissed -- matter of fact, just a couple weeks ago,

5    I dismissed one myself on the complaint for that one --

6              MR. DONSON:  Your Honor, I'm going to make one other

7    point --

8              THE COURT:  -- but others are not dismissed on the

9    complaint, like this one here, the Spirit case.  And how

10   plausible or implausible it is, don't we have to know more about

11   the market and the business and how it works?

12             MR. DONSON:  No, not to determine that they fail to

13   allege a conspiracy.  Doesn't matter what the --

14             THE COURT:  They did allege it.  I read it at noon

15   again.  They did allege it.  Anyway, I appreciate your input.

16   You make some good arguments.

17             MR. DONSON:  Can I have 15 more seconds?

18             THE COURT:  Okay.

19             MR. DONSON:  They have one final claim against

20   International Speedway.  It's an attempt-to-monopolize claim.

21   It's paragraph 48 of Count 2.  The parties agree that for that

22   claim to go forward against International Speedway, International

23   Speedway has to have engaged in exclusionary acts.  Your Honor,

24   there is no exclusionary acts.

25             The plaintiff alleges no barrier to NASCAR tomorrow

App. 105

Page 34

1    awarding a NEXTEL Cup race to plaintiff.  They do not allege that

2    ISC has an exclusive contract.  They do not allege that ISC has a

3    long-term contract.  There is no barrier that ISC has imposed to

4    preventing plaintiff from getting a NEXTEL Cup race tomorrow.

5    And so I'm going to be quiet with that, but they've not alleged

6    the element of exclusionary conduct.

7           THE COURT:  Okay.  You-all have been very patient.

8           MR. CHESLEY:  Your Honor, we're breaking it up also.

9           THE COURT:  Yeah, I'm going to take the long arm

10   second.

11          MR. CHESLEY:  Mr. Susman is going to handle the

12   standing, the antitrust issue, and I'm going to handle the long

13   arm issue.

14          MR. SUSMAN:  Your Honor, let me begin with NASCAR's

15   argument.

16          THE COURT:  Why don't we say what the complaint

17   alleges, as there seems to be -- I spent half an hour reading it

18   at noon, after spending several hours reading it on other

19   occasions, and there seems to be some dispute about what the

20   complaint alleges, at least in its inferences.

21          MR. SUSMAN:  Okay.  In the very first paragraph of the

22   amended complaint, we allege that defendant's antitrust

23   violations have hurt race fans by causing higher ticket prices

24   and creating fewer options; i.e., in antitrust jargon, by

25   reducing output.

App. 106

Page 35

1    Their actions have hurt drivers by reducing awards they

2    compete for, restricting the races they can compete in, and

3    discouraging the construction of new tracks.  It has hurt

4    sponsors by giving them fewer options, hurt broadcasters by

5    limiting the number of races featuring the highest caliber

6    drivers, and hurt all independent racetracks.  These allegations

7    which have harmed the competition, not to a single competitor,

8    are repeated in paragraphs 29 to 32 of the complaint.

9    Kentucky Speedway alleges that if it were allowed to

10   competitively bid for a NEXTEL race, such competition would, in

11   and of itself, regardless of who won, increase purse sizes,

12   ensure track safety, benefit sponsors and broadcasters, lower

13   ticket prices.  Furthermore, we allege, if we won, we would be in

14   a position to develop a different premiere stock car event that

15   would compete with NASCAR's NEXTEL events.

16   There is not the slightest hint, Your Honor, in our

17   complaint that we wish to join the cartel, to exclude other

18   non-ISC tracks from competing for a NEXTEL race, or to measure

19   our damages by the profits being made by tracks currently hosting

20   NEXTEL races.  Indeed, we seek an injunction that mandates

21   competitive bidding for NEXTEL races.

22   Mr. Singer is right when he says that the way for the

23   Court to analyze antitrust standing is to assume a violation of

24   the law.  That's what Areeda and Hovenkamp do.  They suggest

25   that, and that suggestion is attached to their brief.  You assume

OFFICIAL COURT REPORTER

*App.* 107

1   that there's a substantive violation, that the Government, for

2   example, which does not need to show antitrust injury, could

3   attack, and then the question is, well, can we attack it?

4           That means, for purposes of today's exercise, Court

5   should assume that it would violate Section 2 for NASCAR to

6   refuse to sanction a race at Kentucky Speedway.  It would violate

7   Section 2 for NASCAR, as a monopolist, to adopt a rule that

8   prevents drivers from competing in NEXTEL races; and, finally,

9   that it would violate Section 1 for ISC to have agreed with

10  NASCAR on such refusal to sanction and on the adoption of such

11  rules.

12          What is the motive for them to get involved in the

13  adoption of rules?  The rules are adopted to protect the NEXTEL

14  franchise, one that we want to break up, not get a part of.  It's

15  a franchise that belongs almost exclusively to ISC tracks.  They

16  want these exclusionary rules that restrict drivers because if

17  their drivers are not restricted, they will come to tracks like

18  ours and other non-ISC tracks and begin doing what amounts to a

19  competitive race to the NEXTEL races.

20          THE COURT:  Okay.  I think what's confusing the issue

21  is you do allege in there that you want them to give you a NEXTEL

22  race.  And that is, of course, opening up the argument on the

23  lead cases -- I even found one where somebody wanted to join a

24  league, but because of the nature of the league, I guess you have

25  to have a limited number of teams.  But that's confusing things.

App. 108

Page 37

1    You're alleging, on the one hand, that you want the race; and on

2    the other hand, you want to compete with the race.  You're

3    alleging one in one place and another in another place.

4            MR. SUSMAN:  Yes.

5            THE COURT:  So if you could clarify that.

6            MR. SUSMAN:  Well, the answer is, I mean, I don't

7    think -- I don't think there's any way the Court could award us a

8    race.  And I'm sorry we pled for that.  But all we are really

9    asking for is the competitive opportunity to compete and the

10   destruction -- we do want these rules destroyed so that whether

11   we get a race or not, we can provide something similar to premium

12   stock car NEXTEL races.

13           Now, we do not suggest that the issue of standing can

14   never be decided on the pleadings.  We agree that it's possible

15   for a plaintiff to plead itself out of court alleging its sole

16   complaint was that it was hurt or that it wants to join a cartel,

17   or to measure its damages by claiming it would have charged

18   monopolist prices.  In such cases, dismissal on the pleadings

19   would be appropriate.  But nothing of the kind is alleged in this

20   amended complaint.  And the Court, for present purposes, needs to

21   assume it's true each and every allegation in our amended

22   complaint.

23           In the first paragraph -- as I say, I've gone through

24   those allegations in the paragraph, and NASCAR's either ignoring

25   what's in there or trying to read into the complaint things that

App. 109

Page 38

1    are not in there.  Way off their mark is their comparison of the

2    allegations in this case to the dismissed allegations in the

3    Sixth Circuit's Care Heating case.  The complaint dismissed in

4    Care, which we have furnished to the Court as supplemental

5    authority in the last few days, the actual complaint, so the

6    Court can compare that complaint with the complaint here, has one

7    paragraph alleging harm, and it's paragraph 51, which clearly

8    alleges only harm to the disfavored dealer --

9          THE COURT:  Let me stop you.  I'm trying to put this in

10   simple language.  Does your complaint, as I read it, contain an

11   allegation, at least by implication, that under some

12   circumstances, at least, you would like to run a race that

13   competes with the NEXTEL race?

14         MR. SUSMAN:  Absolutely.

15         THE COURT:  And that would make it horizontal rather

16   than vertical?

17         MR. SUSMAN:  You asked for that, and the answer is, our

18   current relationship, as Mr. Singer said, the actual current

19   relationship, is a vertical relationship.  But we are also, at

20   the same time, potential horizontal competitors because if we can

21   get a NEXTEL race by fair, competitive bidding and competition,

22   or if we can create our own similar race, look-alike race, then

23   we may ultimately lead to the creation of a new and competitive

24   sanctioning organization where there's a new series of races at

25   many tracks that are competitive to the NEXTEL Cup.  And we

App. 110

1    explain in the complaint why this is so.

2          The Care complaint was obviously prepared by a lawyer

3    who didn't know anything about the antitrust laws.  It's filed in

4    State Court.  It got removed.  There's no allegation in that

5    complaint of increased price to consumers, limited choices, or

6    limited output.  There's no allegation of plaintiff seeking to

7    enjoin Train from having any exclusive or authorized

8    distributors, or that Train was imposing restraints that

9    prevented the plaintiff from going into the manufacturer of HVAC

10   equipment.

11         Now, shifting -- their cases they rely on, the sports

12   franchise cases, the accreditation cases, the medical privilege

13   cases, each involve situations where the plaintiff seeks to join

14   an exclusive arrangement, while leaving the exclusivity otherwise

15   intact.

16         Your Honor, attached to their reply brief, NASCAR's

17   reply brief, is section 348e1 of Areeda and Hovenkamp's treatise

18   entitled, "Would Be or Actual Member of Combination or Substitute

19   Monopolist - Plaintiff Seeks Access to Monopoly."  The professors

20   in that section discuss most of the cases on which NASCAR relies,

21   including the Eleventh Circuit Todorov decision where a hospital

22   contracted exclusively with a radiologist group to which the

23   plaintiff, in effect, sought admission and damages, based upon

24   what they were charging.  The treatise, on page 400 of what they

25   furnish you, explains, however, quote, "But if membership in the

OFFICIAL COURT REPORTER

*App. 111*

Page 40

1   group or invalidation of the exclusive arrangement with the

2   hospital left plaintiff free to compete on prices, the

3   incremental profits he otherwise would have earned would

4   constitute antitrust injury," close quote.

5           The treatise then discusses a subsequent Eleventh

6   Circuit decision, Ertag v. Naples Community Hospital, not cited

7   in their brief, but it's in the Areeda treatise attached to their

8   brief.  That case, the subsequent Eleventh Circuit case,

9   distinguishes Todorov and grants standing to neurologists that

10  sought only the lost profits they would have made had there been

11  no exclusive license.  NASCAR doesn't tell the Court about Ertag,

12  and no wonder.

13          The professors conclude on 401 that, quote, "The

14  ultimate issue is whether the plaintiff (1) seeks to join the

15  exclusive arrangement while leaving the exclusivity requirement

16  otherwise intact; or (2) seeks to forbid exclusivity -- first on

17  its own behalf, and implicitly in behalf of others.  In the

18  former case, the plaintiff is not a victim of antitrust injury,

19  for there is no antitrust right to join a cartel.  In the latter

20  case, antitrust injury exists because the plaintiff is seeking to

21  destroy an anticompetitive arrangement."

22          By explicitly asking that NASCAR create additional

23  NEXTEL races and put up those for competitive bidding, it is

24  clear that Kentucky Speedway falls in the latter category,

25  seeking to destroy exclusivity.

App. 112

Page 41

```
 1          By asking the Court to enjoin enforcement of rules

 2   restricting drivers, rules that would benefit us if we had a

 3   NEXTEL race, Kentucky is clearly seeking to destroy the cartel

 4   and create competition among premium race sanctioning bodies.

 5          There is not a single suggestion in the amended

 6   complaint that Kentucky Speedway intends to measure its damages

 7   by looking at the profits that any track currently makes with a

 8   NEXTEL race.

 9          NASCAR's opening brief furnishes the Court with

10   Section 349 of the Areeda and Hovenkamp treatise.  It's entitled,

11   "Nascent Firms."  I'll get back to that in a second.  What comes

12   between Section 348e1 and Section 349 -- they give you both of

13   them -- is Section 348e2, which they don't give you.  What's it

14   called?  Quote, "Plaintiff" -- and I have it here for you now,

15   because it is -- and it's obvious why they don't give it to you.

16   It's this case.  It's titled, "Plaintiff Member Challenges Cartel

17   Bylaws."  That section, as you can see, discusses three sports

18   cases.

19          THE COURT:  Okay.  You might have handed me the wrong

20   thing.

21          MR. SUSMAN:  On page 402, Your Honor.

22          THE COURT:  Okay.  Wait a minute.  Okay.  I got it.

23          MR. SUSMAN:  You see page 402 now?  There's a

24   discussion there of three sports cases that illustrate the point

25   that "A member of a combination may challenge a rule of a
```

App. 113

Page 42

1  combination (1) that limits competition unreasonably," even if

2  the member could escape the rule by leaving the combination.

3         One of the cases discussed contains allegations very

4  similar to those made by Kentucky Speedway.  It is the Whitehorse

5  case.  And that is the Volvo case cited in the briefs from the

6  Second Circuit, one they totally ignored in their briefing.

7         The defendant in the Volvo case was Men's International

8  Professional Tennis Council, an organization just like NASCAR

9  that's a sanctioning organization.  It sanctions and schedules

10 Grand Prix tournaments for men's professional tennis.  The

11 plaintiffs in the case were owners and producers, actual and

12 potential, of sanctioned and not sanctioned events who complained

13 that MIPTC adopted rules very similar to the ones adopted by

14 NASCAR to discourage players from participating in nonsanctioned

15 tournaments.

16        MIPTC made the following arguments which the trial

17 court accepted in dismissing the complaint.  It's his argument.

18 "If plaintiff's theory is correct, and MIPTC is a vehicle through

19 which tournament owners and producers have organized a cartel in

20 the market for mens professional tennis, then plaintiffs lack

21 standing to challenge the cartel because, as owners and producers

22 of sanctioned tournaments, they, themselves, are members of the

23 cartel who stand to benefit from the cartel's unlawful activity."

24        Second Circuit reversed, refusing, quote, "to adopt a

25 rule precluding cartel members from raising antitrust challenges

App. 114

Page 43

1  against the cartel."  Here's what the Court said:  "To the

2  consent a cartel member incredibly asserts" -- us asserted --

3  "that it would be better off if it were free to compete, we say

4  that, such that a member's interest coincides with the public

5  interest" -- ours does, with the fans, with the sponsors, with

6  the drivers, with the broadcasters -- "we believe that an

7  individual cartel member satisfies the antitrust injury

8  requirement," quote, "because the individual cartel member's

9  interest may diverge from the interest of a cartel as a whole.

10        MIPTC's decision relates to site location and

11  scheduling might not work to plaintiff's advantage even though

12  they are owners and producers of sanctioned events.  The

13  plaintiff's claim that MIPTC uses power to shield tournaments

14  favored by MIPTC from the rigors of competition" -- that's

15  exactly what we quote.  "And in our view," says the Second

16  Circuit -- I'm still quoting -- "this allegation satisfies the

17  antitrust injury requirement; thus, because plaintiff's

18  individual interest may coincide with the public interest in

19  promoting competition, we believe that plaintiffs have satisfied

20  the first element of the standing analysis."

21        So that case, the Volvo case, is on point.  They ignore

22  it in their briefs.  They don't give the Court the section of

23  Areeda and Hovenkamp that discussed that and two very similar

24  sports cases.

25        They argue, Your Honor, that we lack standing in the

App. 115

Page 44

1   complaint about the adoption of rules that prevent the best

2   drivers from racing at Kentucky Speedway.  And that boils down to

3   a few District Court cases that say a sports team can enter into

4   exclusive arrangements with its own employees and a grab bag of

5   other cases that say that the prevention of free writing is a

6   business justification that Courts will listen to in assessing

7   the reasonableness of a restraint.  None of the cases they cite

8   say it's, per se, lawful for a monopolist to impose restrictions

9   on independent third parties like the stock car drivers that race

10  in these races who are not their employees.

11       Exclusive dealing agreements, particularly by

12  monopolists, are always subject to a rule of reasonable analysis,

13  even though they have the alleged goal of preventing free

14  writing.  They all have that goal.  NASCAR cannot cite a single

15  case it has that a monopolist's exclusive distributorships are,

16  per se, lawful because they are designed to prevent free writing.

17  The only standing point that NASCAR makes about the driver

18  restrictions is that Kentucky Speedway has not properly pled that

19  it is a potential rival because it's not pled that it is prepared

20  to organize a NEXTEL-like event on its own.

21       Again, going back to the Bible, the amended complaint,

22  paragraphs 20 to 25 alleges that our track was built and designed

23  to host premium stock car racing events.  Paragraph 30 alleges

24  that, absence defendant's actions, quote, "Kentucky Speedway

25  would have competed by offering, in part, larger purses, larger

OFFICIAL COURT REPORTER

App. 116

1    capacity ticket sales, better amenities, and safer tracks."

2            Paragraph 39 alleges, quote, "Kentucky Speedway would

3    have been able to attract top stock car drivers and their teams

4    to compete in NASCAR premiere format-type stock car races and

5    other events at Kentucky Speedway," close quote.

6            But they say you've not alleged having taken

7    affirmative action toward the entry in the premiere stock car

8    race market or having consummated contracts in the additional

9    construction or sponsorship.

10            Well, Your Honor, you were right when they said this is

11    pleading.  We don't have to plead facts.  This is notice pleading

12    under Rule 8.  We know to plead the four factors that the Sixth

13    Circuit in Huron Valley Hospital said could be considered in

14    determining whether someone is prepared to and intends to enter a

15    market, but the Twombly case makes it clear that in a conspiracy,

16    you don't have to plead any of the plus factors that converts

17    parallel conduct among horizontal competitors into a conspiracy.

18            In the second place, no case has ever held that a

19    plaintiff must prove each of the four factors listed in Huron

20    Valley Hospital in order to have antitrust standing.  Areeda and

21    Hovenkamp, in their discussion of nascent firms, which is

22    attached to their first brief, at Areeda, the relevant section on

23    nascent firms is attached, they cited many cases which, according

24    to plaintiffs, have neither entered into contracts or taken any

25    affirmative steps if, as Kentucky Speedway, they are first

App. 117

Page 46

1   experienced, which we are (2) well financed, which we are, and

2   (3) successfully having operated a business in a very closely

3   related market for six years.  That's enough.

4           Here's what the Sixth Circuit said in Huron Valley --

5   they don't quote you this -- quote, "Although a person must have

6   a business or property interest to bring an antitrust action, it

7   is not required that he be engaged in an ongoing business.

8   Antitrust injury can be suffered by nascent business enterprise

9   as well.  The antitrust laws protect the serious potential

10  competitor, as well as the established business.  The test for

11  determining whether a potential competitor has a business

12  interest protected by antitrust laws is whether he has both the

13  intention" -- and the only thing -- you ask about the pleading,

14  whether we say the pleading is any different in an antitrust case

15  than the standard on a motion to dismiss.  And we state, the

16  standard is the same, but that because antitrust cases often

17  involve issues of intent -- in this case, what was our intent --

18  the Courts have said, maybe they aren't as susceptible as other

19  types of cases to resolution on motions to dismiss, because items

20  about intent you get through discovery.  Their intent, their

21  specific intent, we get through questioning them.  Our intent,

22  they get through taking our depositions and looking at our

23  documents.

24          THE COURT:  I think you've probably had about equal

25  time.

App. 118

Page 47

1          MR. SUSMAN:  Your Honor, can I hit his points?  I'm

2     sorry.

3          THE COURT:  Quickly.

4          MR. SUSMAN:  On the flows-from argument, he talks about

5     these six Sixth Circuit cases.

6          THE COURT:  Yes.

7          MR. SUSMAN:  The case that organizes them all and

8     describes them all is Cardizem.  That's the case.  Because it

9     distinguishes -- it distinguishes all the cases he relies upon.

10         THE COURT:  What's the name of that one?

11         MR. SUSMAN:  C-A-R-D-I-Z-E-M.  It talks about Axis,

12    Hodges, Valley Products, and Watkins.  And the citation is in our

13    brief, but I can give it to you right now.  Oh, it's right here.

14         MR. NELSON:  332 F.3d 896.

15         MR. SUSMAN:  That case, Your Honor -- let me just go to

16    the very end.  The Sixth Circuit said, quote, "In none of these

17    cases was a complaint dismissed for failure to allege antitrust

18    injury based on the defendant's claim that it could have caused

19    the same injury without committing an antitrust violation."

20         And then it sums it up in footnote 19, key footnote

21    they ignored.  Here's what it says.  Quote, "In addition, the

22    defendant's position, if taken -- "the defendant's position, if

23    adopted, risks undermining a basic premise of antitrust law;

24    that, as the District Court observed, in many instances, an

25    otherwise legal action -- e.g., setting a price -- becomes

App. 119

1    illegal if it is pursuant to an agreement with a competitor."

2              Under the defendant's view -- Mr. Donson's view -- such

3    action would never cause antitrust injury because a defendant

4    could have unilaterally and legally set the same price.

5    Absolutely.  They could have terminated us unilaterally.  If they

6    would have done so, we would have had a claim against them for

7    refusal to deal by a monopolist, but only then under Section 2,

8    unilaterally by a monopolist.  But they didn't do it

9    unilaterally.  We allege they do it in cahoots with ISC.  That is

10   a violation of Section 1.  Our injury flowed, as he says, from

11   that refusal to give us a franchise.  He doesn't like that we

12   allege that he was in cahoots with that decision of refusal to

13   give us a franchise, or sanction a race at our place, but it's in

14   the complaint.

15             We have more than adequately -- we have pled our

16   conspiracy allegations, Your Honor, are clearly pled in --

17             THE COURT:  I thought they were clearly pled.

18             MR. SUSMAN:  I mean, they're there.  We talk about who

19   was in it, we talk about it was a conspiracy to allocate market,

20   a conspiracy to fix sanctioning fees and purses, a conspiracy to

21   deny sanctions to nonaffiliated ISC tracks.

22             We have talked about motive.  The motive is the common

23   ownership, the common directors and officers.  We do plead common

24   officers and directors.  And we have pled that they were both

25   doing something against their interest.  NASCAR was refusing to

App. 120

Page 49

1    sanction a race to the highest bidder.  That would be profit

2    maximizing for them.  And these guys, ISC, were going in and

3    buying these dog tracks that were losers, that had no NEXTEL

4    race, and, lo and behold, shortly thereafter, they got the NEXTEL

5    race.  It was not in their economic interest to buy a dog track

6    unless they had a commitment from their coconspirator that they

7    would get a NEXTEL race upon acquiring that track.

8            So, Your Honor, that, I think, is my -- I mean, I have

9    more to say, but --

10            MR. SINGER:  Your Honor, I would be very brief in

11    rebuttal.

12            THE COURT:  One minute.

13            MR. SINGER:  They made a very important admission when

14    Mr. Susman says that you should strike from the complaint,

15    shouldn't have been in there, a request to award a race.  That

16    should occur.  And along with that -- but that is a NEXTEL Cup

17    race.  And along with that, the first part of their case should

18    be dismissed for lack of standing, because that is squarely in

19    the line of cases, both in the Sixth Circuit and the sports

20    franchise cases, that say they are trying to be part of this

21    activity that they say is anticompetitive.

22            They talk about paragraph 1, the ticket revenues are

23    too high.  They want to share in the ticket revenues for the

24    NEXTEL Cup race.  The same with TV revenue.  They can't have it

25    both ways.  It's the second part of their claim, the part where

OFFICIAL COURT REPORTER

App. 121

Page 50

1    they say, We want to have a right to independently compete and

2    challenge the rules that prevent us from competing.  Therefore,

3    we submit if the allegation is sufficient in paragraph 30, then

4    you should have limited discovery on whether they really are in a

5    position to have an independent race and are affected by these

6    rules that they identify, not open it up more broadly.

7            I note, Your Honor, we cited -- and I don't know what

8    Mr. Susman's looking at, but the parts of Areeda and Hovenkamp

9    that he cites are found -- not only cited, but are attached to

10   our reply brief.  And with respect to the Care Heating case, if

11   you look at paragraphs 50, 51, and 52, you see allegations in

12   that case about effects on competition, notwithstanding it's

13   dismissed for lack of antitrust injury.

14           THE COURT:  Okay.  You made it in the minute.

15           MR. DONSON:  Do I get 60 seconds, Your Honor?

16           THE COURT:  Yeah, that's what you got.

17           MR. DONSON:  Your Honor, I would commend to your

18   careful attention the Sixth Circuit cases that establish this

19   necessary predicate principle.  Frankly, Your Honor, I believe

20   they command dismissal of the claim with respect to the NEXTEL

21   Cup.  I frankly believe this case would be reversed on appeal if

22   it's not dismissed because of that, because those cases are

23   crystal clear.  It is NASCAR's decision to deny the NEXTEL Cup

24   that's the necessary predicate and the immediate cause, not the

25   conspiracy.  And all six of those cases line up precisely with

App. 122

1    that analysis.

2              And the last comment I'll make -- you can tell me when

3    I'm at 60 -- is Mr. Susman talked about anticompetitive effects,

4    and I said that these cases do not require -- or that they assume

5    anticompetitive effects.  If you look at the Hodges case, if you

6    look at the Valley case, if you look at the Axis case, they all

7    assumed a violation.

8              THE COURT:  Time's up.

9              MR. DONSON:  Thank you.

10             THE COURT:  I think you said this same thing before.

11             Okay.  Let's move on to the long arm.  And in this

12   case, it might be more productive to reverse the procedure,

13   although it's the defendant's motion, and have the plaintiff tell

14   us what their theory -- what they think their best theory is of

15   personal jurisdiction, as there are several possible theories,

16   and why don't you proceed.

17             MR. CHESLEY:  Your Honor, could I ask the Court's

18   permission to get a washroom break?

19             THE COURT:  Okay.  We can take about five minutes.

20             MR. CHESLEY:  Thanks.

21        (Brief recess.)

22             THE COURT:  Okay.  Well, let's proceed.  Rather than

23   guess what your theory is -- there's about four possible

24   theories -- what do you think is your best all-around?

25             MR. CHESLEY:  Judge, instead of going to Calder v.

App. 123

Page 52

1    Jones, which is the effects in Kentucky, let me take a simple

2    approach to see if -- this may make sense.  I'm fascinated --

3    incidentally, Calder v. Jones we didn't see in their first

4    papers, and was the same in Ferko, and then they had it in their

5    response.

6            I'm fascinated by the position taken in their

7    declaration, and in their pleadings, in which it says that ISC

8    does not own or operate a website, and even if it did, there's

9    nothing about the website's object to jurisdiction in Kentucky.

10   And they also say -- first, ISC does not own or operate the

11   website at issue.  Your Honor, I would like to give to the Court

12   the face sheet of their web sheet --

13           THE COURT:  What I'd really like to do at this point,

14   rather than start getting into the facts, which I know you're

15   prepared, but what are you proceeding under?  You got a possible

16   theory just under the Kentucky long arm, basically.

17           MR. CHESLEY:  Correct.

18           THE COURT:  You also got a theory about a conspiracy.

19           MR. CHESLEY:  All right.

20           THE COURT:  And you got another theory under the

21   antitrust statute.

22           MR. CHESLEY:  Correct.

23           THE COURT:  Section 22, in only some of those do we

24   have to get into all these facts about the website and all that.

25           MR. CHESLEY:  Let me make it simple.

App. 124

Page 53

1        THE COURT:  One argument you make is there's proper

2   venue when a substantial part of the events or omissions giving

3   rise to the cause of action occurred in the district.  And so

4   that's the general venue statute.  And what's your argument about

5   that?  I think you had an argument in there, but I want to be

6   sure I understand it, without getting into the website and all

7   that.

8        MR. CHESLEY:  All right.  The venue, Your Honor, first

9   of all, under conspiracy --

10        THE COURT:  One problem with the website, it might be

11   run by a subsidiary, and then you got to get into whether the

12   subsidiary --

13        MR. CHESLEY:  Your Honor, I would only ask the Court to

14   look at one paragraph.  That's the only thing I am asking the

15   Court to do.  And then to defray -- okay.  Site content is the

16   only thing I'd ask the Court to look at, because it goes to the

17   issue in their declaration, and that's why I feel that I must.

18        THE COURT:  What statute are you proceeding under?

19   There are two possible statutes to get personal jurisdiction.

20   What statute are you proceeding under?

21        MR. CHESLEY:  15 22, Your Honor.  We can state to the

22   Court categorically, as witnessed this morning, Mr. Mark Cassis,

23   executive vice president and general manager, went to ISC's

24   website and purchased a ticket at the Daytona Speedway.  And it

25   is shown that it comes from ISC Motor Sports, and then the ticket

App. 125

1  is transferred by Daytona, one of ISC's tracks, NASCAR race,

2  NEXTEL.

3      Candidly, Your Honor, if I take two recent cases out of

4  Kentucky.  First of all, I'd like to look at Judge Forester's

5  case in Lexmark.  So long -- even if there's an intermediary --

6  in other words, the Courts have determined that the maintenance

7  of a moderately interactive website is sufficient for the

8  exercise of personal jurisdiction.

9      We have one that has marketing.  You can even buy a

10 job, get a job.  It's not just an information.  And to suggest in

11 their declaration they say they don't buy anything, you can buy

12 anything and everything on their website.  So you have an

13 interactive.  It follows Judge Forester's.  It follows the recent

14 case of the Sixth Circuit case of Scotts v. Aventis, which is in

15 our brief, in which it makes it very clear at page 5 of that

16 opinion that --

17      MR. NELSON:  It's the Neogen case.

18      MR. CHESLEY:  Thus, under the effects test of Calder,

19 the focal point of the effects, the defendant was potentially

20 aware of the terms to Scotts based on the terms of the master

21 contract.  Your Honor, I would like to pass up to the Court an

22 unpublished opinion which is right on point by Judge Hood of this

23 district, which is the Laserland, which is a little different

24 than Lexmark, in which he held the exact same set of facts, and

25 he did a full analysis based on the exact same discussion of

App. 126

Page 55

1   personal jurisdiction and went through every single one of the

2   things that I could go through and spend 15 or 20 minutes for,

3   which I don't need to.

4            So if I take the interactive website, plus 15 22 that

5   says you have a right to file anywhere nationally, and then I

6   also take a look at the long arm statute of Kentucky, which is

7   the best on due process, that you can literally tag anyone at any

8   place, plus you get the advantage of 15 22, if you wrap those all

9   together, plus Aventis, the two cases out of the Eastern

10  District, we have an interactive website, at least at this

11  juncture of the case.

12           They sold something as recently as today in Kentucky.

13  And the conclusion they make, which is what you have to prove, is

14  that it's only for Kentucky.  That's ridiculous.  And they also

15  have a radio station, Your Honor, in which they have nine

16  different radio stations in Kentucky that they operate with.

17           I think I wanted to make it simple and quick, but I

18  could --

19           THE COURT:  I think what they're going to say is they

20  got a subsidiary running the radio station.

21           MR. CHESLEY:  They may have a subsidiary running the

22  radio station, but they're all over it.

23           THE COURT:  That would require a lot of factual.  I was

24  looking for a simpler approach.

25           MR. NELSON:  There's also a way, on Calder v. Jones,

OFFICIAL COURT REPORTER

App. 127

1  the effects test is, if you read Scotts v. Aventis, which is a

2  Sixth Circuit case recently, it says under the effects -- this is

3  page 5, under the effects test of Calder, the focal point of the

4  damage was Ohio, and the defendants were unquestionably aware of

5  the potential damage to Scotts.  The same thing is true here.

6  The focal point of the damage is Kentucky, and the defendant was

7  unquestionably aware of what was going to happen.

8          THE COURT:  Let me just ask you, 1391(b), venue.  It

9  says proper venue is a "District in which a substantial part of

10 the events or omissions giving rise to the cause of action

11 occurred."  And then it says the venue closer -- this is a more

12 theoretical approach.

13         MR. CHESLEY:  I understand.

14         THE COURT:  Venue is getting closer to personal

15 jurisdiction because 1391(c) says any corporation "shall be

16 deemed to reside in any judicial district in which it is subject

17 to personal jurisdiction."  So they get tied together.

18         Then we go over to the antitrust statute, which seems

19 to say anyplace you got venue, if you got proper venue, you have

20 nationwide service of process.  So if the venue is proper, the

21 nationwide service of process is proper.

22         MR. CHESLEY:  You certainly said it better than I.

23         THE COURT:  That was in your brief.  Do you want to

24 elaborate on that at all, or have I understood it correctly?

25         MR. CHESLEY:  You've understood it, but I want to add

App. 128

Page 57

1    one other thing.

2              THE COURT:  Okay.

3              MR. CHESLEY:  In their papers, they claim that we

4    didn't cite 1391(c).  We cited 1391(c) as a subpart.

5              Additionally, I would add, Your Honor, going back to

6    the Court's comments at our last hearing, when Mr. Snyder brought

7    this issue up, I believe the Court's point was that under the

8    long arm statute of Kentucky, if you have a conspiracy -- and we

9    clearly, undisputedly have jurisdiction over NASCAR, and for

10   purposes of our complaint, all things must be taken in 12(b)(2)

11   and (3) as alleged, we have set forth the conspiracy.  And, Your

12   Honor, I think that's enough at this juncture, and I don't

13   think -- I'm happy to respond to, since I went first, anything

14   they have to say, but there's six theories and we don't need all

15   six.  Any one of them's good enough.

16             THE COURT:  That's why I wanted to see what you thought

17   was the best.  Okay.  The first one's pretty simple.  If you have

18   proper venue, if a corporation's deemed to reside or is subject

19   to personal jurisdiction, then you come to personal jurisdiction.

20   Person is subject to personal jurisdiction in Kentucky if they

21   cause tortuous injury by an act or omission in this common law.

22   And the allegation in the complaint is -- now they're talking

23   about taking it out -- that they wanted to have a race in this

24   Commonwealth and they omitted to give it to them.  Sort of like

25   you're supposed to come in and inspect my elevator in this

App. 129

1   Commonwealth, you don't come, and that gives rise to the cause of

2   action.

3           MR. CHESLEY:  And also, I don't think we have to

4   withdraw, Your Honor.  That's a but-for type argument.

5           THE COURT:  But in any event, that's one -- that's

6   maybe the simplest theory, that defendants are deemed to reside

7   wherever there would be personal jurisdiction; and the allegation

8   is that they caused personal injury by an act or omission in this

9   Commonwealth, the omission being or the act being to discriminate

10  or cause antitrust injury to the plaintiff by the result of this

11  conspiracy.

12          Okay.  Then there's a separate conspiracy theory where

13  the best explanation I have found for it is in a case called

14  Jung, 300 F.Supp.2d 119.  I don't know if you-all are familiar

15  with that or not.  District of Columbia, I think.  Yeah, District

16  of Columbia.  And I'll just read what he says.  "Plaintiffs

17  assert that the Court has jurisdiction over all the moving

18  defendants pursuant to the conspiracy theory of long arm

19  jurisdiction.  Under this doctrine, acts undertaken within the

20  forum by one coconspirator, in furtherance of an alleged

21  conspiracy, may subject a nonresident coconspirator to personal

22  jurisdiction under the long arm statute."  It cites several

23  cases.

24          Plaintiffs claim that personal jurisdiction exists over

25  each moving defendant pursuant to the conspiracy theory of

App. 130

Page 59

1    jurisdiction stemming from Section 13 423(a)(1).  Conspiracy

2    jurisdiction under this subsection presumes that the persons who

3    enter the forum and engage in conspiratorial acts are deemed to

4    transact business there directly, and coconspirators who never

5    entered the forum are deemed to transact business there by an

6    agent.  So long as any one coconspirator commits at least one

7    overt act in furtherance of the conspiracy in the forum

8    jurisdiction, there is personal jurisdiction over all members of

9    the conspiracy."

10           Okay.  So that essentially -- it does say the

11   conspiracy has to be pleaded with particularity, as you've been

12   trying to point out.  Okay.  So that's the second theory.

13           The third theory, I guess, would be that since venue is

14   proper, Section 22 gives us nationwide service of process.  So

15   let me hear whoever wants to argue it.  Why my analysis of it is

16   wrong, or you can comment on the website, too.

17           MR. ACKER:  First of all, let me say a couple of things

18   about that.  ISC does not have a radio station, and we don't have

19   subs that run radio stations.  There is a sub that's shown in the

20   affidavit that syndicates a broadcast that is transmitted on

21   radio stations across the country that are not owned or operated

22   by us.  So that's one thing.

23           THE COURT:  What are the broadcasts about, the drivers

24   and the races?

25           MR. ACKER:  Races and stuff like that, yes, Your Honor.

App. 131

Page 60

```
 1              The second thing, on the website, I think the analysis

 2   on the website, there is a twofold analysis.  First of all, you

 3   have to look at it under general jurisdiction.  Is the website

 4   itself sufficient to -- sufficient to do business in the state,

 5   to be interactive in doing business in the state?  I think the

 6   cases are clear.  And there's a number of cases that we've cited

 7   in our brief where, for general jurisdiction, having the website,

 8   even if it permits the -- even if the public is permitted to buy

 9   tickets or to go on line, that is not sufficient.  I don't think

10   there's any cases that hold that operating a website is

11   sufficient for general jurisdiction.

12              That leaves it for specific jurisdiction.  Is the

13   operation of a website -- and we would say ours is just like

14   almost every other website.  We don't search out people in

15   Kentucky.  They sign on the web and come to us.  It's similar to,

16   I believe, what this Court has held in the Mayo Clinic case; that

17   that was -- the operation of the website itself would be by

18   people in Kentucky going to us; and, yes, they could buy tickets.

19   And that's operated by -- they have two problems with the

20   website.  First problem that they have is the website is operated

21   by a subsidiary, and as a general rule, it's ISC.com.  And as a

22   general rule, the actions of the subsidiary don't bind -- there's

23   no piercing-the-corporate-veil argument here.

24              THE COURT:  That's what we held in the Mayo Clinic,

25   although that was an independent foundation.  That was the
```

App. 132

Page 61

1    clinic.

2          MR. ACKER:  Right.  There's no basis for holding us

3    liable on behalf of what a sub does.  And secondly, even if it

4    were our acts, the acts of the sub would be insufficient.

5    Operating a website like that would have been insufficient.

6          THE COURT:  I didn't want to get into all that, but I

7    figured that was your comment on them.

8          MR. ACKER:  Right.

9          THE COURT:  These others seem more simple.  So what

10   have you got to say about, say, the conspiracy theory?

11         MR. ACKER:  Could I add one other point on the website,

12   Your Honor?

13         THE COURT:  Sure.

14         MR. ACKER:  That is, secondly, if they're trying to get

15   on the website for specific jurisdiction, then the cause of

16   action has to arise out of the website.

17         THE COURT:  I understand.

18         MR. ACKER:  And their cause of action for not getting a

19   race doesn't arise out of the website.

20         THE COURT:  Unless it's part of the conspiracy.  Okay.

21   At least that would be complicated.  We'd have to have discovery

22   on it and we'd have to waste a lot of time.  But what have you

23   got to say about (1) the conspiracy theory and (2) the Section 22

24   theory?

25         MR. ACKER:  Yes, Your Honor.  It's interesting, on the

App. 133

Page 62

1    conspiracy theory, in their papers, they raised it in a footnote.

2          THE COURT: I don't care if they send it in a paper

3    airplane if it's valid. Maybe I know more about conspiracies

4    than they do. I may not know more about antitrust law than you

5    guys, but I may know more about conspiracies because I've been

6    doing them for 27 years. But anyway, whether it's in the

7    footnote or wherever it might be, what have you got to say about

8    it?

9          MR. ACKER: Your Honor, in Chrysler v. Fedders, (6th

10   Cir. 1981), the Sixth Circuit said that it had never addressed

11   the conspiracy theory prior to that time. And it commented in

12   that case that using the conspiracy theory in this context was an

13   impermissible means of trying to -- or had been considered to be

14   an impermissible means of trying to enlarge the transacting

15   business test of Section 12 of the Clayton Act.

16          THE COURT: Okay. What case was that?

17          MR. ACKER: That was Chrysler v. Fedders, 643 F.2d

18   1229.

19          THE COURT: You say that was 1981?

20          MR. ACKER: Yes, sir.

21          THE COURT: That's a long time ago.

22          MR. ACKER: Well, since that time, Your Honor, we have

23   been unable to find any case in the Sixth Circuit where the Sixth

24   Circuit has exercised jurisdiction, personal jurisdiction, based

25   upon the conspiracy theory. There are some circuits that have

App. 134

Page 63

1    discredited that, that had previously accepted the conspiracy

2    theory and no longer do, like the Ninth Circuit.

3        But if you look at all of the cases since then, what

4    happened in Chrysler v. Fedders, what happened in the

5    Ecclesiastical Order of the Ism, which is another Sixth Circuit

6    case, what's happened in all of those cases, is that they've

7    looked at the allegations, similar to these allegations, and the

8    Courts have said it is unfair, it violates -- it would be

9    violative of the defendant's due process rights to hold them to

10   personal jurisdiction based upon these allegations of conspiracy.

11   And we think that that's what ought to happen here, is that if

12   you look at these allegations, they can't just say, well, you

13   know, they conspired to not give us a race, they conspired to do

14   this.  No court that we have been able to find and no court

15   that -- and no case that they have cited has held jurisdiction in

16   the Sixth Circuit based upon --

17       THE COURT:  Only in the Sixth Circuit?  I was going to

18   say, this one I just read did.

19       MR. ACKER:  In the Sixth Circuit based upon this

20   conspiracy theory.  They have general allegations of conspiracy,

21   and that is not sufficient -- we don't believe that should be

22   sufficient, and we think that otherwise, no defendant could --

23   their due process rights would not be protected adequately.

24       In terms of Section 22 --

25       THE COURT:  We have some people that allege they're in

OFFICIAL COURT REPORTER

App. 135

Page 64

1    jail because the U.S. Attorney's in conspiracy with Osama bin

2    Laden.  That might be a little easier to decide than this one.

3              MR. ACKER:  In connection with that also, Your Honor,

4    that conspiracy theory, I think it is very important for the

5    Court to look at the long arm statute for Kentucky.

6              THE COURT:  I have looked at it.

7              MR. ACKER:  And if you look at 454.210(2)(a)(4), it

8    talks about -- and we couldn't find any Kentucky cases where

9    personal jurisdiction existed as a result of this conspiracy

10   theory.  And I think the reason is, if you look at the Kentucky

11   long arm statute, you look at the last phrase of that

12   paragraph 4, it says, "Provided that the tortious injury

13   occurring in this Commonwealth arises out of doing or soliciting

14   of business or a persistent course of conduct or derivation of

15   substantial revenue within the Commonwealth."

16             So they would not only have -- they would still, as a

17   part of the conspiracy, to get within the long arm statute even

18   under the conspiracy theory, they would have to show that we did

19   something in Kentucky.

20             THE COURT:  Well, you circulate these broadcasts and

21   you have the website where you're apparently selling jackets and

22   things like that.

23             MR. ACKER:  Your Honor, I think those --

24             THE COURT:  I'd have to allow discovery on that and see

25   what we can turn up.

App. 136

Page 65

1          MR. ACKER:  Your Honor, I think those are insufficient

2     for general jurisdiction.

3          THE COURT:  Well --

4          MR. ACKER:  I do not think that those would come within

5     that provision.  Those are acts, again, by a subsidiary.

6          THE COURT:  Um-hmm.  That's the problem.

7          MR. ACKER:  And as far as Section 22 -- or Section 12

8     of the Clayton Act, circuits are split.  The Circuit has not

9     decided whether or not the -- and they didn't really argue it

10    this way so maybe they're not taking the position that they can

11    get nationwide service of process only by having contacts with

12    the United States.  If they're not arguing that, I won't belabor

13    the point.

14         THE COURT:  Well, you say in your brief that a venue is

15    proper, that statute applies venue over somebody.  So the venue

16    is an act based -- or 1391 says where a substantial part of the

17    act or omission occurred.  And they allege acts or omission in

18    this Commonwealth, which gives us venue, as I understand it, and

19    then there would be nationwide service of process.

20         MR. ACKER:  Your Honor, I think if you look at

21    Section 12 --

22         THE COURT:  Even though it's not enough for general

23    specific jurisdiction.

24         MR. ACKER:  Right.  In Section 12, there is a venue

25    provision, and it says if you meet that venue provision in the

App. 137

1    first clause of Section 12, then you can get the nationwide

2    service of process under the second clause of Section 12.

3        The first clause of Section 12 has three distinct parts

4    to create venue for this second nationwide service-of-process

5    provision to apply.  It says that you have to be an inhabitant.

6    ISC is not an inhabitant.  It's not incorporated here.  It

7    doesn't have its principal place of business here.

8        It says you have to be found here.  We are not found

9    here.  And that's continuous local activity.  We don't have that.

10   We don't have officers, directors.  We don't have anyone here

11   that's established, uncontroverted by the affidavit that we

12   filed.

13       And third, that ISC doesn't transact business here.

14   ISC is a holding company.  It transacts no business here.  The

15   only thing that they go back to is the website by a subsidiary

16   where tickets are sold to out-of-state races.

17       And these syndicated radio programs are broadcast by

18   radio stations owned in the state, not by us.

19       THE COURT:  But you do the broadcast?

20       MR. ACKER:  But that is -- it's not directed

21   specifically at Kentucky.  Those are --

22       THE COURT:  Well, it's in -- I presume the broadcast is

23   to try to arouse fan interest so they come to your track.

24       MR. ACKER:  That's also by a subsidiary, Your Honor.

25   That is a subsidiary to ISC.

App. 138

1          THE COURT:  See, we'd have issues of fact on that.

2    That's why I thought the others might be simpler.

3          Now, on the 22, the interesting thing is, that

4    probably -- that was enacted, when, 1900 or something like that,

5    that Section 22, some long time ago.  Okay.  And that probably

6    tracked the federal venue statute at that time.  But since then,

7    in 1990, the federal venue statute was amended so that you have

8    venue wherever any substantial part of the cause of action

9    occurred or omission occurred.  An independent omission can

10   occur, I guess.

11         Do you believe that the venue should be read under the

12   modern 1391, rather than those three phrases in the beginning?  I

13   know you don't, but that's a question.  Do you know of any cases

14   that have discussed that?

15         MR. CHESLEY:  Your Honor, I could -- oh, I'm sorry.

16         MR. ACKER:  Your Honor, I don't think it makes a

17   difference.  I don't think that there is -- I don't think that

18   there is venue under either of those statutes.

19         THE COURT:  Well, a substantial part -- they say they

20   didn't get a race or that they're keeping them from having a

21   race, which is a substantial part of the acts or omission.

22         MR. ACKER:  Worldwide Volkswagen and a number of cases

23   say that you have to establish jurisdiction and venue as to each

24   defendant.  And they're talking about they didn't get a race from

25   NASCAR, who's the only one that can sanction a race.  There is no

App. 139

Page 68

1    action by ISC in Kentucky that they can point to.

2           The Sixth Circuit -- and in terms of this other part of

3    their Calder v. Jones test -- and we would refer the Court to the

4    Reynolds case, which we think is much more on point than the

5    Calder v. Jones case -- the Sixth Circuit has repeatedly held

6    that the mere fact that an in-state plaintiff suffered monetary

7    injury is insufficient when the defendant didn't purposefully do

8    some act in the state.

9           So even if they claim this conspiracy, it's not

10   directed just at Kentucky; it's people all over the country, you

11   know, every other state didn't get a race either under their

12   theory.

13          So it seems to me that it is -- the fact that they are

14   here and the fact that they didn't get a race, if they're

15   claiming an injury to competition, competition everywhere, that

16   it is not purposeful action directed at Kentucky, and we think

17   that's -- we think very strongly that it would violate our due

18   process rights to hold us to personal jurisdiction.

19          MR. NELSON:  Can I just pick that one up?

20          MR. CHESLEY:  Just a second.  May I respond, Your

21   Honor?

22          THE COURT:  Yeah.

23          MR. CHESLEY:  Let's go to 22 and go back to the 1900

24   versus 1990.  I want to cite two cases out of the Sixth Circuit,

25   Medical Mutual of Ohio v. de Soto, 245 F.3d 561 (6th Cir. 2001).

App. 140

Page 69

1    The Sixth Circuit did hold that a --

2              THE COURT:  Give to it me again.

3              MR. CHESLEY:  I'm sorry, 245 F.3d 561, (6th Cir. 2001).

4    The Sixth Circuit did hold that an ERISA federal statute that

5    provided for nationwide service of process, immediately analogous

6    to antitrust, conferred personal jurisdiction and that the

7    question then became whether defendant has sufficient minimal --

8    minimal contacts with the United States, citing United Liberty

9    Life Insurance Company v. Ryan, another Sixth Circuit case in

10   1993, 985 F.2d 1320, a nationwide service of process statute

11   under this SEC, Security Exchange Act, in Haile, H-A-I-L-E, v.

12   Henderson National Bank, 657 F.2d 816.  And I know that one is

13   suggesting that this is a subsidiary, and I'm suggesting, Your

14   Honor, that what's already in front of the Court, if you take 22,

15   you take Calder v. Jones, not cited in their original -- not even

16   recognized until we brought it up -- the leading case on the

17   issue of who-is-harmed effects in Kentucky, the allegations we

18   made in our complaint, which must be assumed to be true, the

19   purposeful availment to suggest that, gee, they didn't want any

20   business.

21             They even sell Visa cards, ISC Visa cards.  It's this

22   very nice, innocent, gee, these folks in Kentucky are rushing to

23   us and we are offering it on our website, a Visa card, discount

24   points.  In other words, if you buy tickets at different ISC

25   tracks, you get points and you get cheaper tickets.  Now, Your

*App. 141*

1 Honor, that is solicitation. And I think Aventis is right on

2 target, and I think Judge Hood's case and I think Judge

3 Forester's case. And I did check with those counsel. Neither of

4 those cases were appealed, Your Honor. And I find them to be

5 very informative on the issue.

6 THE COURT: I have a problem with the website, is they

7 say it's run by a subsidiary.

8 MR. CHESLEY: Your Honor, on the face, on the face,

9 when it says ISC-controlled site, that's their bold statement.

10 They made a declaration, which is an affidavit by Mr. Sanders,

11 that said they don't do business in Kentucky and they don't

12 advertise in Kentucky. Your Honor, to suggest that that could

13 even be accurate -- and all I ask the Court to do is that's an

14 adverse inference and we're entitled to that adverse inference

15 when, on their website, they say they are controlled, licensed by

16 ISC. The bold statement by counsel here today to defeat

17 jurisdiction -- pardon me, claiming --

18 THE COURT: Well, I'd probably have to allow discovery

19 on it.

20 MR. CHESLEY: Well, I don't want to do discovery on

21 this because I don't think you need discovery, but you could take

22 it under Aventis, you could take it under Judge Forester's case,

23 you could take it under Judge Hood's case. You could take it

24 under Calder v. Jones. And you could take the analogy of the SEC

25 under ERISA and the three cases I just gave the Court. I think

App. 142

1   there's six criterium.

2          And the other thing, Your Honor, is long arm.  I'm

3   going to go back to the Court's comment in the transcript in

4   which you look at the long arm statute of Kentucky in which it

5   has the broadest possibility.  You couple that together with the

6   allegation of conspiracy -- they may not like it because it's in

7   a footnote -- and that's enough under the long arm statute of

8   Kentucky to protect the citizens of Kentucky from harm.

9          THE COURT:  What's your theory about what ISC did in

10  furtherance of the conspiracy?  Complaint's a little vague.

11         MR. CHESLEY:  All I can tell you is with the exception

12  of grandfathered tracks, three out of the last four races got ISC

13  tracks, and they've committed two races to Seattle where they

14  have not even built a track and one to New York City where

15  they've not even built a track.  They've already stated publicly

16  that they're going to get NEXTEL races.

17         Miami, Florida, is the best example.  That was a track,

18  man almost went bankrupt.  They bought it for peanuts, and three

19  months later, they had a NEXTEL race.

20         Your Honor, the point is that the allegations of our

21  complaint are severe enough and the conspiracy is severe enough

22  and the interlocutory directors; and I think we're entitled not

23  only to the allegations of our complaint, but the inferences that

24  are actually drawn.  And I don't believe that they can, in any

25  way, substitute their bold-based statement that they don't sell

App. 143

Page 72

1   things when right on there they say, "Shop now.  Officially

2   licensed merchandise," plus a Visa card.  And it's ISC Motor

3   Sports, an entertainment company.  And today, we bought something

4   in Kentucky.

5          Your Honor, I mean, there's six -- you know, we don't

6   need all six of them, but you can take any one of those.  And I

7   think 15 22 certainly conveys national and the antitrust statute,

8   Clayton Act, which is identical.  The fact that the Sixth Circuit

9   hasn't commented on it doesn't make it not so.  And to suggest

10  that since it doesn't exclusively say it goes to Kentucky,

11  there's not one case cited by these defendants to suggest that a

12  website has to only look to the particular statement.  And that's

13  the Amazon case.  And I think, Your Honor, there is enough there

14  for jurisdiction, general jurisdiction and subject jurisdiction.

15         MR. ACKER:  Your Honor --

16         MR. NELSON:  Your Honor, two quick points, Your Honor.

17  First, Mr. Acker talked about the Reynolds case under Calder, and

18  he said that's distinguishable from this particular case and

19  that's why you shouldn't rely on the Scotts case.  If you look at

20  Reynolds, you can see exactly why this case, there's jurisdiction

21  under Calder v. Jones.  In Reynolds, the action took place in

22  Monaco.  The defendant had no idea it was going to happen in

23  Ohio.

24         There was a press release that issued in Monaco.  It

25  was about a track star who had a urine sample.  The urine sample

OFFICIAL COURT REPORTER

*App. 144*

Page 73

1   was taken in Monaco.  Here, our allegations, exactly like Scotts

2   and Aventis, that together, ISC and NASCAR wanted to deny

3   Kentucky Speedway a race, and because they wanted to deny it,

4   they knew -- it wasn't just Mr. Acker said that it was all over

5   the country.  Well, no.  Our allegation specifically states

6   otherwise.  They wanted to deny us a race here in Kentucky.

7   That's the thrust of our injury is exactly that, which is exactly

8   like Calder.

9           Second, on the subsidiary point, very briefly, we cited

10  in our papers the Wedge case, the Dean case, that say that the

11  parent-subsidiary relationship is something -- it's an important

12  factor to look at in deciding.

13          THE COURT:  That's what I said.  We may have to allow

14  discovery on that.

15          MR. NELSON:  You're right,, and so that's why we're

16  talking about Calder, too.

17          THE COURT:  Okay.  One minute.

18          MR. ACKER:  Your Honor, well, several things.  First of

19  all, a lot of what's been said here is completely outside the

20  record.  They've not made -- that's something that's just been

21  sprung on us today.  We do have some issue with that.

22          Secondly, as far as the conspiracy they're talking

23  about, you're talking about the effect.  What they're claiming is

24  the effect, not any act by ISC in the State of Kentucky.  The

25  cases --

App. 145

1          THE COURT:  At the risk of being tedious, I point out

2     that all coconspirators are charged with the acts of the other

3     coconspirators.  That's the theory of a conspiracy.

4          MR. ACKER:  In the Kentucky long arm statute, Your

5     Honor, in looking at the Kentucky long arm statute, it talks

6     about, in subparagraph 4, "Provided that the tortious injury

7     occurring in this Commonwealth arises out of the doing or

8     soliciting of business or a persistent course of conduct" here.

9          THE COURT:  You'd be charged with the acts of NASCAR

10    under the conspiracy theory.  They're considered to be your

11    agent.

12         MR. ACKER:  What they have done --

13         THE COURT:  At the risk of being tedious, they're

14    considered -- if the conspiracy theory applies, you would be

15    charged with the acts of NASCAR in Kentucky, and they don't deny

16    they're active in Kentucky.  So you may be right, that it doesn't

17    apply; but if it does apply, those criteria would be met by your

18    agent.  All coconspirators are agents of all the other

19    conspirators.  So if one guy -- in a criminal case, even though

20    one guy might stay home after planning the bank robbery, if

21    another guy goes in and kills somebody, the first guy is

22    chargeable with murder just as much as the people who went there,

23    even though he didn't intend for there to be a murder.

24         So the idea is that if NASCAR did acts in Kentucky and

25    you're a coconspirator, those acts are charged to you, and that

App. 146

Page 75

1    would meet this systematic activity requirement, if the

2    conspiracy theory applies.  And I have to think some more about

3    that.  Okay.  It's all been enlightening.

4              MR. CRAIG:  Your Honor, could I take 30 seconds to just

5    answer a question?  You asked whether there had been any cases

6    that decided whether the general jurisdiction statute could be

7    substituted into the first sentence of Section 12.

8              THE COURT:  Venue statute.

9              MR. CRAIG:  And the answer to that -- first of all,

10   there is.  Judge Swinford decided Phillip Gall & Son, 340 F.Supp.

11   1255.  But more recently, the Second Circuit, in the most recent

12   case on that, in a long discussion -- we've cited it.  It's

13   Daniel v. The Emergency Board, 428 F.3d 408, and specifically

14   states, "We conclude from the language and context of 'in such

15   cases,' and the service of process provision of Section 12 that

16   the phrase plainly refers to those cases qualifying for venue in

17   the immediately preceding clause."

18             And they go on to rule that you need to satisfy just

19   that first sentence in Section 12, the venue statute, before you

20   can apply the nationwide service of process provision.

21             THE COURT:  The problem is that the first clause in 22

22   is narrower than the present federal venue statute.

23             MR. CRAIG:  But the Court in Daniel says -- that is

24   true.  The Court recognizes that and says that if you're going to

25   take advantage of the second sentence in Section 12, then you

OFFICIAL COURT REPORTER

App. 147

Page 76

1    have to satisfy the first sentence in Section 12.

2              THE COURT:  Okay.  I'll take a look at all that.  I'll

3    try to get something out.

4              MR. CHESLEY:  Your Honor, could I give one citation,

5    concert of action, Beverly Hills, where that was a civil

6    conspiracy based upon defendants who were part and parcel, a

7    concert of action who never even saw Kentucky.  And that's as

8    good as I can get you.  That's right here in Kentucky.

9              THE COURT:  That was another theory.

10             MR. NELSON:  The ten-second response to that is that

11   the general statute is different from the statute.

12             MR. CRAIG:  I waive my five seconds.

13             THE COURT:  He couldn't have commented on the 1990

14   statute.  He died in 1974.

15             MR. CHESLEY:  And you took his place.

16             MR. SINGER:  One final point, Your Honor.  I think

17   Mr. Susman now recognizes that we did cite the relevant parts and

18   attached the relevant parts of Areeda.

19             THE COURT:  Okay.

20             MR. CHESLEY:  Judge, thank you for your time.

21             THE COURT:  You bet.  You'll be hearing from me.  I'll

22   make it as quick as I can.

23             MR. CHESLEY:  Thank you, Judge.

24        (Proceedings concluded at 3:35 p.m.)

25

App. 148

1                    C E R T I F I C A T E

2              I, JOAN LAMPKE AVERDICK, RMR-CRR, certify that the
   foregoing is a correct transcript from the record of proceedings
3  in the above-entitled case.

4

5  JOAN LAMPKE AVERDICK, RMR-CRR       Date of Certification
   Official Court Reporter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

App. 149

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

KENTUCKY SPEEDWAY, LLC    :    CASE NO:
:
          Plaintiff,    :    1:06-mc-00203-KAJ
    v.           :
:
NATIONAL ASSOCIATION    :
FOR STOCK CAR AUTO    :
RACING, INC., ET AL.,    :
:
          Defendants.    :

## DECLARATION OF KLAUS M. BELOHOUBEK, ESQ.

        Klaus M. Belohoubek, Esq. makes the following declaration pursuant to 28 U.S.C. §1746:

    1.    I am the General Counsel and Senior Vice President of Dover Motorsports, Inc. ("Dover"), and have held that position since 1999.  I make this declaration to put before the Court the facts surrounding Kentucky Speedway, Inc.'s ("Kentucky") past breaches of confidentiality agreements, and the risks and harms involved in allowing Kentucky to have access to any further confidential information from Dover.

    2.    In my role as General Counsel, I was personally involved in and have personal knowledge of efforts made by Kentucky to gain access to confidential information of Dover and to propose certain potential corporate transactions with Dover in 2004.  As a public company, Dover gave full and due consideration to Kentucky's proposals and provided significant confidential information to Kentucky.

    3.    As is typical when such proposals are made by one entity to another, there was a confidentiality agreement agreed to in advance.  Such agreements are used to prevent various improper and potentially harmful disclosures, including disclosure of confidential corporate information such as detailed financial and operating information and business plans, disclosure of information about potential transactions, disclosures which may violate or lead to a violation of securities laws, and disclosures concerning the fact that discussions or negotiations are taking place or even being contemplated.  Disclosure of such information can be extremely harmful to Dover from an investor relations standpoint and can be extremely harmful to the company in its relations with employees and in the communities in which it has operations.

    4.    A copy of the August 26, 2004 Confidentiality Agreement between Dover and Kentucky is attached as Exhibit A.  Among other things that agreement provides at ¶2:

        2.    You [Kentucky] and your Representatives [directors, officers, employees . . .] will not   .   .   . disclose to any person the fact that   .   .   . you are

2137193v1

considering the Transaction or any other transaction involving the Company [Dover] or that discussions or negotiations are taking or have taken place concerning the Transaction or involving the Company or any term, condition or other fact relating to the Transaction or such discussions or negotiations, including, without limitation, the status thereof.

Exhibit A at p. 2.

5.     After the Confidentiality Agreement was signed, Dover discovered that Kentucky (through its Chairman, Jerry Carroll) breached the agreement by talking to the press about a potential transaction with Dover.  These breaches resulted in several press articles, including the articles from a June edition of the NASCAR Scene and the June 21, 2005 edition of the Herald Leader attached as Exhibit B.

6.     Among other things, Kentucky in breach of the Confidentiality Agreement revealed that:

Kentucky Speedway owner Jerry Carroll said June 18 that the track's ownership group was in negotiations to buy Dover Motorsports, but that the deal has fallen through.

Exhibit B, p1.  He went on to tell at least one other reporter in some detail his version of the events involving Dover.  See Exhibit B. p. 3.  These disclosures violated Kentucky's agreement not to disclose any discussions about a potential transaction, and also its agreement not to disclose the status thereof.  See Exhibit A, ¶2.  Carroll's statements were also a blatant mischaracterization of the discussions which Dover had had with Kentucky -- discussions which had never progressed to a level of serious discourse due mainly to Kentucky's inability to raise capital.

7.     Kentucky's improper disclosures caused (and may have been designed to cause) significant harm to Dover, including creating a misleading impression that Dover was or should be "in play" and harming Dover with investors, analysts, shareholders and employees.

8.     On June 24, 2005, upon seeing the article in the NASCAR Scene, I sent the letter attached as Exhibit C to Carroll, as Chairman of Kentucky, notifying him that Kentucky had breached the Confidentiality Agreement and demanding that such breaches stop.  After receiving this letter, Carroll called me to apologize for the breach.

9.     The making of such improper and inaccurate disclosures at the very highest levels of an organization underscores that Kentucky cannot and should not be trusted with confidential information.

I verify under penalty of perjury that the foregoing is true and correct; I understand that

-2-

App. 151

this verification is made subject to the penalties of 28 U.S.C. §1746 relating to unsworn falsification to authorities.

DOVER MOTORSPORTS, INC.

Executed on: December 12, 2006

By: _____
Klaus M. Belohoubek
General Counsel –
Senior Vice President

-3-

2137193v1

App. 152

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

KENTUCKY SPEEDWAY, LLC     :     CASE NO:

            Plaintiff,     :     1:06-mc-00203-KAJ

            v.                  :

NATIONAL ASSOCIATION     :
FOR STOCK CAR AUTO     :
RACING, INC., ET AL.,     :

            Defendants.     :

# EXHIBIT A

Exhibit A to Belohoubek Declaration

App. 153



writer's direct dial:  (302) 475-6756
telecopy:              (302) 475-3555
email:                 kbelohoubek@dovermotorsports.com

August 26, 2004

Mark Simendinger
Kentucky Speedway, LLC
2216 Dixie Highway, Suite 200
Ft. Mitchell, KY   41017

## CONFIDENTIALITY AGREEMENT

Dear Mr. Simendinger:

In connection with your possible interest in a potential transaction (the "Transaction") with Dover Motorsports, Inc. (the "Company"), you have requested that we or our representatives furnish you or your representatives with certain information relating to the Company or the Transaction. All such information (whether written or oral) furnished (whether before or after the date hereof) by us or our directors, officers, employees, affiliates, representatives (including, without limitation, financial advisors, attorneys and accountants) or agents (collectively, "our Representatives") to you or your directors, officers, employees, affiliates, representatives (including, without limitation, financial advisors, attorneys and accountants) or agents or your potential sources of financing for the Transaction (collectively, "your Representatives") and all analyses, compilations, forecasts, studies or other documents prepared by you or your Representatives in connection with your or their review of, or your interest in, the Transaction which contain or reflect any such information is hereinafter referred to as the "Information". The term Information will not, however, include information which (i) is or becomes publicly available other than as a result of a disclosure by you or your Representatives or (ii) is or becomes available to you on a nonconfidential basis from a source (other than us or our Representatives) which, to the best of your knowledge after due inquiry, is not prohibited from disclosing such information to you by a legal, contractual or fiduciary obligation to us.

Accordingly, you hereby agree that:

1.    You and your Representatives (i) will keep the Information confidential and will not (except as required by applicable law, regulation or legal process, and only after compliance with paragraph 3 below), without our prior written consent, disclose any Information in any manner whatsoever, and (ii) will not use any Information other than in connection with the Transaction; provided, however, that you may reveal the Information to your Representatives (a) who need to know the Information for the purpose of evaluating the Transaction, (b) who are informed by you

phone 302.475.6757   fax 302.475.3555

3505 Silverside Road, Plaza Centre Building, Suite 203

Wilmington, Delaware 19810

dovermotorsportsinc.com

App. 154

Mark Simendinger
August 26, 2004
Page 2

of the confidential nature of the Information and (c) who agree to act in accordance with the terms of this letter agreement. You will cause your Representatives to observe the terms of this letter agreement, and you will be responsible for any breach of this letter agreement by any of your Representatives.

2.    You and your Representatives will not (except as required by applicable law, regulation or legal process, and only after compliance with paragraph 3 below), without our prior written consent, disclose to any person the fact that the Information exists or has been made available, that you are considering the Transaction or any other transaction involving the Company, or that discussions or negotiations are taking or have taken place concerning the Transaction or involving the Company or any term, condition or other fact relating to the Transaction or such discussions or negotiations, including, without limitation, the status thereof.

3.    In the event that you or any of your Representatives are requested pursuant to, or required by, applicable law, regulation or legal process to disclose any of the Information, you will notify us promptly so that we may seek a protective order or other appropriate remedy or, in our sole discretion, waive compliance with the terms of this letter agreement. In the event that no such protective order or other remedy is obtained, or that the Company does not waive compliance with the terms of this letter agreement, you will furnish only that portion of the Information which you are advised by counsel is legally required and will exercise all reasonable efforts to obtain reliable assurance that confidential treatment will be accorded the Information.

4.    If you determine not to proceed with the Transaction, you will promptly inform our Representative, Raymond James and Associates ("Raymond James"), of that decision and, in that case, and at any time upon the request of the Company or any of our Representatives, you will either (i) promptly destroy all copies of the written Information in your or your Representatives' possession and confirm such destruction to us in writing, or (ii) promptly deliver to the Company at your own expense all copies of the written Information in your or your Representatives' possession. Any oral Information will continue to be subject to the terms of this letter agreement.

5.    You acknowledge that neither we, nor Raymond James or its affiliates, nor our other Representatives, nor any of our or their respective officers, directors, employees, agents or controlling persons within the meaning of Section 20 of the Securities Exchange Act of 1934, as amended, makes any express or implied representation or warranty as to the accuracy or completeness of the Information, and you agree that no such person will have any liability relating to the Information or for any errors therein or omissions therefrom. You further agree that you are not entitled to rely on the accuracy or completeness of the Information and that you will be entitled to rely solely on such representations and warranties as may be included in any definitive agreement with respect to the Transaction, subject to such limitations and restrictions as may be contained therein.

6.    You are aware, and you will advise your Representatives who are informed of the matters that are the subject of this letter agreement, of the restrictions imposed by the United States securities laws on the purchase or sale of securities by any person who has received material, non-public information from the issuer of such securities and on the communication of

App. 155

Mark Simendinger
August 26, 2004
Page 3

such information to any other person when it is reasonably foreseeable that such other person is likely to purchase or sell such securities in reliance upon such information.

7.  You agree that, for a period of three years from the date of this letter agreement, neither you nor any of your affiliates will, without the prior written consent of the Company or its Board of Directors: (i) acquire, offer to acquire, or agree to acquire, directly or indirectly, by purchase or otherwise, any voting securities or direct or indirect rights to acquire any voting securities of the Company or any subsidiary thereof, or of any successor to or person in control of the Company, or any assets of the Company or any subsidiary or division thereof or of any such successor or controlling person; (ii) make, or in any way participate in, directly or indirectly, any "solicitation" of "proxies" (as such terms are used in the rules of the Securities Exchange Commission) to vote, or seek to advise or influence any person or entity with respect to the voting of, any voting securities of the Company; (iii) make any public announcement with respect to, or submit a proposal for, or offer of (with or without conditions) any extraordinary transaction involving the Company or its securities or assets; (iv) form, join or in any way participate in a "group" (as defined in Section 13 (d)(3) of the Securities Exchange Act of 1934, as amended) in connection with any of the foregoing; or (v) request the Company or any of our Representatives, directly or indirectly, to amend or waive any provision of this paragraph. You will promptly advise the Company of any inquiry or proposal made to you with respect to any of the foregoing.

8.  You agree that, for a period of three years from the date of this letter agreement, you will not, directly or indirectly, solicit for employment or hire any employee of the Company with whom you have had contact or who became known to you in connection with your consideration of the Transaction; provided, however, that the foregoing provision will not prevent you from employing any such person who contacts you on his or her own initiative without any direct or indirect solicitation by or encouragement from you.

9.  You agree that all (i) communications regarding the Transaction, (ii) requests for additional information, facility tours or management meetings, and (iii) discussions or questions regarding procedures with respect to the Transaction, will be first submitted or directed to Raymond James and not to the Company. You acknowledge and agree that (a) we and our Representatives are free to conduct the process leading up to a possible Transaction as we and our Representatives, in our sole discretion, determine (including, without limitation, by negotiating with any prospective buyer and entering into a preliminary or definitive agreement without prior notice to you or any other person), (b) we reserve the right, in our sole discretion, to change the procedures relating to our consideration of the Transaction at any time without prior notice to you or any other person, to reject any and all proposals made by you or any of your Representatives with regard to the Transaction, and to terminate discussions and negotiations with you at any time and for any reason, and (c) unless and until a written definitive agreement concerning the Transaction has been executed, neither we nor any of our Representatives will have any liability to you with respect to the Transaction, whether by virtue of this letter agreement, any other written or oral expression with respect to the Transaction or otherwise.

10.  You acknowledge that remedies at law may be inadequate to protect us against any actual or threatened breach of this letter agreement by you or by your Representatives, and,

App. 156

Mark Simendinger
August 26, 2004
Page 4

without prejudice to any other rights and remedies otherwise available to us, you agree to the granting of injunctive relief in our favor without proof of actual damages. In the event of litigation relating to this letter agreement, if a court of competent jurisdiction determines in a final, nonappealable order that this letter agreement has been breached by you or by your Representatives, then you will reimburse the Company for its costs and expenses (including, without limitation, legal fees and expenses) incurred in connection with all such litigation.

11.   You agree that no failure or delay by us in exercising any right, power or privilege hereunder will operate as a waiver thereof, nor will any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

12.   This letter agreement will be governed by and construed in accordance with the laws of the State of Delaware applicable to contracts between residents of that State and executed in and to be performed in that State. The parties agree to the exclusive jurisdiction of federal and state courts in Delaware with respect to any disputes hereunder and, for such purposes, consent to jurisdiction and venue in any such courts.

13.   This letter agreement contains the entire agreement between you and us concerning the confidentiality of the Information, and no modifications of this letter agreement or waiver of the terms and conditions hereof will be binding upon you or us, unless approved in writing by each of you and us.

Please confirm your agreement with the foregoing by signing and returning to the undersigned the duplicate copy of this letter enclosed herewith.

Very truly yours,

DOVER MOTORSPORTS, INC.,

Klaus M. Belohoubek
Senior Vice President – General Counsel

**Accepted and Agreed as of the date first written above:**

KENTUCKY SPEEDWAY, LLC

By: _Mark J. Simendinger_

Name: _MARK F. SIMENDINGER_

Title: _PRESIDENT_

KMB/lal
Simendinger, M/001.doc

_App. 157_

From the Desk of:
### MARK F. SIMENDINGER

8/27/04

Klaus—

As requested. Thanks,

Mark

RECEIVED

AUG 30 2004

LEGAL DEPT.

Kentucky Speedway™

App. 158

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

KENTUCKY SPEEDWAY, LLC          :        CASE  NO:
                                :
                     Plaintiff, :        1:06-mc-00203-KAJ
                                :
          v.                    :
                                :
NATIONAL ASSOCIATION            :
FOR STOCK CAR AUTO              :
RACING, INC., ET AL.,           :
                                :
                    Defendants. :


# EXHIBIT B


Exhibit B to Belohoubek Declaration

App. 159

JUN-24-05 FRI 08:05 AM DOVER

FAX NO.

P. 02

allowing entrance.

**MARTINSVILLE SPEEDWAY** will host Celebration 2005 on July 1. Gates open at 5 p.m. with carnival rides. The free event will include a concert by Domino and Trick Pony. Followed

Michigan.

**ACTION PERFORMANCE COS., INC.** has hired Michael Smith as vice president of mass retail sales. *NS*

**LISA MARIE PRESLEY** will perform a preface concert prior to the July 2 Pepsi 400 at Daytona.

*NASCAR Scene*

# Kentucky Speedway owner still exploring Cup options

**BY JEFF OWENS**
*ASSOCIATE EDITOR*

Kentucky Speedway owner Jerry Carroll said the 18 that the track's ownership group will be in negotiations to buy Dover Motorsports, but that the deal has failed through.

Carroll said he also has spoken to Dover Motorsports' Penske Raceway and the Bruton family, which owns New Hampshire, about buying their tracks. He said Carroll with Bruton in the last year. Carroll had also talked with the Campbell family, which owns the Speedway Corp.

Nothing has come from those discussions as he continues his attempt to land a Nextel Cup date for his facility, located in the Cincinnati area.

Carroll said he has not had discussions with ISC nor Speedway Motorsports Inc., which own most of the tracks where the Nextel Cup Series races.

"We checked with all of them and we made a lot of headway for whatever reason," Carroll said. "We really made what I thought was really good conversations with Dover and spent a lot of time with Dover and with financial people and for some reason the deal sort of slipped away and was put on hold.

"We were trying every way we could because we're so assured of our market here."

The track had more than 70,000 fans for the June 18 Meijer 300 Busch Series race. It has had five consecutive years of strong attendances for its Busch Series events.

"This thing would cost $250 to $300 million to duplicate today," said Carroll, whose group spent approximately $152 million to build a track that opened in 2000. "It's built. It's ready. We could, within three months, get it to the seating (capacity) of Kansas City or Chicago."

NASCAR officials have consistently said they won't add another race weekend to the Midwest, where it feels it has a solid presence. NASCAR Chairman Brian France has said that the only track that would get a date without having to move one from an existing track would be for

New York City.

Carroll suggested that NASCAR give his track the New York City date until that track is built.

"Let us have that date, and when you get ready to go to New York and you build the track, then take the date away from us if we're not performing," Carroll said. "Why waste the date? New York hasn't even started."

He also has toyed with the idea of having a non-sanctioned race with a megaplume on an off weekend.

"You either make it happen or you don't," Carroll said. "I get a sense that we haven't said enough. I think we have been too nice. We've been toeing that line trying not to upset anybody."



*NS*

## This Week's NASCAR Scene Lucky Subscribers

*Sponsored by Jeff Gordon Racing School*

Mail in this form and be automatically entered to win a "Qualifier" session at Jeff Gordon Racing School

These three NASCAR Scene subscribers have been selected as winners of a "Champ Ride" session courtesy of Jeff Gordon Racing School.

Frank Thrift

Ives Boisvert

Thomas F. Pinion

Bedford VA

✉ email this    🖨 print this    📋 reprint or license this

Posted on Tue, Jun. 21, 2005

# Big-time sympathy for Carroll, and state

## SPEEDWAY'S BID TO BRING KENTUCKY INTO MAJOR LEAGUES HITS WALL

**By Mark Story**

**HERALD-LEADER SPORTS COLUMNIST**

RELATED CONTENT



Brian Tietz

Carl Edwards, 60, overtook Greg Biffel in the back stretch for the lead spot early in the 2005 Meijer 300 NASCAR Busch Series race at the Kentucky Speedway in Sparta, Ky. on June 18, 2005.

In some ways, being a sports fan in Kentucky just stinks.

Sure, in some senses, we're lucky.

In the Kentucky Derby, we're home to a genuinely unique sporting event of international scope.

Outside of Notre Dame football, there may be no college athletics program in any sport whose magnitude exceeds University of Kentucky basketball.

From the time of Denny Crum, the University of Louisville has consistently fielded a basketball team worthy of UK's and given our state a sizzling rivalry.

Heck, there are even signs that the U of L of Tom Jurich may give the commonwealth what UK has not provided since the days of Blanton Collier: A consistent winner at a high level of Division I-A football.

But what our state has consistently lacked is someone with the daring and the vision -- and the access to cash -- to get Kentucky a spot in the real big time of American sport:

App. 161

The pros.

(I know the NBA is in bad odor with many, but it's a five-alarm shame that a state with our basketball heritage is not involved in pro basketball at the highest level.)

All of which brings me to **Jerry Carroll** and Kentucky Speedway.

As a rule, I don't expend a lot of sympathy on multi-millionaires, but I find myself feeling sorry for Carroll.

It's been six years now since he and his well-heeled investor group turned a Gallatin County cow pasture into a $150 million-plus motorsports palace with the ultimate goal of bringing a NASCAR Nextel Cup race to the commonwealth.

For once, our state had someone who was willing to dream on an epic scale and even put up private money to make it happen.

In between then and now, Carroll and Co. have promoted the heck out of their Speedway; in a spotty economy, they have attracted corporate sponsors for all their races; have sold out five straight NASCAR Busch Series (think Class Triple-A) events; even installed state-of-the-art SAFER barriers to aid driver safety.

Done, in other words, about everything right that can be done.

Yet, they still seem no nearer the goal of bringing the coveted Cup date to the commonwealth than on that rainy night when Kentucky Speedway opened back in 2000.

"We're sitting here competing our butts off," Carroll said Saturday night, during the early stages of what became a Carl Edwards victory in the Busch Series Meijer 300 Presented by Oreo.

"And we're totally ignored by the powers-that-be at NASCAR. The frustration mounts and mounts and mounts."

So now, Carroll says the time "for trying" to get a Cup race is done; "now is the time for doing," he says.

Yet, he acknowledges there "really aren't that many options" for doing.

One that Carroll mentioned Saturday night was the possibility of running an "independent" race, one outside of NASCAR's purview.

Meaning?

"You're not sanctioned," Carroll said. "You invite the drivers. You put up a purse and

-2-

*App. 162*

get a race."

Problem with that, even if you put up the largest purse in the history of American motorsports, can you imagine Jeff Gordon or Dale Earnhardt Jr. (or for that matter, Ford, Chevrolet or Dodge) risking the wrath of NASCAR to run?

Me neither.

So, this being America, 2005, there's also the possibility of retaining an attorney and going to court.

It was lost on no one in motorsports that Bruton Smith's Texas Motor Speedway only got a second Cup date after a track shareholder filed an anti-trust suit against NASCAR.

(Both the sanctioning body and the International Speedway Corporation, a public company that owns 13 of the 22 racetracks that currently have Cup dates, are controlled by the France family.)

Carroll declined to discuss that subject Saturday.

"I can't go into that; I can't go into that," he said.

It is widely believed that NASCAR has two Cup dates more or less parked that will go to new tracks ISC hopes to build in the New York City and Seattle/Portland, Ore., markets.

"They're saving a date to go to New York; everyone knows that," Carroll said. "And they're saving a date to go to Oregon or Washington.

"Three years ago, we said to NASCAR, 'Hey, you're saving that date. Let us have that date, let us run some Nextel Cup. By the time you get your speedway built, if we're not hitting a grand-slam home run, take it back.'"

That went nowhere, Carroll said.

Two years ago, Bill France Jr. -- patriarch of the France family -- publicly spoke of the possibility of Kentucky Speedway perhaps getting a Cup date from another of the "independent" tracks that already have one.

Carroll said Kentucky Speedway interests subsequently held talks with the respective ownerships of four tracks: **Dover**, Del.; Pocono, Pa.; New Hampshire; and Martinsville, Va., (before the latter track was sold to ISC).

The discussions went the deepest with **Dover**, he said.

-3-

App. 163

"We have visited the tracks and tried to see where we could fit in," Carroll said. "See if we can't, basically, make a deal. That's what I like to do. But nothing materialized."

At least one financial adviser who works in the motorsports sector says he fears no Cup date is likely to ever materialize at Kentucky Speedway.

"You never say never," says Chicago-based Tim Frost. "But it looks very, very difficult. And it's a shame. Because **Jerry Carroll** and his people have done a really good job in so many ways."

Which, as I said, is why I feel sorry for Carroll.

As well as for those of us who, in a pro sports context, would like to see Kentucky go big-time in *something.*

*Reach Mark Story at 859-231-3230, 800-950-6397 (Ext. 3230) or at mstory@herald-leader.com.*

-4-

App. 164

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KENTUCKY SPEEDWAY, LLC | : | CASE NO: |
| | : | |
| Plaintiff, | : | 1:06-mc-00203-KAJ |
| | : | |
| v. | : | |
| | : | |
| NATIONAL ASSOCIATION | : | |
| FOR STOCK CAR AUTO | : | |
| RACING, INC., ET AL., | : | |
| | : | |
| Defendants. | : | |

# EXHIBIT C

Exhibit C to Belohoubek Declaration

App. 165

# **Dover**Motorsports
I N C O R P O R A T E D

writer's direct dial: (302) 475-6756
telecopy: (302) 475-3555
email: kbelohoubek@dovermotorsports.com

*via facsimile (859) 647-4307*
*and Federal Express*

Jerry Carroll
Chairman
Kentucky Speedway, LLC
2216 Dixie Highway, Suite 200
Ft. Mitchell, KY 41017

Re:     *Breach of Confidentiality Agreement*

Dear Mr. Carroll:

I would like to remind you that you and Kentucky Speedway are bound by the terms of a confidentiality agreement dated August 26, 2004.

As is customary with such agreements, the terms of your confidentiality agreement extend to even mentioning the fact that discussions with us took place.

For you to refer to our preliminary discussions as "major" and refer to a "deal" that slipped away is a gross mischaracterization. For you to have such a dialogue with members of the press violates both the spirit and the letter of our agreement. Your comments were extremely damaging to Dover Motorsports and we are now in the position of having to explain your comments to investors, analysts, shareholders and employees.

We entered into a confidentiality agreement for a reason and we expect that you and Kentucky Speedway will honor the terms of that agreement.

Thank you.

Very truly yours,

Klaus M. Belohoubek
Senior Vice President-General Counsel

KMB/lal
Carroll, J/001.doc

phone 302.475.6757    fax 302.475.3555
3505 Silverside Road, Plaza Centre Building, Suite 203
Wilmington, Delaware 19810
dovermotorsportsinc.com

App. 166

| Transmission Report |
|---|

Date/Time       06-24-2005      10:40:21
Local ID 1      30247535555
Local ID 2

Transmit Header Text
Local Name 1        DOVER
Local Name 2

This document : Confirmed
(reduced sample and details below)
Document size : 8.5"x11"

*Confidential*
*Attorney-Client Privileged Communication*

*From:*

**Klaus M. Belohoubek, Esq.**
**Senior Vice President-General Counsel**
Direct Dial:    302-475-6756
Fax:            302-475-3555
Email:          khelohoubek@dovermotorsportsinc.com

Date:       6/24/05

To:         Jerry Carroll

Fax Number:     (859) 647-4307

Number of Pages including Cover Sheet:      2

*Please call Lynda Lee at 302-475-6757 if you have not received the*
*number of pages indicated or if there is any other problem in the*
*transmission of this fax.*

Message: _____
_____
_____
_____

*This message is for the exclusive use of the person to whom it is addressed. Any disclosure,*
*distribution or copying of this message, the attachments, or their contents is prohibited. If this has*
*reached you in error, please notify me immediately. Thank you.*

Total Pages Scanned : 2          Total Pages Confirmed : 2

| No. | Job | Remote Station | Start Time | Duration | Pages | Line | Mode | Job Type | Results |
|---|---|---|---|---|---|---|---|---|---|
| 001 | 658 | 859 647 4307 | 10:39:27 06-24-2005 | 00:00:20 | 2/2 | 1 | EC | HS | CP26400 |

Abbreviations:
HS: Host send
HR: Host receive
WS: Waiting send

PL: Polled local
PR: Polled remote
MS: Mailbox save

MP: Mailbox print
CP: Completed
FA: Fail

TU: Terminated by user
TS: Terminated by system
RP: Report

G3: Group 3
EC: Error Correct

App. 167